UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.    13 CR 515 |
| | ) | Hon.   Rebecca R. Pallmeyer |
| DMITRY FIRTASH, | ) | |
| also known as, "Dmytro Firtash," | ) | |
| and "DF," and | ) | |
| ANDRAS KNOPP | ) | |

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT FIRTASH'S AND KNOPP'S <u>MOTIONS TO DISMISS INDICTMENT</u>

JOEL R. LEVIN
Acting United States Attorney

By:   AMARJEET S. BHACHU
Assistant United States Attorney
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 469-6212

MICHAEL T. DONOVAN
Special Assistant United States Attorney
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604

SANDRA MOSER
Acting Chief, Fraud Section
United States Department of Justice

By:   JONATHAN P. ROBELL
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20530

# TABLE OF CONTENTS

**Page:**

BACKGROUND ......................................................................................................1

SUMMARY OF ARGUMENT ...............................................................................7

ARGUMENT ........................................................................................................16

I.    Defendants' Motions are Not Ripe for Decision as a Matter of International Comity. ...........................................................................................................16

II.   Defendants' Motions to Dismiss for Improper Venue Should Be Denied. ...........21

      A.    Applicable Law.................................................................................21

      B.    Analysis. ...........................................................................................29

            1.    Venue is Proper in this District...........................................29

            2.    The Defendants' Venue Arguments are Meritless. ............31

III.  Defendants' Motions to Dismiss Count One for Failure to State an Offense Should Be Denied.......................................................................................36

      A.    Background concerning the RICO Statute, the United States's Treaty Obligations to Combat Transnational Organized Crime, and the Supreme Court's Decision in *Nabisco*.......................................36

      B.    Count One Sufficiently Alleges the Offense of Racketeering Conspiracy. ......................................................................................44

**Page:**

C.     The Defendants' Challenges to the Sufficiency of Count One are
       Meritless. .............................................................................................46

       1.     Count One Contains Sufficient Allegations that the
              Enterprise Affected Commerce............................................47

       2.     Count One Contains Sufficient Allegations Concerning the
              Predicate Offenses. .............................................................50

              a.     The Allegations in Count One Concerning the Money
                    Laundering Predicate are Sufficient.......................................53

                    (1)     Correspondent Bank Transactions are Within
                           the Scope of the Money Laundering Statute. ............53

                    (2)     There is No Requirement that Firtash
                           Personally Engaged in Illegal Activity in the
                           United States. .................................................................60

              b.     The Allegations in Count One Concerning the Travel
                    Act Predicate are Sufficient. .....................................................66

IV.    Defendants' Motions to Dismiss Counts Two through Four for Failure to
       State an Offense Should Be Denied. .............................................................69

V.     Defendants' Motions to Dismiss Count Five for Failure to State an Offense
       Should Be Denied..............................................................................................70

       A.     When Alleging a Conspiracy to Violate the FCPA, the Government
              is Not Required to Allege that a Conspirator "Committed Bribery"
              within the United States. .................................................................70

              1.     Applicable Law.......................................................................70

              2.     Analysis. .................................................................................74

iii

**Page:**

B.     Defendants Firtash and Knopp Do Not Have to Be "Domestic Concerns" or to Personally Take An Act within the United States in Order to Be Prosecuted for Conspiring to Violate Sections 78dd-2 and 78dd-3 of the FCPA. ...................................................................76

      1.     Applicable Law.....................................................................76

      2.     Analysis. ..............................................................................78

          a.     *Gebardi* Does Not Apply to this Case Because the Defendants Are Neither Victims of, Nor Necessary Parties to, an FCPA Violation. ...................................82

          b.     *Hoskins'* Application of the Narrow Exception in *Gebardi* to the FCPA is Inconsistent with the Supreme Court's More Recent Decision in *Ocasio* and Seventh Circuit Precedent.......................................................90

VI.    Defendants' Motions to Dismiss on Due Process Grounds Should Be Denied................................................................................................93

     A.     The Due Process Clause Does Not Apply to the Defendants. ...................93

     B.     The Defendants' Due Process Arguments are Without Merit. ..................94

      1.     Applicable Law.....................................................................94

      2.     Analysis. ..............................................................................97

          a.     This Prosecution Does Not Offend Due Process Because the Conduct Took Place in Substantial Part in the United States.......................................................97

          b.     This Prosecution Does Not Offend Due Process Because the Conduct Had or Was Intended to Have Substantial Effect within the United States. ..........................98

iv

**Page:**

        c.     This Prosecution Does Not Offend Due Process Because the Conduct Was Directed Against Significant United States Interests. .......................................100

        d.     This Prosecution Does Not Offend Due Process Because it is Reasonable...........................................................106

CONCLUSION ............................................................................................................108

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| v. | ) | No. | 13 CR 515 |
| | ) | Hon. | Rebecca R. Pallmeyer |
| DMITRY FIRTASH, | ) | | |
| also known as, "Dmytro Firtash," | ) | | |
| and "DF," and | ) | | |
| ANDRAS KNOPP | ) | | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANT FIRTASH'S AND KNOPP'S
MOTIONS TO DISMISS INDICTMENT**

The UNITED STATES OF AMERICA, by JOEL R. LEVIN, Acting United States Attorney for the Northern District of Illinois, and SANDRA MOSER, Acting Chief, Fraud Section, United States Department of Justice, hereby respond to defendant Dmitry Firtash's and Andras Knopp's motions to dismiss the indictment (the "Motions"). In support of this response, the government respectfully represents as follows:

## BACKGROUND

*Summary of Alleged Offense Conduct*

The instant prosecution concerns defendants Dmitry Firtash and Andras Knopp, two organized crime members, and their criminal organization's efforts to introduce millions of pounds of illegally obtained goods into the United States. Specifically, beginning no later than in or around 2006, Firtash, Knopp and others planned to bribe Indian public officials in order to receive the necessary approvals for a mining project in India. A substantial amount of the products to be generated from the mining activity—

approximately five to twelve million pounds of titanium sponge on an annual basis—were intended for sale to a company ("Company A") headquartered in Chicago, Illinois. Moreover, in order to carry out this illegal bribery activity, individuals working with Firtash, and under Firtash's direction and control, utilized United States financial institutions to transfer millions of dollars of bribe money to Indian officials, used the communications infrastructure of the United States to direct the ongoing illegal activity, and traveled to, and held meetings within, the United States and elsewhere to advance the illegal activity by, for example, attending meetings in the United States with Company A personnel to negotiate the sale of products to be obtained through the illegal bribery of Indian officials. The conspirators also caused personnel from Company A to commit acts in the United States in aid of the objectives of the conspiracy.

Firtash was a leader of this criminal enterprise. He exercised control over "Group DF," an international conglomerate of companies that were directly and indirectly owned by Group DF Limited, a company organized under the laws of the British Virgin Islands. Beginning in 2006, Firtash oversaw an effort by members of the criminal enterprise to establish a beach sand mining project in the State of Andhra Pradesh, India, for the purpose of mining various minerals, including ilmenite, which can be processed into various titanium-based products such as titanium sponge (the "project"), and caused certain Group DF companies to participate in the project, directly and indirectly. However, certain licenses had to be obtained for the project before the mining could

begin. These licenses required the approval of both the State Government of Andhra Pradesh and the Central Indian Government prior to their issuance.

The members of the criminal enterprise worked together over the course of several years to, among other things, obtain the necessary licenses for the project through the bribery of Indian public officials. In addition to personally meeting with the Chief Minister of the State of Andhra Pradesh, Firtash personally authorized the payment of at least $18.5 million in bribes to officials of both the State Government of Andhra Pradesh and the Central Government of India to secure the approval of licenses for the project. Further, Firtash directed his subordinates to create documentation to make it falsely appear that money transferred for the purpose of paying these bribes was transferred for legitimate commercial purposes.

Other members of the criminal enterprise led by Firtash occupied different roles in the conspiracy. Firtash appointed various subordinates, including his second-in-command, Andras Knopp, to oversee efforts to obtain the necessary licenses through bribery. Knopp, along with Firtash, met with Indian government officials concerning the project. Knopp attended meetings with representatives of Company A (including a meeting here in Chicago) for the purpose of discussing the supply of titanium products to Company A that would be derived from the project. Knopp also supervised and directed the activities of others employed by and associated with the enterprise, including but not limited to defendant Gajendra Lal. Knopp, along with Firtash, was consulted in connection with major decision-making relating to the project, including significant

3

actions taken with respect to the payment of bribes to Indian public officials.

Defendant Suren Gevorgyan, who was employed by a Group DF company, was responsible for, among other things: monitoring the total amount of bribe payments made; signing false documentation to make it appear that money transferred for the purpose of paying bribes was transferred for legitimate commercial purposes; and meeting with employees of Company A in the United States to negotiate the terms of the sale of titanium products to Company A. Additionally, Lal, a United States national who resided at times in North Carolina, and who communicated about and directed bribery activity here in the United States, was responsible for: providing status reports to Firtash and Knopp concerning the progress of bribery activity; seeking authorization to pay additional bribes; making recommendations regarding the payment of certain bribes; causing the preparation of documentation to make it falsely appear that money transferred for the purpose of paying bribes was transferred for legitimate commercial purposes; and coordinating transfers of bribe money. Lal also traveled within the United States on multiple occasions with the intent to promote the unlawful activity, and thereafter committed acts to promote the unlawful activity.

Defendant Periyasamy Sunderalingam performed several roles on behalf of the enterprise. Among them, he met with Indian public official and defendant K.V.P. Ramachandra Rao (commonly known as and referred to herein as "KVP") for the purpose of determining the total amount of bribes to be paid to Indian public officials; and monitored bribe payments. KVP served the criminal enterprise by abusing his position

4

as an official of the State of Andhra Pradesh and close adviser to the Chief Minister of Andhra Pradesh to solicit bribes and by agreeing to accept bribe money, including money for his own benefit, in return for the approval of licenses for the project.

*Indictment, Arrest and Extradition*

On June 20, 2013, a grand jury in this district returned a five-count indictment charging Firtash, Knopp and others with conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity, in violation of Title 18, United States Code, Section 1962(d) (Count One); conspiring to commit money laundering, in violation of Title 18, United States Code, Section 1965(h) (Count Two); interstate travel in aid of racketeering activity, in violation of Title 18, United States Code, Section 1952 (Counts Three and Four); and conspiring to commit an offense against the United States, namely, conspiring to violate the Foreign Corrupt Practices Act, in violation of Title 18, United States Code, Section 371 (Count Five). R. 2. This Court issued warrants for the arrest of both Firtash and Knopp.

On or about March 12, 2014, defendant Firtash was arrested by Austrian law enforcement in Vienna based on the request of the United States. Within days, Firtash was released after posting an all-cash bond of 125,000,000 Euros, the equivalent at the time to approximately 174,000,000 in United States dollars. The conditions of his bond also required Firtash to remain within Austria. Knopp has remained a fugitive since the unsealing of the indictment in this case.

On or about April 1, 2014, the United States, through the United States Department of State, submitted a request for Firtash's extradition to the Republic of Austria. The Vienna Regional Court for Criminal Matters denied the request on or about April 30, 2015. The Austrian government appealed that decision.

On or about February 21, 2017, a three-judge panel of the Vienna Higher Regional Court rejected the lower court's grounds for denying extradition, and ordered Firtash's extradition to the United States. The extradition process in Austria, however, has not ended. Firtash has announced his intention to file an appeal with the Austrian Supreme Court.[1] In addition, on the very day the Vienna Higher Regional Court ordered his extradition to the United States, Firtash was arrested in Austria at the request of Spain. Spain has also sought Firtash's extradition from Austria based on separate charges laid against Firtash in Spain. No decision has been made by the Austrian courts concerning the Spanish extradition request. Furthermore, if the Austrian courts conclude Firtash's extradition to Spain is also appropriate, then it will be up to the Austrian Minister of Justice to determine, after the court proceedings conclude, whether to surrender Firtash to the United States or to Spain.

On or about May 9, 2017—more than three years after his arrest on the instant charges, several weeks after losing the appeal in his extradition case, and while Austrian

---

[1] *See* Shadia Nasralla, *Austrian court backs extradition of Ukraine businessman Firtash to U.S.* (Feb. 21, 2017) (available at http://reut.rs/2lE5h2F ) (noting comments of Firtash's Austrian counsel concerning plans to challenge extradition decision) (copy available upon request).

6

extradition proceedings remain pending—Firtash asked this Court to essentially intervene in the pending extradition proceedings by considering his motion to dismiss the indictment. R. 24.[2]

On or about May 15, 2017—more than three years after he taking up residence in Russia following the arrest of his fellow organized crime associate, and admittedly dissatisfied with Firtash's loss in Austria—Knopp also asked this Court to consider a motion to dismiss the indictment. R. 30.

## SUMMARY OF ARGUMENT

The motions to dismiss are not ripe for decision. Multiple extradition proceedings concerning Firtash are still ongoing in Austria. Firtash intends to appeal the judgment ordering his extradition, and Spain has also sought his extradition. The United States and Austria are parties to an international extradition treaty; it does not contemplate dueling proceedings in Austria and in this Court about whether a defendant should be extradited. Principles of international comity require, under these circumstances, that this Court defer to the Austrian courts until they complete their extradition proceedings. *Casey v. Department of State*, 980 F.2d 1472, 1476 (D.C. Cir. 1992). For this reason, the United States asks the Court to defer ruling on the motions until the conclusion of the extradition proceedings and to strike the oral argument scheduled for August 25, 2017.

---

2      References to the record in this case appear as "R. __." References to Firtash's brief in support of his motion to dismiss the indictment (R. 25) appear as "DF Br. at __." References to Knopp's brief in support of his motion to dismiss the indictment (R. 31) appear as "AK Br. at __."

Even if this Court considers the merits of the defendants' motions to dismiss, they are still entitled to no relief for the reasons set forth below.

The defendants' motion to dismiss for improper venue should be denied. When considering a pretrial motion challenging venue, this Court must view the indictment's factual allegations as true. The allegations in each count that the charged crimes took place "in the Northern District of Illinois, Eastern Division, and elsewhere," are sufficient to establish venue at this stage of the proceedings. Moreover, the allegations of the indictment establish venue is proper because (1) they make clear that the charged crimes were intended to have an effect in Chicago (*i.e.*, the introduction of illegally obtained goods—between five to twelve million pounds of titanium sponge on an annual basis—into the United States through their sale to Company A, which is based in Chicago); and (2) the offenses involved transportation in interstate commerce from this district. 18 U.S.C. § 3237. Finally, with respect to Count Two of the indictment, which charges money laundering conspiracy, venue is also proper pursuant to 18 U.S.C. § 1956(i)(2), because the government's evidence will show that an act in furtherance of the conspiracy took place here.

Firtash's argument that venue is not established because the indictment fails to allege that he personally committed an act within this district is frivolous. The government is not required to set out in any indictment any specific conduct, much less the commission of an overt act by an individual defendant, so long as the charged crime is alleged to have taken place at least in part in this district. Moreover, where the charged

8

crime is conspiracy, it has long been established that venue is proper even if a defendant has never set foot within a district, so long as the government can prove that an overt act took place there. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281-82 (1999); *King v. Brisac*, 4 East 164, 171, 102 Eng. Rep. 792, 795 (K.B. 1803). In any event, the indictment does allege that specific actions were taken within this district to further the illegal activity. Similarly meritless is the defendants' claim that the government must allege the foreseeability of venue. The government is not required to do so; however, the evidence at trial will show that both Firtash and Knopp could foresee venue here: Firtash was personally advised of Knopp's travel to Chicago to meet with Company A concerning the project. In short, the defendants' foreseeability argument is premature now and destined for failure later.

The defendants' motion to dismiss Count One for failure to state an offense should also be denied. Count One charges the defendants with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), a part of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The RICO statute was passed by Congress in order to provide a "new weapon of unprecedented scope for an assault upon organized crime," *Russello v. United States*, 464 U.S. 16, 26 (1983), and Congress specifically directed that its provisions were to be liberally construed for this purpose. Since its enactment, it has been effectively used to prosecute transnational organized crime groups, and the United States has explicitly recognized that the fight against organized crime is not confined to groups that operate domestically by becoming a party

to the United Nations Convention on Transnational Organized Crime. This understanding recently was confirmed by the Supreme Court, which held that the substantive provisions of the RICO statute reach the illegal activities of foreign enterprises, so long as the foreign enterprise engages in a pattern of racketeering activity composed of predicate acts committed domestically, or predicate offenses that, by their own terms, apply extraterritorially. *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016).

Contrary to the defendants' suggestion, rather than a rare case of transnational organized crime that cannot be prosecuted under the RICO statute, Count One presents a textbook example of a transnational criminal enterprise that is properly subject to RICO prosecution. They argue that Count One should be dismissed because it fails to allege that the activities of the enterprise affected commerce. All that is required is that the indictment specifically alleges that the enterprise affected commerce, and the indictment does that. In essence, the defendants argue that the government will not be able to *prove* this allegation. At best, this is a factual argument that must be resolved at trial, rather than through a motion to dismiss. But in reality, it is irrelevant, because the government does not even have to prove that a racketeering act occurred or that there was any actual effect on commerce; racketeering conspiracy charges punish the criminal agreement, not the completed crime. *United States v. Glecier*, 923 F.2d 496, 499-501 (7th Cir. 1991).

10

Similarly meritless are the defendants' challenges to the predicate racketeering acts. As an initial matter, the defendants' argument that Count One fails to allege facts showing domestic violations of the federal money laundering statute and the Travel Act is beside the point because Count One need only allege the agreement to commit *types* of racketeering acts. *Id.* Because the charge need not allege the completion of any act at all, the defendants' claim that the indictment does not allege any completed acts of racketeering they consider to be sufficient fails.

In addition to this threshold problem, the defendants' arguments do not withstand closer scrutiny. First, they argue that the money laundering statute does not apply to financial transactions involving a United States institution acting as a correspondent bank. This argument assumes facts that are not true, that is, that the government's evidence is limited to correspondent bank transactions, and is wrong on the merits in any event. The money laundering statute punishes any financial transaction in furtherance of specified unlawful activity, including efforts to bribe foreign public officials in violation of foreign law, so long as the financial transaction concerned takes place "in part" in the United States. *E.g.*, *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 11-12 (D.D.C. 2008). Second, Firtash argues that, in order for the money laundering offense to qualify as a racketeering act, he must have personally engaged in conduct in the United States. This is wrong too. Congress made efforts to bribe foreign officials a specified unlawful activity, and only required that the transaction take place in part in the United States, without regard to the presence of the defendant.

11

18 U.S.C. § 1956(c)(7). The provision Firtash cites in support of his argument, 18 U.S.C. § 1956(f)(1), actually supports the government's position, because, rather than requiring the personal presence of the defendant within the United States, it requires only that the conduct occur in the United States. Indeed, several cases relied upon by Firtash flatly reject his argument. *See, e.g., United States v. Stein*, No. 93-375, 1994 WL 285020, at *3-4 (E.D. La. 1994).

Contrary to the defendants' suggestion, Count One alleges domestic violations of the Travel Act, and does not raise the issue of extraterritorial application of the statute. The defendants complain that travel and activity here in the United States were related to criminal activity conducted by a "foreign operation in foreign jurisdictions." This complaint accomplishes no more than registering disagreement with the Supreme Court's holding in *Nabisco*, which provides that "if the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." 136 S. Ct. at 2101. An enterprise cannot escape the broad reach of the RICO statute intended by Congress merely because the enterprise conducts illegal operations in multiple countries. Indeed, the United States' treaty obligations commit it to prosecute transnational organized crime which is, *by definition*, committed in more than one country.

The defendants' motions to dismiss Counts Two through Four, which charge violations of the money laundering statute and the Travel Act, are premised on the same flawed arguments, and should be denied as well.

The defendants' motion to dismiss Count Five is similarly meritless. Count Five charges the defendants under Title 18, United States Code, Section 371, with conspiring to violate Title 15, United States Code, Sections 78dd-2 and 78dd-3, two sections of the Foreign Corrupt Practices Act (the "FCPA"). An indictment charging a Section 371 conspiracy need only plead the elements of Section 371, and Count Five easily meets this requirement. The defendants claim that Count Five must allege that a conspirator "committed bribery" within the United States, but the commission of an act of bribery within the United States is not a required element of a substantive offense under Sections 78dd-2 and 78dd-3, and Count Five charges a conspiracy in any event, so it is unnecessary to allege the completion of the crime. *United States v. Feola*, 420 U.S. 671, 694 (1975).

The defendants also complain that since they personally are not "domestic concerns" (that is, United States nationals), or did not personally take action within the United States, they cannot be prosecuted for entering into a conspiracy to violate Sections 78dd-2 (which applies to "domestic concerns") and Sections 78dd-3 (which applies to foreign nationals that act within the United States). But the Supreme Court has recently reaffirmed the general rule that a person may be liable for conspiracy even though he is incapable of committing the substantive offense himself; it is sufficient that he agree that the underlying crime be committed by a member of the conspiracy who is capable of committing it. *Ocasio v. United States*, 136 S. Ct. 1423 (2016). Contrary to the defendants' contention, they do not fall within a narrow exception to this general rule created by *Gebardi v. United States*, 287 U.S. 112 (1932); that exception applies in unusual

13

circumstances not applicable here, where Congress has deliberately exempted either victims of, or necessary parties to, the crime from liability. The language and legislative history of the FCPA make clear that Congress intended for the FCPA to be far-reaching, and for ordinary principles of conspiratorial and accessory liability to apply. Adopting the interpretation urged by the defendants would also risk putting the United States in violation of its international legal obligations, which require that the United States enact criminal legislation broadly punishing any person's involvement in criminal efforts to bribe foreign officials. *United States v. Kay*, 359 F.3d 738, 755 n.68 (5th Cir. 2004).

The defendants' claim that that all the charges should be dismissed because their prosecution in this district violates the Fifth Amendment's Due Process Clause lacks any merit. To begin with, the defendants cannot invoke the Due Process Clause because neither has appeared here to answer the charges, and its protection does not extend to aliens outside the boundaries of the United States. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990). In any event, their criminal conduct took place in substantial part in the United States. The criminal enterprise conducted extensive operations within this country: Enterprise members used U.S. financial institutions to funnel millions of dollars of bribes to officials; used the communications infrastructure of the United States to direct the illegal bribery activity; and traveled and held meetings within the United States to advance their illegal activities. The conspirators also caused personnel from Company A to take acts within the United States in aid of the unlawful activity. Moreover, the illegal conduct was intended to have a substantial effect in the United

States. Not only was one of the defendants' principal aims to introduce five to twelve million pounds of illegally obtained titanium sponge annually into the United States market, but in order to advance the project, conspirators took multiple acts affecting commerce. Nothing more is required. *United States v. Leija-Sanchez*, 602 F.3d 797, 801 (7th Cir. 2010). Firtash once again complains that he did not set foot in the United States. But the law is clear: If a criminal enterprise is carried out in part within the United States, all of the participants, including foreigners whose activities were entirely outside the United States, may be prosecuted. *Ford v. United States*, 273 U.S. 593, 622-24 (1927).

Finally, this case involves significant interests of the United States, thus making prosecution here reasonable under the Due Process Clause. Indeed, this prosecution vindicates United States interests of the highest order. Congress has found that organized crime activities within the United States "threaten the domestic security, and undermine the general welfare of the Nation and its citizens." Pub. L. 91-452, § 1. This prosecution targets an effort by a criminal enterprise to infiltrate the United States commercial sector. Moreover, Firtash and Knopp have been identified by United States law enforcement as two upper-echelon associates of Russian organized crime; their prosecution will disrupt this organized crime group and prevent it from taking further criminal acts within the United States. This prosecution therefore seeks to protect this country, its commerce and its citizens from the corrupting influence and withering effects of international organized crime. Moreover, this prosecution also takes aim at the corruption of foreign public officials, a concern that the Congress has identified as a threat

15

to global security. The decisions of Congress and the Executive Branch to pass and enforce a series of laws and enter into a network of international agreements to combat transnational organized crime and foreign corruption must be given great deference by the judiciary when answering the question of where the interests of the United States lie. *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Consistent with the international framework which Congress and the Executive Branch have chosen to join, this investigation and prosecution has been marked by extensive cooperation with other countries that are also committed to the fight against transnational organized crime and corruption. The efforts of two members of organized crime to derail this prosecution and avoid accountability for their actions on the most tenuous of grounds should be rejected.

## ARGUMENT

### I. Defendants' Motions are Not Ripe for Decision as a Matter of International Comity.

Firtash's motion to dismiss is not ripe for decision. The United States and Austria are parties to a treaty governing Firtash's extradition.[3] The treaty provides for an orderly process by which extradition requests can be considered and disposed of by each party. At the request of the United States, Austria has devoted considerable resources

---

3    *See* Extradition Treaty between the United States of America and the Government of the Republic of Austria, U.S.-Austria, Jan. 8, 1998, S. Treaty Doc. No. 105-50 (1998), and Protocol to the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Austria signed 8 January 1998, U.S.-Austria, July 20, 2005, S. Treaty Doc. No. 109-14 (2006).

16

over the past three years to consider and resolve the extradition request made by this country. The treaty does not contemplate simultaneous, dueling proceedings in both jurisdictions concerning whether the defendant should be extradited to the United States to answer the charges. Comity, in the international sense, is defined as courtesy demonstrated between nations involving the mutual recognition of legislative, executive, and judicial acts. Black's Law Dictionary 267 (6th ed. 1999). As a matter of international comity, as well as in deference to the orderly process established by the treaty, which represents an international legal obligation of the United States, this Court should decline to rule on Firtash's motion to dismiss until the proceedings in Austria have concluded and he appears here—particularly since his motion was filed after the Austrian appellate court ordered his extradition to the United States. *Casey v. Department of State*, 980 F.2d 1472, 1476 (D.C. Cir. 1992) ("[A]n American court must give great deference to the determination of the foreign court in an extradition proceeding. This deference is necessary to further international comity—a goal the Supreme Court has emphasized in a variety of contexts."). *See also United States v. Garavito-Garcia*, 827 F.3d 242, 247 (2d Cir. 2016) (noting that it would not promote international comity "to request a grant of extradition and then, after extradition is granted, have the requesting nation take the stance that the extraditing nation was wrong to grant the request") (citations omitted).

Indeed, taking up Firtash's motion now not only will disrupt the orderly process contemplated by the treaty and contravene principles of international comity, but it may

17

also have the unintended effect of interrupting or delaying the extradition proceedings in Austria. Any comments, statements or observations made by this Court (even at the oral argument currently scheduled for August 25, 2017) could be misunderstood by the Austrian courts.[4] *See Casey*, 980 F.2d at 1476 (noting it was inappropriate for district court to adjudicate matter relating to U.S. extradition request that was still pending in foreign court; the "district court decision may actually further cloud the Costa Rican proceedings . . . the Costa Rican Supreme Court could well be uncertain as to what weight to give the district court's opinion"). This Court should therefore abstain from ruling on Firtash's motion until proceedings in Austria conclude and he is extradited to the United States. For these reasons, the government also respectfully requests that the Court strike the oral argument scheduled for August 25, 2017 as well.

Furthermore, although the Vienna Higher Regional Court has ordered extradition, Firtash has indicated that he intends to appeal this decision. That appeal has not been resolved. There is also the question of the competing extradition request to Austria made by Spain, which also remains unresolved. Add to all this the need of the Austrian Minister of Justice to decide which extradition request (the United States or Spanish request) will be given precedence if both extradition requests are granted by the Austrian courts. Given this fluid situation, now is not the time for this Court to take up

---

4 Because the United States is not a party to the extradition proceedings in Austria, and owing to the challenges surrounding the extradition process, the United States will not receive a copy of any filings made by Firtash, and may not have an adequate opportunity to correct any misunderstanding that may arise in the Austrian courts about the nature of the proceedings before this Court and this Court's views.

18

Firtash's motion to dismiss. Rather, it should await resolution of the multiple extradition proceedings ongoing in Austria.

The same reasoning applies to Knopp's motion to dismiss, filed within a few days of Firtash's, and which largely parrots Firtash's motion. Although Knopp knows he has been wanted by United States law enforcement for more than three years, he freely concedes that he has been content to reside in Moscow. AK Br. at 1. He also provides the Court with the reason for breaking his silence: his dissatisfaction with the Vienna Higher Regional Court's decision ordering Firtash's extradition on February 21, 2017. *Id.* ("with the decision having been made on February 21, 2017, he can no longer refrain from addressing this injustice"). In other words, Knopp only now seeks relief from this Court (a mere six days after Firtash) because of the extradition decision made by the Austrian court. As discussed above, this is an improper basis upon which to invoke this Court's authority, and any such challenge must wait until after the conclusion of the extradition proceedings in Austria.

Defendant Knopp points to the Seventh Circuit's decision in *In re Hijazi*, 589 F.3d 401 (7th Cir. 2009), and argues that *Hijazi* requires the Court to consider his motion now. AK Br. at 8-9. Not so. In *Hijazi*, the Seventh Circuit held, under the "unusual" facts of that case which are not present here, that the district court was required to consider a motion to dismiss an indictment by a foreign defendant located in Kuwait who had not appeared in federal court. *Id.* at 403. What made that case unusual was that the United States did not have an extradition treaty with Kuwait, and Kuwait refused to turn the

defendant over to the United States—indeed, Kuwait went so far as to ask the United States to abandon its efforts to prosecute Hijazi. *Id.* at 403, 405. The defendant's home was in Lebanon, and therefore he was left in limbo, stuck in a country that had decided it would not extradite him, and potentially unable to return to his home state without being arrested. *Id.* at 403, 407.

Neither defendant in this case finds himself in Hijazi's predicament. Firtash has already been arrested at the request of the United States; he has been released on bond, and a condition of his bond prevents him from leaving Austria. The Vienna Higher Regional Court has ordered Firtash's extradition, but the extradition process in Austria is not yet complete because Firtash has chosen to challenge that order and because of the potential need of the Austrian Minister of Justice to determine which of two separate extradition requests he will honor if both are granted by the Austrian courts. So Firtash is not in limbo. And neither is Knopp. As noted above, he tells the Court the reason he filed his "me too" motion six days after Firtash (and more than three years after the United States obtained a warrant for his arrest) is that Firtash lost his appeal in Austria several weeks prior; and he also tells the Court that he "is currently living and working in Moscow," and also has a "permanent address there and has recently acquired a residency permit." AK Br. at 7. Apparently the only inconvenience Knopp suffers is that he feels that he is not able to travel at his whim to other countries. *Id.* at 11. Because there is an extradition proceeding at work in Austria, this Court should adhere to

principles of international comity and decline to rule on the motions to dismiss at this time.[5]

Accordingly, the government respectfully requests that the Court enter an order (i) denying the Motions without prejudice to the defendants' right to present them after the Austrian extradition proceedings have concluded, and (ii) striking oral argument on the Motions to avoid interference in or disruption of the extradition proceedings in Austria.

## II. Defendants' Motions to Dismiss for Improper Venue Should Be Denied.

Defendants Firtash and Knopp ask this Court to dismiss the indictment on the grounds that venue is improper in this district. The motions should be denied because, as discussed below, there are multiple grounds supporting venue here.

### A. Applicable Law.

The Constitution provides that the trial of all crimes "shall be held in the State where the said Crimes shall have been committed; but when not committed within any

---

[5] The government preserves for further review the argument that the doctrine of mutuality also counsels against considering the motions to dismiss at this time. The doctrine of mutuality is based on the concept that, if a court rules, each party should be bound by the court's decision. In this case, in the event of an adverse ruling, neither Firtash or Knopp will be bound by the court's decision and they will not abide by it. The Seventh Circuit in *Hijazi* declined to adopt the concept of mutuality, and was satisfied with the possibility that some other third party might take into account the district court's ruling, if it turned out to be adverse to the defendant. 589 F.3d at 413. The Eleventh Circuit has rejected the argument that a defendant may simply refuse to show up in federal court and challenge an indictment from a safe distance; a defendant that wishes to challenge his indictment "has an adequate remedy: appearance in the district court." *See United States v. Shalhoub*, 855 F.3d 1255, 1264-65 (11th Cir. 2017) (rejecting holding of *Hijazi*).

State, the Trial shall be at such Place or Places as the Congress may by Law have directed." U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment further provides that the defendant is entitled to trial "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ."

Consistent with this grant of authority to Congress, as early as 1867, Congress provided that, in cases involving a criminal offense "begun in one judicial district of the United States and completed in another," the prosecution for such an offense might be brought "in either of the said districts, in the same manner as if it had been actually and wholly committed therein." Act of Mar. 2, 1867, ch. 169, § 30, 14 Stat. 484. Today this general rule is embodied in 18 U.S.C. 3237(a), which provides that, except as otherwise provided by Congress, "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued or completed." Accordingly, for crimes that occur in more than one district, "venue is constitutionally and statutorily proper in any district in which part of the crime was committed." *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir. 2000) (citing 18 U.S.C. § 3237(a)); *United States v. Tingle*, 183 F.3d 719, 726 (7th Cir. 1999)).

In cases charging conspiracy, venue is proper in any place where an act in furtherance of the conspiracy took place. *Ochoa*, 229 F.3d at 636 (citing *United States v. Rodriguez*, 67 F.3d 1312, 1318 (7th Cir. 1995) and quoting *United States v. Molt*, 772 F.2d

366, 369 (7th Cir. 1985) ("As long as one overt act in furtherance of the conspiracy is committed in a district, venue is proper there.")); *United States v. Mayo*, 721 F.2d 1084, 1089-91 (7th Cir. 1983). This rule applies even where there is "no evidence that the defendant had entered that district or that the conspiracy was formed there." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281-82 (1999) (citing *Hyde v. United States*, 225 U.S. 347, 356-57 (1912)). *Accord Ochoa*, 229 F.3d at 636-37.

This broad rule governing venue in conspiracy cases has been in place for more than two hundred years, and was in place before the framing of the Constitution. *King v. Brisac*, 4 East 164, 171, 102 Eng. Rep. 792, 795 (K.B. 1803). In *Brisac*, the facts at trial showed that the charged conspiracy was hatched on the high seas, but that the conspirators caused false vouchers to presented in Middlesex County, England. *Id.* at 170-71; 102 Eng. Rep. at 795. Despite this, the Court of King's Bench, citing an earlier case from 1787, announced that venue was properly laid in Middlesex County, because there was no reason why "the crime of conspiracy . . . may not be tried wherever one distinct overt act of conspiracy is in fact committed," even if "the individual actings of some of the conspirators were wholly confined to other counties," or in this case, the high seas. *Id.* at 171-72; 102 Eng. Rep. at 795-96. *See also* John Frederick Archbold, Summary of the Law Relative to Pleading and Evidence in Criminal Cases 5 (London 1822) ("In indictments for conspiracies, the venue may be laid in any county in which it can be proved that an act was done by any one of the conspirators in furtherance of their common design.").

The holding of *Brisac* was adopted by both the State and federal courts here in the United States after the ratification of the Constitution. *See, e.g.*, *Hyde*, 225 U.S. at 365 (quoting *Robinson v. United States*, 172 F. 105, 108 (8th Cir. 1909) (quoting *People v. Mather*, 4 Wend. 229, 259 (N.Y. 1830) (citing *Brisac*, 4 East 164))). For example, in *Hyde v. United States*, the defendants were convicted of conspiracy to defraud the United States out of public lands located in Oregon and California. 225 U.S. at 349-51. The prosecution was brought in the District of Columbia, based on a co-conspirator's performance in that district of overt acts in furtherance of the conspiracy. Although it was not alleged either that the defendants had entered the District of Columbia or that the conspiracy had been formed there, the Court held that venue in that district was proper, based on the performance of overt acts there by the defendants' co-conspirator. *Id.* at 356-67. The Supreme Court explained the rationale for this holding as follows:

> It is not an oppression in the law to accept the place where an unlawful purpose is attempted to be executed as the place of its punishment, and rather conspirators be taken from their homes than the victims and witnesses of the conspiracy be taken from theirs. We must not, in too great a solicitude for the criminal, give him a kind of immunity from punishment because of the difficulty in convicting him—indeed, of even detecting him. And this may result, if the rule contended for be adopted. Let him meet with his fellows in secret, and he will try to do so; let the place be concealed, as it can be, and he and they may execute their crime in every state in the Union and defeat punishment in all. . . . The possibility of such a result repels the contention and demonstrates that to yield to it would carry technical rules and rigidity of reasoning too far for the practical administration of criminal justice. We see no reason why a constructive presence should not be assigned to conspirators as well as to other criminals; and we certainly

24

> cannot assent to the proposition that it is not competent for
> Congress to define what shall constitute the offense of
> conspiracy or when it shall be considered complete, and do
> with it as with other crimes which are commenced in one place
> and continued in another.

*Hyde*, 225 U.S. at 363-64. *Accord Mayo*, 721 F.2d at 1091 ("Thus, our decision promotes

the practical administration of criminal justice in conspiracy cases under 21 U.S.C. § 846

without violating either Fed. R. Crim. P. 18 or the Sixth Amendment since in our view,

each time conspirators commit an overt act in furtherance of the conspiracy, they renew

or continue their conspiratorial agreement.") (citing *Hyde*). *See also United States v.

Lombardo*, 241 U.S. 73, 77 (1916) ("Undoubtedly where a crime consists of distinct parts

which have different localities the whole may be tried where any part can be proved to

have been done."). Thus, when a defendant's criminal acts are performed in concert with

other wrongdoers, the defendant is subject to prosecution in any district where one overt

act was carried out by his confederates, whether or not he was present in that district.

In addition to the grounds for venue discussed above, there are other means by

which venue can be established. For example, venue lies where the effects of a crime are

felt. *United States v. Lewis*, 797 F.2d 358, 366-67 (7th Cir. 1986).[6] Specifically, in *Lewis*,

the Seventh Circuit considered where venue was proper for a case involving the Hobbs

Act, Title 18, United States Code, Section 1951, which prohibits extortion and robbery

---

[6]     *Accord United States v. Bowens*, 224 F.3d 302, 312-13 (4th Cir. 2000) ("Congress may,
consistent with the venue clauses of Article III and the Sixth Amendment, define the
essential conduct elements of a criminal offense in terms of their effects, thus providing
venue where those effects are felt.") (citing *Lewis*); *United States v. Davis*, 689 F.3d 179,
186-87 (2d Cir. 2012) (same) (citing *Bowens*).

that "in any way . . . affects commerce." *Id.* The Court of Appeals explained that it had "long held that venue for a Hobbs Act prosecution lies in any district where the requisite effect on commerce is present, even if the acts of extortion occur outside the jurisdiction." *Id. See also United States v. Muhammad*, 502 F.3d 646, 655 (7th Cir. 2007) (citing *United States v. Frederick*, 835 F.2d 1211, 1215 (7th Cir. 1987) (noting, in the context of a conspiracy charge, that "[p]roper venue is not limited to districts where the defendants were physically present when they committed unlawful acts. So long as an overt act in furtherance of the conspiracy is intended to have an effect in the district where the case is finally brought, venue is proper.")); *United States v. Craig*, 573 F.2d 513, 517 (7th Cir. 1978) ("Because the extortion affected commerce in Chicago, the District Court for the Northern District of Illinois was empowered to entertain that charge, regardless of the fact that defendants may have been prosecuted in another district under venue principles pertaining to conspiracy.").

Congress has provided other statutory grounds for establishing venue. For example, the money laundering statute, Title 18, United States Code, Section 1956, contains its own venue provision. Consistent with the principles discussed above concerning venue in conspiracy cases, it provides that a conspiracy to violate the substantive provisions of Section 1956 may be brought in any district where an act in furtherance of the conspiracy took place. 18 U.S.C. § 1956(i)(2). As another example, venue may be established based on the transit of a thing or person in interstate commerce

26

from, through or to a district.  Specifically, Title 18, United States Code, Section 3237 provides in pertinent part that:

> Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

*See also United States v. Johnson*, 323 U.S. 273, 275 (1944) (consistent with the Constitution, "an illegal use of the mails or of other instruments of commerce may subject the user to prosecution in the district where he sent the goods, or in the district of their arrival, or in any intervening district").

Rule 12 of the Federal Rules of Criminal Procedure provides that a defendant may make a motion to dismiss for improper venue prior to trial, but such a motion may only be granted if "the motion can be determined without a trial on the merits."  Fed. R. Crim. P. 12(b)(3).  For this reason, a district court may not look beyond the allegations of an indictment to grant a motion for improper venue.  *United States v. Clark*, 728 F.3d 622, 623 (7th Cir. 2013) ("we accept these factual allegations as true in assessing a pre-trial motion to dismiss an indictment for improper venue") (citing *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012)); *United States v. Bohle*, 445 F.2d 54, 59 (7th Cir. 1971) ("An indictment alleges proper venue when it alleges facts which, if proven, would sustain venue.").  *Accord United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010); *United States v. Mendoza*, 108 F.3d 1155, 1156 (9th Cir. 1997) ("only the indictment may be considered

in pretrial motions to dismiss for lack of venue, and . . . the allegations must be taken as true"); *United States v. Marra*, 481 F.2d 1196, 1199-1200 (6th Cir. 1973) ("A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence . . . . The Court should not consider evidence not appearing on the face of the indictment."). Where, for example, an indictment brought in the Eastern District of Virginia alleges that the charged crime took place "in the Eastern District of Virginia and elsewhere," a pretrial improper venue motion must be denied. *Engle*, 676 F.3d at 415-16. *See also United States v. Ringer*, 300 F.3d 788, 790 (7th Cir. 2002) (where indictment alleged that crime occurred "in the Southern District of Indiana and elsewhere," it was not apparent on the face of the indictment that venue was improper in the Southern District of Indiana).[7]

---

[7]     *See also United States v. Nicolo*, 523 F. Supp. 2d 303, 320 (W.D.N.Y. 2007) ("the Government's burden is satisfied with regard to pleading venue by alleging that criminal conduct occurred within the venue, even if phrased broadly and without specific address or other information") (quotations and citations omitted); *United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006) (court denied pretrial motion to dismiss on venue grounds where indictment alleged offenses occurred "in the Southern District of New York and elsewhere"); *United States v. Bellomo*, 263 F. Supp. 2d 561, 579-80 (E.D.N.Y. 2003) ("the indictment, alleging on its face that the offenses occurred 'within the Eastern District of New York and elsewhere,' suffice[d] to sustain it against this pretrial attack on venue"); *United States v. Ayeki*, 289 F. Supp. 2d 183, 188 (D. Conn. 2003) (stating that "[s]ince the indictment, on its face, properly alleges venue in the District of Connecticut, there is no basis at this stage for moving for dismissal because of improper venue," but that "[i]f the government has failed to meet its burden of establishing venue at trial, Ayeki may move for a judgment of acquittal under Fed. R. Crim. P. 29 at the conclusion of the government's case").

B.  Analysis.

1.  Venue is Proper in this District.

Venue is proper in this district as to all counts of the indictment.  Each count in the indictment alleges that the crime charged took place in the "Northern District of Illinois, Eastern Division, and elsewhere." See. R. 2 at 10, 20, 22-23, 25.  That is sufficient to establish venue at this stage.  *Engle*, 676 F.3d at 415-16; *Ringer*, 300 F.3d at 790; *Nicolo*, 523 F. Supp. 2d at 320; *Stein*, 429 F. Supp. at 643; *Bellomo*, 263 F. Supp. 2d at 579-80; *Ayeki*, 289 F. Supp. 2d at 188.  Of course, it remains for the government to prove at trial that this is in fact true; the government, however, need not prove its case prior to trial.  The defendants will have an opportunity to challenge venue at trial.

Venue is proper in this district for other reasons as well.  First, venue is proper here because the crimes were intended to have an effect in this district.  *Muhammad*, 502 F.3d at 655; *Frederick*, 835 F.2d at 1215.  Count One alleges that Firtash was the leader of an association-in-fact racketeering enterprise, and that the purpose of the enterprise was to generate revenue through illegal activity.  *See* R. 2 at 5-6.  That illegal activity included bribing public officials in India in order to get the necessary approvals for a mining project, a project which would in turn generate revenues from the sale of between five to twelve million pounds of titanium sponge on an annual basis to Company A, based here in Chicago.  *See id.* at 2 ("Company A was a Delaware corporation that maintained its corporate headquarters and principal executive offices in Chicago, Illinois.  Company A was a purchaser of titanium products"), 3 (noting entry into agreement with Company

29

A, which specified parties would work towards supply agreement of five to twelve million pounds of titanium sponge annually to Company A, to be derived from the project), 5-6 (noting illegal activities of enterprise included bribing public officials in order to obtain approval for project that would generate "more than $500 million in revenues per year, including revenues generated from the sale of titanium products to Company A").[8] By the same token, Counts Two, Three and Four allege racketeering acts undertaken as part of the racketeering conspiracy, R. 2 at 20-23,[9] while Count Five alleges a conspiracy to violate of the Foreign Corrupt Practices Act in connection with efforts to obtain the necessary approvals to conduct mining operations in India, a prerequisite to the sales of the illegally obtained product to Company A. *Id.* at 6, 25-26. The intended purpose of all this criminal activity was to introduce illegally obtained goods into the domestic market through their sale to Company A, a company based here in Chicago. Because the indictment alleges crimes intended to have effects on commerce in this district, venue is proper.

---

[8]    Indeed, an element of the offense charged in Count One requires the government to prove that the activities of the criminal enterprise "would affect interstate commerce." Seventh Circuit Pattern Federal Jury Instructions (Criminal) at 658 (18 U.S.C. § 1962(d) Racketeering Conspiracy—Elements). The indictment thus sufficiently alleges that the activities of the enterprise would affect commerce through the sale of titanium product derived from a project in India to a Chicago-based company. *Frederick*, 835 F.2d at 1215 (venue proper if conspiracy is intended to have an effect in the district where the case is finally brought).

[9]    The pattern of racketeering activity alleged in Count One includes predicate offenses indictable under 18 U.S.C. §§ 1952 and 1956. R. 2 at 10-11.

Venue is also proper under 18 U.S.C. § 3237. Each offense involves transportation in interstate commerce from this district. Indeed, Count One, as well as the Travel Act violations that are charged in Counts Three and Four, and the conspiracy charged in Count Five, specifically allege transportation in interstate commerce from this district to another. See R. 2 at 17-18 (Lal's travels from Chicago), 22-23 (same), 27 (incorporating Lal's travels from Chicago). The motion can therefore be denied for the additional reason that, pursuant to Title 18, United States Code, Section 3237, venue is proper in this district because the charges involve transportation in interstate commerce originating in this district. *Accord Johnson*, 323 U.S. at 275.

Finally, with respect to Count Two of the indictment, which charges money laundering conspiracy, venue is proper pursuant to 18 U.S.C. § 1956(i)(2), which permits venue where an act in furtherance of the money laundering conspiracy takes place.

### 2. The Defendants' Venue Arguments are Meritless.

The defendants argue that venue is improper in this district, but all of their arguments are meritless. First, Firtash argues venue is improper here because the indictment does not allege that he personally committed an act within this district. DF Br. at 6.[10] This argument is frivolous. To begin with, as noted above, the government is not required to set out specific acts concerning any particular defendant's conduct in the

---

10    This argument is not available to Knopp, because the government's evidence will show he personally took acts in this district.

31

indictment, so long as the charges allege that the crime took place at least in part in this district. *Engle*, 676 F.3d at 415-16; *Ringer*, 300 F.3d at 790; *Nicolo*, 523 F. Supp. 2d at 320; *Stein*, 429 F. Supp. at 643; *Bellomo*, 263 F. Supp. 2d at 579-80; *Ayeki*, 289 F. Supp. 2d at 188.[11] Moreover, as discussed earlier, Firtash's claim—that he personally had to take acts in the district for venue to be proper—has been a losing argument for more than two hundred years: venue is proper even if a defendant has never set foot within this district, so long as the government is able to prove one overt act took place in the district. *Rodriguez-Moreno*, 526 U.S. at 281-82; *Hyde*, 225 U.S. at 356-57, 363-64; *Ochoa*, 229 F.3d at 636 *Molt*, 772 F.2d at 369; *Mayo*, 721 F.2d at 1089-91; *Brisac*, 4 East at 171-72; 102 Eng. Rep. at 795-96. *See also* 18 U.S.C. § 1956(i)(2).

Furthermore, although it is unnecessary, as a matter of law, to allege specific acts taken in this district to support venue here, the indictment does just that.[12] Count One

---

11   *See also United States v. Tello*, 687 F.3d 785, 795-96 (7th Cir. 2012) (racketeering conspiracy indictment need not specify any overt acts taken in furtherance of conspiracy, because racketeering conspiracy charge does not require proof of any overt act).

12   Of course, it is well established that, at trial, "'[t]he Government is not restricted to the overt acts charged in the indictment in justifying its choice' of venue." *United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016) (quoting *United States v. Schwartz*, 535 F.2d 160, 165 (2d Cir. 1976)). The allegations in the indictment are not the entirety of the government's evidence concerning acts taken in this district. By way of example only, the government's proof at trial will include: (i) proof of Knopp's interstate travel to this district for the purpose of taking acts in furtherance of the illegal activity, as well as acts taken by defendant Knopp within this district; and (ii) additional actions taken by Company A in aid of the conspirators, which acts were caused by members of the conspiracy. *See United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) (overt acts in furtherance of conspiracy include acts that conspirators cause others to take that materially further ends of conspiracy). These facts merely reinforce the corollary that, where a challenge to venue is made prior to trial, it is a facial challenge only. Indeed, many of the cases Firtash cites in support of his motion are challenges to venue that were made after the government had

alleges that conspirators traveled in interstate and foreign commerce with the intent to promote the unlawful activity, and further specifies that co-defendant Gajendra Lal traveled from Chicago to Greensboro, North Carolina on two occasions with the intent to promote the unlawful activities of the racketeering conspiracy, and upon reaching his destination in North Carolina, took additional acts in aid of the conspiracy. R. 2 at 16-18, 22-23. An overt act sufficient to support a conspiracy charge can be any act, legal or illegal, that advances the conspiracy. *United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016) (citing *United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011)). It can include the act of boarding a plane in a district for the purpose of thereafter furthering the conspiracy. *Id. See also Tzolov*, 642 F.3d at 319-21 (venue may be laid in any district through which a conspirator passed in order to commit the underlying offense) (collecting cases). Lal's travel from this district as alleged in Counts One, Three and Four of the indictment are therefore specific overt acts that demonstrate venue is proper in this district.

In addition, Count One also specifies that one or more of the conspirators used and caused the use of cellular telephones, including a "cellular telephone located in Chicago, Illinois" to promote the unlawful activity and to discuss and direct future activity. R. 2. at 19.[13] It is well established that the use of a telephone within a district to further a crime

---

presented its proof and the defendant had been convicted, not challenges that occurred prior to trial. *See* DF Br. at 6.

13    Firtash also complains that the indictment does not specify that a cellular telephone was used in this district to further the conspiracy. DF Br. at 7. This is inaccurate. Count One

is a sufficient overt act to establish venue. *United States v. Spiro*, 385 F.2d 210, 211-12 (7th Cir. 1967); *United States v. Brown*, 739 F.2d 1136, 1148 (7th Cir. 1984). *See also United States v. Gonzalez*, 683 F.3d 1221, 1225-26 (9th Cir. 2012) (use of telephone within district suffices to provide venue for conspiracy charge); *United States v. Crippen*, 627 F.3d 1056, 1065 (8th Cir. 2010) ("telephone conversations in which plans and arrangements are made in furtherance of the conspiracy are overt acts") (citation and quotations omitted); *United States v. Rommy*, 506 F.3d 108, 120-22 (2d Cir. 2007) (noting it is "beyond question" that telephone calls can constitute overt acts in furtherance of conspiracy, where conspirator uses call to further conspiracy).

Second, although the defendants recognize that venue may also be proper in instances where the crime is intended to have an effect in this district, they argue that the indictment fails to allege any intended effect in this district. DF Br. at 6. However, as discussed earlier, this argument is clearly refuted by the allegations in the indictment itself. The indictment alleges that the bribery of public officials was planned so that the enterprise could obtain the necessary approvals for the project and then introduce illegally obtained titanium products into the domestic market through their sale to Company A, a company based in this district. Quite obviously, the effects of the criminal activity were intended to be felt in this district.

---

of the indictment plainly alleges that "one or more conspirators used and caused the use of cellular telephones, including . . . a cellular telephone located in Chicago, Illinois . . . with intent to promote . . . money laundering . . . including but not limited to communicating the status of the conspirators' activities and discussing and directing future activity." R. 2 at 19.

Third, the defendants complain that the indictment does not allege that venue in this district was foreseeable to them. DF Br. at 7. There is, of course, no requirement that the government allege foreseeability of venue in the indictment, and the defendants do not cite any case establishing this proposition. Instead, the defendants cite a concurring opinion from the Seventh Circuit's decision in *Andrews v. United States*, 817 F.2d 1277, 1280 (7th Cir. 1987). This concurrence (representing the views of a single judge) does not say that foreseeability must be alleged *in the indictment*; indeed, the *Andrews* case was a post-trial appeal. To the contrary, the concurrence in *Andrews* reinforces the view that issues such as foreseeability cannot be properly resolved before trial; after all, the *Andrews* court was discussing the evidence that had been presented at trial. *Id. See also* Fed. R. Crim. P. 12(b)(3) (prohibiting the court from ruling on disputed factual matters). Yet another case cited by the defendants, *United States v. Jang*, No. 1:07-cr-52-DFH-KPF, 2007 WL 4616927, at *9 (S.D. Ind. Dec. 27, 2007), did involve a pre-trial challenge to venue; the defendants neglect to mention that in that case, then-District Court Judge Hamilton denied the defendant's pretrial venue motion because it was premature:

> At this stage of this case, however, the issue of venue cannot be decided based only on the papers. The indictment neither alleges nor denies Jang's knowledge or reason to know of the later transportation of the images to Indiana. To the extent that the Constitution's venue provisions require some degree of knowledge or foreseeability of, or agreement to, the connection with the forum district where venue is based on the actions of persons other than the defendant on trial, the

35

issue in this case cannot be decided short of a trial on the merits.

The defendants' foreseeability challenge in this case is not ripe. Indeed, the government is confident the evidence at trial will show that Firtash and Knopp could foresee venue in this district. The government will introduce a wiretap phone call demonstrating that Firtash was personally advised by Knopp that Knopp planned to travel to Chicago to meet with Company A concerning the project, and will also prove that Firtash gave advice to Knopp about what to do during that meeting. In short, the defendants' foreseeability argument is premature now and destined for failure later. The defendants' motion to dismiss on venue grounds should be denied.

## III. Defendants' Motions to Dismiss Count One for Failure to State an Offense Should Be Denied.

### A. Background concerning the RICO Statute, the United States' Treaty Obligations to Combat Transnational Organized Crime, and the Supreme Court's Decision in *Nabisco*.

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title 18, United States Code, Section 1961 *et seq.*, was intended to "provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States*, 464 U.S. 16, 26 (1983). As the Supreme Court noted in *Russello*, Congress' statement of findings and purpose in enacting the RICO statute "dramatically describes the problem presented by organized crime." *Id.* Congress found that "organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by

36

unlawful conduct and the illegal use of force, fraud and corruption." Pub. L. 91-452, § 1. Congress also found that "organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens." *Id.* Legislators were acutely aware of the infiltration of legitimate business by organized crime.[14] Legislators spoke of the need for "new legal weapons" to combat organized crime, 116 Cong. Rec. 819 (1970), and of a need for "drastic methods" and "law enforcement measures at least as efficient as those of organized crime." *Id.* at 35199. The RICO statute was the result of this need, and it was considered an "extraordinary" weapon that could be used to battle organized crime. *Id.* at 602 (remarks of Sen. Hruska).

In passing the RICO statute, Congress directed that it "shall be liberally construed to effectuate its remedial purposes." Pub. L. 91–452, § 904(a), 84 Stat. 947. The Supreme Court noted in *Russello* how exceptional this directive was: "So far as we have

---

14      *See United States v. Turkette*, 452 U.S. 576, 591 n.13 (1981) (citing 116 Cong. Rec. 591 (1970) (remarks of Sen. McClellan) ("title IX is aimed at removing organized crime from our legitimate organizations"); *id.* at 602 (remarks of Sen. Hruska) ("Title IX of this act is designed to remove the influence of organized crime from legitimate business by attacking its property interests and by removing its members from control of legitimate businesses which have been acquired or operated by unlawful racketeering methods"); *id.* at 607 (remarks of Sen. Byrd) ("alarming expansion into the field of legitimate business"); *id.* at 953 (remarks of Sen. Thurmond) ("racketeers . . . gaining inroads into legitimate business"); *id.* at 845 (remarks of Sen. Kennedy) ("title IX . . . may provide us with new tools to prevent organized crime from taking over legitimate businesses and activities"); S. Rep. No. 91–617 at 76 (1969)).

been made aware, this is the only substantive federal criminal statute that contains such a directive." 464 U.S. at 27. For this reason, the Supreme Court has held that the RICO statute "is to be read broadly." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985). The RICO statute is therefore rightly considered as the foremost and most potent weapon available in the fight against organized crime.

In order to carry out these broad remedial purposes, the RICO statute prohibits, among other things, conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d). An "enterprise" includes a group of individuals associated-in-fact, and "racketeering activity" encompasses a long list of acts, threats and offenses indictable under State and federal law. 18 U.S.C. § 1961(1), (4). A member of the conspiracy who agrees to participate in the affairs of an enterprise through a pattern of racketeering activity need not personally commit a racketeering act; indeed, no racketeering act need be committed at all in order to establish a defendant's guilt. *Salinas v. United States*, 522 U.S. 52, 63-65 (1997); *United States v. Benabe*, 654 F.3d 753, 776 (7th Cir. 2011) ("A RICO conspiracy case does not require proof that any racketeering acts were actually carried out.") (citing *Salinas*, 522 U.S. at 63). The RICO statute has therefore proved to be a powerful tool enabling the prosecution of organized crime groups—including those that operate internationally. *See, e.g., United States v. Casamento*, 887 F.2d 1141, 1148-49 (2d Cir. 1989) (affirming RICO convictions in the "Pizza Connection" case arising from Sicilian Mafia's international distribution of narcotics). As District Judge Lewis Kaplan of the Southern District of New York

38

observed in discussing the reach of RICO to organized crime groups that operate internationally:

> From a practical perspective, it is well to bear in mind that foreign enterprises have been at the heart of precisely the sort of activities—committed in the United States—that were exactly what Congress enacted RICO to eradicate. Many will recall, for example, that a RICO count in perhaps the largest criminal conspiracy case ever tried in this district, the so-called "Pizza Connection" case, rested on a decision by members of the Sicilian Mafia to begin shipping narcotics to the United States and their development of a distribution network in this country. The RICO enterprise in that case "consisted of 'made members' . . . and associates of such members, of a secret criminal organization, which operated in Sicily, the United States and elsewhere, known as 'La Cosa Nostra,' or 'the Mafia.'" No enterprise could have been closer to the core of the Congressional concerns that resulted in the enactment of RICO.

*Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 242 (S.D.N.Y. 2012) (footnotes omitted).

Indeed, the United States has explicitly recognized that the fight against organized crime is not confined to organized criminal groups that operate on a purely domestic level. As noted earlier, the United States is a signatory to the United Nations Convention Against Transnational Organized Crime, 2225 U.N.T.S. 209 (known as the "Palermo Convention"). The Palermo Convention was ratified by the United States Senate October 7, 2005. The stated purpose of the Palermo Convention is to combat transnational organized crime; in the foreword to the Palermo Convention, the United Nations Secretary General makes the following observations:

> With the signing of the United Nations Convention against Transnational Organized Crime in Palermo, Italy, in

39

> December 2000, the international community demonstrated the political will to answer a global challenge with a global response. If crime crosses borders, so must law enforcement. If the rule of law is undermined not only in one country, but in many, then those who defend it cannot limit themselves to purely national means. If the enemies of progress and human rights seek to exploit the openness and opportunities of globalization for their purposes, then we must exploit those very same factors to defend human rights and defeat the forces of crime, corruption and trafficking in human beings.

It requires parties to the Convention to criminalize offenses committed by organized criminal groups[15] which are "transnational" in nature, which is defined to include any offense (1) "committed in more than one State," (2) "committed in one State but a substantial part of its preparation, planning, direction or control takes place in another State," (3) "committed in one State but involves an organized criminal group that engages in criminal activities in more than one State," and (4) "committed in one State but has substantial effects in another State." Palermo Convention, art. 2-3, 5. Article 11(2) of the Palermo Convention requires each party to "ensure that any discretionary legal powers under its domestic law relating to the prosecution of persons for offences covered by this Convention are exercised to maximize the effectiveness of law enforcement measures in

---

[15] "Organized criminal groups" are defined to mean a "structured group of three or more persons, existing for a period of time and acting in concert with the aim of committing one or more serious crimes or offences established in accordance with this Convention, in order to obtain, directly or indirectly, a financial or other material benefit." Palermo Convention, art. 2(a). Serious crimes are defined to include offenses punishable "by a maximum deprivation of liberty of at least four years or a more serious penalty." *Id.* art. 2(b). In this regard, the Convention intends to target the same vices as the RICO statute.

respect of those offences and with due regard to the need to deter the commission of such offences."

It is significant that, in urging ratification of this international treaty—obligating the United States to vigorously prosecute transnational organized crime—leaders of both the Executive and Legislative Branches believed that existing federal criminal law targeting organized crime could be invoked to fulfill the obligations of the United States under this treaty. For example, in recommending the ratification of the Palermo Convention, both the Secretary of State and President indicated their view that ratification would not require any new legislation. S. Treaty Doc. 108-16 at 3, 5. In his executive report to the Senate recommending ratification of the Palermo Convention, Senator Richard Lugar, the then-Chairman of the Senate Committee on Foreign Relations, agreed that no further legislation would be required for the United States to fulfill its obligations to fight transnational organized crime under the treaty. S. Exec. Rep. 109-4 at 4. The full Senate ratified the Palermo Convention, with narrow reservations recommended by Senator Lugar, one of which noted that U.S. federal criminal law was broad enough to enable the United States to combat transnational organized crime, and that it would only be the "rare case" of transnational organized crime that would not be susceptible to prosecution under already existing law:

> U.S. federal criminal law, which regulates conduct based on its effect on interstate or foreign commerce, or another federal interest, serves as the principal legal regime within the United States for combating organized crime, and is broadly effective for this purpose. Federal criminal law does

41

> not apply in the rare case where such criminal conduct does not so involve interstate or foreign commerce, or another federal interest. There are a small number of conceivable situations involving such rare offenses of a purely local character where U.S. federal and state criminal law may not be entirely adequate to satisfy an obligation under the Convention. The United States of America therefore reserves to the obligations set forth in the Convention to the extent they address conduct which would fall within this narrow category of highly localized activity.

See Resolution of Ratification, Section 2.[16]

The Supreme Court's recent decision in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016), confirms Congress's intent for the RICO statute to have broad reach, as well as the view expressed by the Secretary of State, the President and the Senate in connection with its ratification of the Palermo Convention that it would be a "rare case" involving transnational organized crime that could not be effectively prosecuted under existing federal criminal law. As a general matter, federal laws are presumed not to apply outside the United States. *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247, 255 (2010). But in *Nabisco*, the Supreme Court, echoing District Judge Kaplan's observations about the intended breadth of the RICO statute in *Donziger*, held that RICO applies to foreign enterprises and explained that it was "easy to see why Congress did not limit RICO to domestic enterprises. A domestic enterprise requirement

---

16    The Senate resolution ratifying the Palermo Convention also further specified that "The United States of America declares that, in view of its federalism reservation, current United States law, including the laws of the States of the United States, fulfills the obligations of the Convention for the United States. Accordingly, the United States of America does not intend to enact new legislation to fulfill its obligations under the Convention." *Id.*

would lead to difficult line-drawing problems and counterintuitive results. It would exclude from RICO's reach foreign enterprises—whether corporations, crime rings, other associations, or individuals—that operate within the United States." *Nabisco*, 136 S. Ct. at 2104. Further, the Supreme Court decided that the "focus" of the substantive RICO provisions is on the pattern of racketeering activity: So long as the pattern of racketeering activity is composed of predicate acts committed domestically, or predicate offenses that, by their own terms, apply extraterritorially, a prosecution of a foreign enterprise is permissible. *Id.* at 2102-03.

The Supreme Court's ruling thus confirms that the RICO statute can be used by the United States to fulfill its obligation to combat transnational organized crime under the Palermo Convention.[17] Of course, consistent with the views expressed by the Senate

---

[17]     The Seventh Circuit held in *United States v. Leija-Sanchez*, 602 F.3d 797, 798 (7th Cir. 2010), that *United States v. Bowman*, 260 U.S. 94, 98 (1922), means that the presumption against extraterritorial application does not apply to all criminal statutes like it does to civil statutes. Where criminal statutes are "not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents," then those criminal statutes have extraterritorial reach. The Seventh Circuit noted that "criminal businesses may be international in scope," and where a statute applies to enterprises that affect foreign commerce, it must be possible to apply such a statute even where the enterprise has activities abroad. *Id.* at 799-800. The Seventh Circuit recently was asked to overrule this decision, and it declined to do so. *See United States v. Leija-Sanchez*, 820 F.3d 899 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1327 (2017). Notably, the Supreme Court denied the defendants' petition for *certiorari*, in which defendants asked the Supreme Court to grant, vacate and remand the case in light of the Supreme Court's decision in *Nabisco*. *See Leija-Sanchez v. United States*, petition for writ of *certiorari* (2016 WL 7972454). The decisions in *Leija-Sanchez* provide additional grounds to find the use of the RICO statute in this case is permissible, because this case also concerns the criminal (as opposed to civil) prosecution of a criminal enterprise that operates in multiple countries. Defendant Knopp contends that the rule of *Bowman* does not apply here. AK Br. at 3-7. In any event, because (as discussed below)

43

when it ratified the Palermo Convention, the Supreme Court also reiterated an obvious limitation on RICO prosecutions that anchor them to the United States: the government will still be required to prove, as an element of a substantive RICO offense, that the enterprise, whether domestic or foreign, affected commerce, meaning commerce "directly involving the United States," as opposed to commerce taking place somewhere else in the world. *Id.* at 2105; *see* 18 U.S.C. § 1962(c).[18]

### B. Count One Sufficiently Alleges the Offense of Racketeering Conspiracy.

In order for an indictment to be sufficient, it must state all the elements of the offense; adequately advise the defendant of the nature of the charges so that he can prepare a defense; and allow the defendant to plead the judgment as a bar to future prosecutions for the same offense. *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (citations omitted). In this case, Count One need only allege a conspiracy to violate Title 18, United States Code, Section 1962(c), which prohibits participating in the affairs of an enterprise through a pattern of racketeering activity. Moreover, as the Seventh Circuit explained in *United States v. Glecier*, 923 F.2d 496, 499-501 (7th Cir. 1991), a RICO

---

this prosecution easily passes muster under the rubric of *Nabisco*, the Court need not resolve this argument and the application of the *Leija-Sanchez* line of cases.

18  However, the Supreme Court did not resolve the reach of Section 1962(d), the racketeering conspiracy provision, in *Nabisco*. *Id.* at 2103. Racketeering conspiracy charges punish the criminal agreement, not the completed crime, *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014), and "a RICO conspiracy case does not require proof that any racketeering acts were actually carried out." *Benabe*, 654 F.3d at 776 (citing *Salinas*, 522 U.S. at 63).

conspiracy indictment need only allege the specific *types* of predicate racketeering acts to be committed; not a single specific racketeering act that was in fact committed need be identified, because section 1962(d) punishes the agreement to commit the substantive offense, not the substantive offense itself. *Accord Tello*, 687 F.3d at 795-96 (racketeering conspiracy indictment need not specify any overt act).

It is obvious that Count One sufficiently alleges the offense of racketeering conspiracy. Paragraphs 2 through 5 and 13 through 15 of Count One allege that: (1) the defendants conspired to conduct and participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity, which consisted of multiple acts indictable under 18 U.S.C. §§ 1952 and 1956, and agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise, R. 2 at 10-11; (2) the association-in-fact described was an enterprise, *id.* at 5-6, 10; and (3) the enterprise engaged in and affected commerce. *Id.* at 10. In addition to these allegations, as discussed earlier, the indictment alleges that the enterprise sought to introduce illegally obtained goods into the United States domestic market—namely, five to twelve million pounds of titanium sponge on an annual basis that was to be obtained through the bribery of public officials in India. *Id.* at 2-3, 6. These tainted goods were to be sold to Company A. *Id.* The sale of illegal goods was forecast to generate revenues of more than $500 million a year, including revenues from sales to Company A. *Id.* Not only that, but the indictment alleges that various facilities of interstate commerce were utilized by the conspirators in aid of their criminal objectives. Conspirators traveled within the United

45

States to attend meetings in furtherance of the enterprise's objectives. *Id.* at 17. For example, the indictment alleges trips from: New York to Washington, as well as Ohio to Washington to meet with representatives of Company A concerning the progress of the project and terms on which titanium sponge would be supplied to Company A. *Id.* Additional interstate travel occurred, including travel to New York in order to solicit the participation of third parties in the project. *Id.* at 18. In addition, the indictment alleges that conspirators utilized and caused the use of the United States' communications infrastructure in order to communicate about, plan, and coordinate their bribery activity. Electronic mail accounts hosted on servers located in the United States were used for this purpose, as well as cellular telephones. *Id.* at 18-19. Furthermore, the indictment alleges that United States financial system was used by the criminal enterprise to transfer millions of dollars into and out of the United States, money that was intended to be used to bribe public officials in India in order to obtain the necessary approvals for the project. *Id.* at 6.

### C. The Defendants' Challenges to the Sufficiency of Count One are Meritless.

The defendants apparently argue that this is one of the "rare" cases of transnational organized crime that cannot be prosecuted under existing federal criminal law.[19] The defendants are wrong—indeed, as discussed below, Count One presents a

---

19    The defendants repeatedly claim throughout their Motions that this Court does not have "jurisdiction" over the charges in the indictment. This is a misuse of the word jurisdiction. What the defendants apparently mean to say is that the relevant federal statutes do not

textbook example of a transnational criminal enterprise that is properly prosecuted under the RICO statute.

### 1.    Count One Contains Sufficient Allegations that the Enterprise Affected Commerce.

The defendants point to the Supreme Court's recent decision in *Nabisco*, and contend that Count One should be dismissed because it fails to allege that the activities of the enterprise affected commerce.  DF Br. at 10.  Specifically, the defendants argue that, because no titanium sponge was, in fact, sold to Company A, the indictment does not allege the enterprise affected commerce.  *Id.* at 10-11.  This argument is a make-weight. As discussed above, the indictment specifically alleges that the enterprise affected commerce, and that should be the end of the matter.  See R. 2 at 10 ¶ 13 (alleging "defendants herein, being persons employed by and associated with an enterprise, that is the enterprise as described in paragraphs 2-5 above, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce").

Although the defendants couch their argument in terms of the government's failure to *allege* the enterprise affected commerce, their argument boils down to the claim that the government will not be able to *prove* at trial that the enterprise affected commerce, because the criminal conspiracy was not ultimately successful in introducing

---

cover their conduct.  This Court obviously has subject matter jurisdiction over offenses against the United States.  18 U.S.C. § 3231.  *See also Morrison*, 561 U.S. at 253 (asking what conduct a statute reaches is a merits question, not a question about the court's subject matter jurisdiction).

tainted goods into the United States market. But there is no summary judgment in criminal cases, and a pretrial motion to dismiss is not the time to resolve disputed factual issues, such as whether the government will be able to prove an element of the offense. *United States v. Ladish Malting Co.*, 135 F.3d 484, 490-91 (7th Cir. 1998); *United States v. Thomas*, 150 F.3d 743, 747 (7th Cir. 1998) (Easterbrook, J., concurring); *United States v. Yaska*, 884 F.2d 996, 1000-01 (7th Cir. 1989). *See also United States v. Xiong*, No. 06-CR-72-S, 2006 WL 3025651, at *2 (W.D. Wisc. July 7, 2006) ("Put another way, challenging the government's ability to prove its case is not a ground for pretrial dismissal of a charge because summary judgment does not exist in criminal cases") (collecting cases). This is an argument for the jury.[20]

Needless to say, the government disputes the claim that it will be unable to prove at trial that the enterprise had no affect commerce—indeed, as discussed above, and as other evidence will show at trial, the operations of the charged enterprise affected commerce, without regard to the ultimate supply of titanium to Company A. The

---

[20]  Nor is a pretrial motion to dismiss the proper forum to second-guess the determination that has already been made by the grand jury that there is probable cause the crime of racketeering conspiracy has been committed. Indeed, there is no "authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof," because the "grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime" that they must answer for at a trial. *Kaley v. United States*, 134 S. Ct. 1090, 1097-98 (2014). *Accord Costello v. United States*, 350 U.S. 359, 409 (1956) ("An indictment returned by a legally constituted an unbiased grand jury . . . if valid on its face, is enough to call for trial of charge on the merits. The Fifth Amendment requires nothing more.").

indictment alleges that the criminal enterprise engaged in a broad array of activity within the United States, including but not limited to meeting and negotiating with Company A about the project, attempting to obtain financing and other participants in the project, and that the conspirators used the territory and infrastructure of the United States—its channels of commerce, communications facilities and financial institutions to achieve the objectives of the conspiracy. The evidence at trial will also show that enterprise members caused employees of Company A to take acts within the United States affecting commerce. The defendants' request to dismiss on this basis is therefore meritless.

There are additional defects with the defendants' argument. As noted above, the Supreme Court did not address the scope of the RICO conspiracy provision, 18 U.S.C. § 1962(d), in *Nabisco*.[21] Racketeering conspiracy charges seek to punish the criminal agreement, not the completed crime; the government does not have to prove that *any* racketeering act even occurred, *Salinas*, 522 U.S. at 63; *Glecier*, 923 F.2d at 499-501, nor is the government required to prove an actual effect on commerce in the context of a RICO conspiracy charge. Rather, consistent with the pattern instructions in this Circuit, the government must prove that the enterprise's activities *would* affect commerce. As the Supreme Court has held in construing section 1962(d), "[i]t is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous the public, and so punishable in itself."

---

21    The defendants get this wrong. DF Br. at 10. The Supreme Court specifically wrote that it was not deciding the issue. *Nabisco*, 136 S. Ct. at 2103.

*Salinas*, 522 U.S. at 477-78 (citing *Callanan v. United States*, 364 U.S. 587, 594 (1961)). The government need not prove the completion of the substantive offense in order to successfully prove the existence of a conspiracy. Accordingly, the defendants' claim that Count One should be dismissed because it does not allege the successful completion of the crime is meritless.

### 2. Count One Contains Sufficient Allegations Concerning the Predicate Offenses.

As discussed above, Count One properly charges that the defendants conspired to participate in the affairs of the enterprise through a pattern of racketeering activity, including multiple acts indictable under Title 18, United States Code, Sections 1952 and 1956. R. 2 at 10 ¶ 13-15. This is sufficient to allege the crime of racketeering conspiracy. *Glecier*, 923 F.2d at 499-501 (RICO conspiracy indictment need only allege the specific *types* of predicate racketeering acts to be committed; no specific acts have to be identified for indictment to be sufficient).

Although not necessary for charging purposes, the indictment also provides a non-comprehensive set of examples of conduct in furtherance of the conspiracy, which includes reference to acts indictable under the racketeering predicates. Beginning with the money laundering statute, Count One alleges that the conspirators "caused the transfer of funds to a place in the United States from or through a place outside the United States, and from a place in the United States to or through a place outside the United States" with the intent to promote the carrying on of specified unlawful activity,

namely, "with respect to a financial transaction occurring in part in the United States, an offense against a foreign nation, India, involving bribery of a public official." R. 2 at 11 ¶ 16(b). The indictment then identifies more than approximately fifty financial transactions carried out in furtherance of the conspiracy. *Id.* at 11-16. Turning to the Travel Act, the indictment alleges a non-exclusive list of seven trips in interstate commerce, and acts done in furtherance of the unlawful activity within the United States thereafter, including: (1) co-defendant Gevorgyan's travel from New York to Washington, to attend a meeting with representatives of Company A about the progress of the project; (2) Gevorgyan's travel from Ohio to Washington, to attend a meeting with representatives of Company A to discuss the progress of the project and the terms on which titanium products would be supplied to Company A; (3) co-defendant Lal's travel from North Carolina to India for the purpose of meeting with defendants Firtash, Knopp and others concerning the progress of the project; (4) Lal's travel from Illinois to North Carolina, followed by Lal's request for additional bribe funds and instructions to pay fees to professionals associated with the project; (5) Lal's travel from North Carolina to New York to meet with representatives of Company D, in order to solicit their participation in the project; (6) Lal's travel from North Carolina to India, whereafter Lal met with Individual C and discussed the additional transfer of funds intended for bribing public officials; and (7) Lal's travel from Illinois to North Carolina, and his subsequent action to

51

arrange for the transfer of additional funds to bribe Indian public officials. R. 2 at 17-18.[22] Count One also alleges the use of other facilities of interstate commerce, including electronic mail hosted within the United States, and cellular telephones, and their use with the intention to, among other things, promote the carrying on of the unlawful activity, and further alleges that the conspirators did promote the unlawful activity through the use of these facilities. *Id.* at 18-19. The indictment therefore clearly alleges an agreement to participate in the affairs of an enterprise through a pattern of racketeering activity.

Despite this, the defendants argue that the allegations in the indictment concerning the agreement to commit predicate racketeering acts are insufficient. Specifically, with regard to both the money laundering predicate and the Travel Act predicate, the defendants apparently argue that Count One alleges an impermissible extraterritorial application of both predicate racketeering statutes under *Nabisco*. DF Br. at 8-18.

The fatal problem with the defendants' position is this: To be legally sufficient, the indictment need only allege the agreement to commit *types* of racketeering acts. A RICO conspiracy indictment need not allege the completion of a single racketeering act, *Glecier*,

___

22    As noted earlier, the government's proof at trial will show that Knopp traveled in interstate commerce to Chicago and thereafter took acts to advance the conspiracy by meeting with Company A. The government's evidence at trial will also show that enterprise members caused employees of Company A to travel in interstate commerce and in foreign commerce (from the United States to other countries) for the purpose of furthering the project.

923 F.2d at 499-501, and if no completed act needs to be alleged in a racketeering conspiracy indictment in order for it to withstand scrutiny, then a pretrial motion to dismiss cannot be successfully predicated on a perceived failure to adequately specify the actual commission of a racketeering act that the defendants believe to be legally sufficient. All of the defendants' arguments about the pattern of racketeering acts can be rejected on this threshold ground alone. Again, it will be up to the government to prove a permissible violation of the RICO statute at trial, and the jury will also receive whatever instructions are legally appropriate to aid it in carrying out its function as the finder of fact.

Notwithstanding this dispositive threshold problem with all of the defendants' arguments concerning the predicate acts, the government explains in greater detail below why these arguments are meritless on alternate grounds, addressing them as to each predicate act in turn, beginning with the money laundering statute.

> a. **The Allegations in Count One Concerning the Money Laundering Predicate are Sufficient.**
>
> (1) **Correspondent Bank Transactions are Within the Scope of the Money Laundering Statute.**

The government expects that its evidence at trial will show that millions of dollars in bribe money was funneled through United States financial institutions, at times acting in their capacity as correspondent banks, in order to make bribe payments to Indian public officials. The defendants argue that the government's allegations in Count One somehow add up to the impermissible extraterritorial application of the money

53

laundering statute because it does not apply to financial transactions where a United States institution acts as a correspondent bank. DF Br. at 11.

As an initial matter, the defendants' argument assumes facts that are not true. The defendants incorrectly suggest that the government's evidence at trial will be limited to correspondent bank transactions, where the United States financial institution acted as an intermediary between banks in foreign nations. The government expects the evidence at trial will show that multiple transfers of money into the United States from abroad were designed to finance or reimburse the expenses of a conspirator operating within the United States. Moreover, the government expects the evidence will show that other transfers were destined for the benefit of third parties located within the United States who were designated as third-party beneficiaries of the bribes paid in order to obtain approvals for the project in India.[23]

This argument is wrong on the merits as well. The money laundering statute prohibits, among other things, transferring funds into or out of the United States with the intent to promote "specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). "Specified unlawful activity" includes "an offense against a foreign nation involving . . . bribery of a public official," so long as the financial transaction occurs "in whole or in part in the United States." *Id.* § 1956(c)(7)(B)(iv). In other words, specified unlawful activity

---

[23] And, as noted earlier, the government is not required to prove any racketeering act actually occurred, so the argument is legally defective in any event.

includes the violation of foreign bribery laws, with one limitation: a transfer of money connected to this specified unlawful activity has to take place at least "in part" in the United States. This provision was added by Congress in order to "send a strong signal" that the United States would not tolerate the use of United States financial institutions in connection with foreign crimes, including foreign public corruption offenses. *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp.2d 1, 10 (D.D.C. 2008) (quoting H.R. Rep. No. 107-250 at 55) [hereinafter "*Julius Baer I*"]. Indeed, in *Julius Baer I*, the district court was asked to decide whether the use of United States financial institutions to engage in correspondent bank transactions that facilitated the bribery of Pavlo Lazarenko, a former Ukrainian public official, was sufficient for the government to invoke section 1956(a)(2), so that the government could forfeit approximately $250 million in funds involved in the money laundering offense. *Id.* at 2-5. The claimants resisting forfeiture of these funds argued that the use of United States financial institutions as correspondent banks to effectuate a transfer between two other countries was not sufficient to give rise to jurisdiction in the United States under section 1956(a)(2): "Claimants argue that jurisdiction cannot be based on these provisions because the funds or the transactions did not originate in or end in the United States or involve a United States person." *Id.* at 11. The district court soundly rejected this argument: "To require more would be to suppose that Congress did not intend to criminalize the use of United States financial institutions as clearinghouses for criminal money laundering and conversion into United States currency." *Id.* at 12. The district

55

court also rejected the argument that permitting the United States to use Section 1956(a)(2) to reach instances where United States financial institutions were used to conduct correspondent bank transactions would make the United States the "policeman of the world":

> If, as Claimants assert, United States currency has been the bedrock of international trading and commerce, then Congress was justified in attempting to oversee the use of United States financial institutions and in seeking to prevent their use as clearinghouses for criminals. At oral argument, Claimants suggested that such an assertion would make the United States the "policeman of the world." . . . . In fact, it only makes the United States government the police of criminal conduct that takes place, at least in part, in this country.

*Id.*

The *Julius Baer I* court also found that a correspondent bank transaction involves a "transfer" within the meaning of 18 U.S.C. § 1956(a)(2). The claimants maintained that a correspondent bank transaction—such as, for example, a transaction that begins in Poland, goes from Poland to a United States financial institution, and from that United States financial institution to Switzerland—should be viewed as a single transaction or transfer from Poland to Switzerland. *Id.* at 13. The *Julius Baer I* court rejected this argument. *Id.* at 13. In doing so, the court quoted the Second Circuit's decision in *United States v. Daccarett*, 6 F.3d 37, 54 (2d Cir. 1993), which explained that each correspondent bank transaction involving an electronic funds transfer is in fact "at least two separate transactions" involving (1) the movement of funds "from the originating bank to the

intermediary bank" and (2) the transfer of funds from the intermediary bank to the destination bank, and that these transactions, while often virtually instantaneous, could sometimes be "separated by several days." *Id.* In other words, a correspondent bank transaction involving a United States financial institution is made up of two parts involving a United States financial institution.

The definitions provided in section 1956 confirm that correspondent bank transactions are within the ambit of the money laundering statute. Section 1956(a)(2) was amended in 1988 to add the terms "transmit" and "transfer" to the offense language. *See* Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, § 6471(b), 102 Stat. 4181, 4378 (Nov. 18, 1988). The purpose of the amendment was to clarify that this provision was meant to include "electronic and other forms of movement of funds other than physical transportation." 134 Cong. Rec. S17367 (Nov. 10, 1998) (statement of Senator Biden). There is more: the term "transaction," as used in section 1956, includes "a deposit, withdrawal, transfer between accounts, . . . or any other payment, transfer, or delivery by, *through,* or to a financial institution, by whatever means effected." 18 U.S.C. § 1956(c)(3) (emphasis added). This further confirms that a correspondent bank transaction involving the transmission of funds through a United States financial institution is within the ambit of the money laundering statute. *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.,* No. 04-0798, — F. Supp. 3d —, 2017 WL 1508608, at *9 (D.D.C. April 27, 2017) (holding definition of "transaction" within money laundering statute is "further indication" that Congress intended Section 1956 to cover electronic fund

transfers where U.S. financial institution acted as a correspondent bank) [hereinafter "*Julius Bear II*"].[24]

Other courts have reached the same conclusion. For example, in *United States v. Prevezon Holdings, Ltd.*, No. 13-CV-6326, — F. Supp. 3d —, 2017 WL 1951142, at *1 (S.D.N.Y. May 10, 2017), the government brought a civil forfeiture action arising from the laundering of proceeds of a $230 million fraud perpetrated by a Russian organized crime group. One of the specified unlawful activities identified by the government in the forfeiture action was bribery of a foreign official—kickback payments were made to a Russian tax official in order to perpetuate the fraud. *Id.* at *6. The claimants opposing forfeiture argued that the government had alleged impermissible extraterritorial violations of both 18 U.S.C. § 2314 and 18 U.S.C. § 1956 because the specified unlawful activity was tied to four transfers of funds involved in the crime through correspondent banks in the United States. *Id.* at *5-7. The district court rejected this argument, and held that the use of correspondent banks in these circumstances was not an impermissible extraterritorial application of these statutes, and was conduct that "'fits well within the

---

[24]  Because a transaction is defined to include a transfer that occurs "through" a United States financial institution, there is no requirement that the transaction "originate" in the United States. The defendants' argument that the transaction must originate in the United States therefore fails, and none of the cases the defendant cites in his brief stand for this proposition. *See* DF Br. at 12. It is also wrong for the reasons explained by the Second Circuit in *Daccarett*. A correspondent bank transaction is really a series of multiple transactions, a part of which originate or terminate in the United States. *See also* 18 U.S.C. § 1956(i)(3) (noting a transfer of funds is a continuing transaction and that venue is proper in any district where a "portion of the transaction . . . takes place").

statute's requirement of conduct that occurs in part in the United States.'" *Id.* (quoting *Julius Baer II*, 2017 WL 1508608, at *9).[25]

Indeed, with regard to Title 18, United States Code, Section 1956(a)(2), the Second Circuit has held that this section is *not* subject to the presumption against extraterritorial application. *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129, 140 n.7 (2d Cir. 2014), *reversed on other grounds*, 136 S. Ct. 2090 (2016). Specifically, the Second Circuit held that because it regulates the transfer of funds into and out of the United States, the statute "necessarily involves crossing the United States border. Regulation of conduct in crossing United States borders is not regulation of extraterritorial conduct," and therefore, this statute does not raise concerns about extraterritorial application. *Id.*

In the face of this, the defendants only cite one case that they claim prevents reliance upon the money laundering statute as a predicate in a RICO conspiracy.

---

25    In reaching this conclusion, the *Prevezon Holdings* court cited several decisions of the Second Circuit, including *Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201 (2d Cir. 2016). In *Licci*, plaintiffs brought a civil suit against the Lebanese Canadian Bank under the Alien Tort Statute, 28 U.S.C. § 1350, seeking to recover damages from the bank for its role in providing international financing services to a terrorist organization, Hezbollah, which had carried out a series of rocket attacks against civilians in Israel. *Id.* at 205. The bank had no branches, offices or employees in the United States, and in order to effectuate U.S.-dollar-denominated transactions, it maintained a correspondent bank account with a United States financial institution. *Id.* at 206. The plaintiffs alleged that the bank carried out international wire transfers through the United States financial institution on behalf of the terrorist organization. *Id.* The bank countered that the use of a correspondent bank was insufficient to constitute a domestic application of the Alien Tort Statute. The Second Circuit disagreed, and noted that these allegations amounted to domestic conduct that overcame any claim of impermissible extraterritorial application of the statute. *Id.* at 215-17 (citing *Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014) (passage of illicit funds through escrow account based in New York sufficiently touched and concerned the United States to overcome claim of extraterritorial application)).

Specifically, the defendants mistakenly cite *Cedeno v. Intech Group, Inc.*, 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010), for the proposition that the transfer of funds in and out of U.S. financial institutions in the United States is an insufficient predicate offense to support a racketeering conspiracy charge under the RICO statute when the enterprise is a foreign one. But the defendants fail to mention that *Cedeno* held that the RICO statute does not apply to foreign enterprises, and therefore cannot apply even if there are predicate acts involving money laundering. *Id.* at 473-74. *Cedeno* was, of course, overruled by the Supreme Court's decision in *Nabisco* and is no longer good law. The defendants' arguments concerning correspondent bank transactions are therefore wholly without merit.

### (2) There is No Requirement that Firtash Personally Engaged in Illegal Activity in the United States.

Defendant Firtash also argues that Count One should be dismissed because, in order for the money laundering statute to be a permissible racketeering act in this case, Firtash must have personally engaged in conduct within the United States. DF Br. at 11.[26] This is an incorrect reading of the money laundering statute for a number of reasons. As noted above, Congress has made it clear through its amendment of the money laundering statute that "specified unlawful activity" includes bribery of a foreign official that is an offense under foreign law. 18 U.S.C. § 1956(c)(7)(B)(iv). Congress sent this

---

[26] Again, as the government's proof at trial will show that Knopp personally committed acts in furtherance of the racketeering conspiracy within this district, Knopp cannot advance this argument.

"strong signal" in order to ensure that the United States financial system did not become a clearinghouse for international criminals. *Julius Baer I*, 571 F. Supp. 2d at 10, 12; H.R. Rep. No. 107-250 at 55. By making an offense against a foreign nation a specified unlawful activity, Congress clearly indicated that foreign conduct was within the ambit of this statute. The only caveat that Congress has imposed on this specified unlawful activity as a basis for invoking the money laundering statute is that the financial transaction concerning this offense under foreign law must take place "in whole or in part in the United States." 18 U.S.C. § 1956(c)(7). This provision independently provides for the punishment of foreign bribery offenses under section 1956, without regard to the presence of any defendant within the United States, so long as the financial transaction takes place in part in the United States. In addition, as the Second Circuit has previously held, the presumption of extraterritoriality has no application to Section 1956(a)(2), because regulation of money entering or exiting the United States is not the regulation of extraterritorial conduct. *Nabisco*, 764 F.3d at 140 n.7.

In advancing this argument, Firtash points to 18 U.S.C. § 1956(f)(1), which provides as pertinent here that "[t]here is extraterritorial jurisdiction over the conduct prohibited by this section if . . . the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States." But the government does not need to rely upon this provision in order to bring this case. It does not displace the other provisions of the statute, which provide independent grounds for using bribery of a foreign official as a specified unlawful activity, and section 1956(a)(2),

which regulates non-extraterritorial conduct.  In any event, section 1956(f) provides an additional ground supporting prosecution in the United States, because the provision does not stand for the proposition Firtash cites it for.  Rather, it includes two generally well-understood bases for making a law apply extraterritorially: (1) where the crime is committed "*by* a United States citizen," without regard to the location of the United States citizen when the citizen commits the crime (referred to as the "nationality principle"), and (2) when all or part of the crime occurs within the territory of the United States, or as stated in the statute, when "the conduct occurs in part *in* the United States" (the "subjective territorial principle").  *See, e.g., United States v. Hasan*, 747 F. Supp. 2d 599, 606-07 (E.D. Va. 2010) (discussing these principles in connection with prosecution of Somali pirates) (citing Restatement (Third) of Foreign Relations Law of the United States § 402(1)-(2) (1986)); *United States v. Bin Laden*, 92 F. Supp. 2d 189, 195 (S.D.N.Y. 2000) (discussing these principles in connection with prosecution of terrorist bombings of U.S. embassies in East Africa) (citing Restatement (Third) of the Foreign Relations Law of the United States § 402(1)(a) (1987)).  Beyond requiring the conduct to be by a United States citizen wherever located or, alternatively, to be committed in part in the territory of the United States, section 1956(f) does not require the personal presence of the non-citizen within the United States.  It is well established that a defendant may be punished as a principal for all acts done at his direction, 18 U.S.C. § 2, as well as for the acts of others in furtherance of a conspiracy.  *Pinkerton v. United States*, 328 U.S. 640, 647 (1946).  Congress is assumed to understand existing case law when it passes legislation,

*Hall v. United States*, 132 S. Ct. 1882, 1889 (2012), and statutes are read to be consistent with this existing body of law absent Congress's unambiguous expression of an intent to deviate from it. *Abuelhawa v. United States*, 556 U.S. 816, 821-24 (2009). There is no reason to think Congress deviated from these principles here.[27]

Even the cases the defendants cite in support of their motion to dismiss flatly reject the very argument they make here. Specifically, in *United States v. Stein*, No. 93-375, 1994 WL 285020, at *3-4 (E.D. La. 1994),[28] the defendant, a non-U.S. citizen, argued that he could not be prosecuted for a violation of 18 U.S.C. § 1965(a)(2) because, under his reading of section 1956(f)(1), it required him, as a non-U.S. citizen, to be personally present in the United States and conduct a financial transaction. The district court rejected the argument that the statute required the physical presence of a non-U.S. citizen within the United States in order for the statute to apply. *Id.* at *4. As the *Stein* court explained:

> Section 1956 was enacted to combat "one of the greatest challenges facing law enforcement today." S.Rep. 99–433, at 3–4. In light of the modern methods of transporting funds between countries, Congress authorized extraterritorial jurisdiction for violations of the nation's money laundering statute. It is clear that in so doing Congress intended section 1956 to apply to money laundering activities in which the United States has a substantial interest. Thus, the statute requires that part of the offense conduct occur in this country

---

27    Moreover, given the nature of the crime, which often involves the transmission of money by third party bank intermediaries, it is particularly improbable that Congress meant to require a defendant to personally take an act within the United States to establish an offense under this section.

28    See DF Br. at 12 (citing *Stein*).

63

where the defendant is of foreign citizenship. 18 U.S.C. § 1956(f). But section 1956 was not intended to only apply when the defendant acts within the borders of this country. Rather it was intended to reach situations in which "*the transaction* occurred in whole or in part in the United States." S.Rep. 99–433, at 14. It is the entire transaction that forms the offense conduct, not merely its initiation or conclusion. If, as it is alleged in this case, a defendant, who never enters this country, initiates a transfer of funds from a place within the United States to place outside the United States, there will be extraterritorial jurisdiction, because a portion of the conduct occurred in this country.

Stein is correct in his assertion that section 1956 was not intended, nor does it, apply to actions of a non-United States citizen taken wholly outside the United States. *See* S.Rep. 99–433, at 14. The indictment does not allege conduct wholly outside this country. It alleges a transfer of funds from New Orleans to London. Although the defendant was physically in the United Kingdom throughout the transaction, he acted, albeit electronically or otherwise, within the borders of the United States. Those actions constitute a sufficient basis for the exercise of extraterritorial jurisdiction under section 1956.

*Id.* at *5. Yet another case the defendants cite specifically repudiates their interpretation of section 1956(f)(1) as well. *United States v. Approximately $25,829,681.80 in Funds*, No. 98 Civ. 2682, 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999) ("As in *Stein*, the parties initiating the fund transfers 'acted electronically' within the United States, and such action is sufficient to constitute 'conduct' for purposes of 18 U.S.C. § 1956.").

Indeed, the defendants' cramped reading of the statute would lead to the anomalous result that, in cases involving joint criminal activity by a transnational organized crime group, all defendants could not be charged unless each and every one

independently took action within the United States. But this has never been the rule in conspiracy cases, even where the criminal enterprise engages in conduct outside the United States. *Ford v. United States*, 273 U.S. 593, 622-24 (1927) (if a criminal enterprise is carried out in part within the United States, all of the participants, including foreigners whose activities were entirely outside the United States, may be prosecuted); *Leija-Sanchez*, 602 F.3d at 800 (same).[29]

The defendants' reading of the statute is also inconsistent with the Senate's ratification of the Palermo Convention. The Senate's resolution ratifying the treaty made it clear that the Senate believed that it would be the "rare" case of transnational organized crime that could not be effectively prosecuted under federal criminal law; the defendants propose a rule that would open a large fissure in the law, permitting any member of an international organized crime group to escape prosecution simply by causing other members of the criminal enterprise to commit criminal acts within the United States at his direction. Doubtless this is not what Congress did or intended when it expanded the reach of the money laundering statute and it certainly isn't what the

---

29    The defendants' proposed reading of section 1956(f) would also not be in harmony with other provisions of section 1956. Section 1956(h) permits the government to charge conspiracies to violate the section, and section 1956(i)(2) provides that a prosecution for conspiracy to violate any provision of 1956 can be brought in any district where "an act" in furtherance of the conspiracy took place. Under the defendants' reading of the statute, it would not possible to charge a conspiracy that involves extraterritorial application of the statute unless all members of the conspiracy each engaged in conduct within the United States. This would be at odds with the general law of conspiracy as well.

Senate did or intended when it ratified the Palermo Convention. The defendants' challenges to the money laundering predicate should therefore be rejected.

> **b.** **The Allegations in Count One Concerning the Travel Act Predicate are Sufficient.**

The defendants' contention that Count One alleges impermissible extraterritorial violations of the Travel Act is wrong as well. In fact, the opposite is true: the allegations in the indictment make it clear that the indictment alleges domestic violations of the statute. As discussed above, the allegations concerning travel point to numerous examples of travel in interstate commerce within the United States with the intent to promote the unlawful activity, and then acts taken here in the United States after such travel to promote the unlawful activity (even though it is not required under *Glecier* because Count One is a RICO conspiracy). R. 2 at 16-18. That is enough to establish that Count One alleges an agreement to engage in domestic violations of the Travel Act.

Perhaps recognizing this, the defendants are forced to feebly argue that it is "irrelevant" that the indictment alleges domestic travel in interstate commerce and acts taken thereafter in furtherance of the conspiracy within the United States, because, according to the defendants, these allegations have been included by the government in an effort to "establish United States jurisdiction over an entirely foreign operation in foreign jurisdictions." DF Br. at 15-16. This is nothing more than a round-about way of the defendants registering, once again, their disagreement with the Supreme Court's

decision in *Nabisco*.[30]  *Nabisco* holds that the substantive provisions of the RICO statute apply to foreign enterprises—including transnational organized crime groups like the one charged here—so long as the charged pattern of racketeering activity consists of predicate offenses either committed within the United States, or predicate offenses that, by their own terms, apply extraterritorially.  136 S. Ct. at 2102-03.  As the Supreme Court said in *Nabisco*, "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad."  136 S. Ct. at 2101.  The unlawful activity in *Nabisco* involved the smuggling of narcotics into Europe by Colombian and Russian drug traffickers, the sale of these drugs in Europe, and the use of the proceeds to pay for RJR Nabisco's cigarettes. *Id.* at 2098.   Yet before the case reached the Supreme Court, the Second Circuit had found that the civil complaint alleged domestic violations of the Travel Act by a foreign enterprise, because the conduct alleged to have occurred in the United States satisfied every essential element of the Travel Act offense. *Id.* at 2105 (citing *Nabisco*, 764 F.3d at 142).[31]  An enterprise, like the Sicilian Mafia in the famous "Pizza Connection" case, or the

---

30      Recall the defendants rely prominently upon *Cedeno v. Intech Group, Inc.*, 733 F. Supp. 2d 471  (S.D.N.Y. 2010), a case that was overruled by the Supreme Court's decision in *Nabisco*.  DF Br. at 13.

31      The Second Circuit pointed to, among other things, an allegation in the civil complaint that "RJR executives traveled from the United States to Europe and South America to meet with, entertain, and maintain relations with RJR's criminal customers" in support of its conclusion that the complaint satisfactorily alleged a domestic violation of the Travel Act.  764 F.3d at 142.  RJR Nabisco did not challenge this conclusion before the Supreme Court.  136 S. Ct. at 2105.

criminal enterprise charged here, cannot escape the broad reach of the RICO statute intended by Congress merely because it conducts illegal operations in multiple countries.[32]

Indeed, the defendants' argument would no doubt amaze the Senators who ratified the Palermo Convention and committed the United States to the fight against transnational organized crime. Transnational organized crime is, *by definition*, crime undertaken by a group that occurs in more than one state. *See* Palermo Convention, art. 2-3, 5. The United States took on the obligation to fight transnational organized crime, and did so with the understanding the federal criminal law was capable of addressing this threat, and that only the "rare" case could not be pursued. It therefore cannot credibly be argued that the most potent weapons in the fight against organized crime—such as the RICO statute and the Travel Act—are incapable of being used against a transnational criminal organization such as the one charged in this case precisely because it conducts its criminal operations in multiple countries.

Once again recognizing the weakness of their argument, the defendants also ask this Court to simply *ignore* various allegations in Count One for purposes of deciding whether it sufficiently alleges a domestic application of the Travel Act, because they don't

---

[32] The defendants are also wrong to argue that the unlawful activity charged in the indictment is not within the focus or concern of the Travel Act. DF Br. at 15. The Travel Act specifically provides the unlawful activity encompasses any act indictable under section 1956; and by now it is apparent from the discussion above that Congress meant for section 1956 to squarely target criminal endeavors that focus on the bribery of foreign officials. 18 U.S.C. § 1956(c)(7)(B)(iv).

believe that the government can prove its case. For example, they ask the Court to ignore the allegations concerning co-defendant Lal's travel from North Carolina to India because Lal lived in North Carolina at the time, so, according to the defendants, these trips were "incidental to any other purpose he may have had." DF Br. at 17. The defendants also assert that the use of email servers and cellular telephones within the United States were incidental too. DF Br. at 18. They also make the related assertion that discussions and meetings with Company A were not designed to advance an illegal purpose. *Id.* These are questions for the jury to decide after receiving all the evidence in the case, and cannot be decided prior to trial—and certainly not based on the assertions of the defendants about what the evidence would show. *Kaley*, 134 S. Ct. at 1097-98; *Ladish Malting Co.*, 135 F.3d at 490-91; *Thomas*, 150 F.3d at 747 (Easterbrook, J., concurring); *Yaska*, 884 F.2d at 1000-01. The motions to dismiss Count One should be denied.

## IV. Defendants' Motions to Dismiss Counts Two through Four for Failure to State an Offense Should Be Denied.

The defendants simply reiterate the same arguments they make to dismiss Count One to support dismissal of Counts Two through Four. DF Br. at 19. These arguments fail for the same reasons discussed above. Indeed, with regard to Counts Two through Four, the weakness of these arguments is even more apparent. All three of these counts properly allege that the offenses occurred in this district and elsewhere, and so there is no basis to believe on the face of these charges that they allege an impermissible

extraterritorial application of the relevant statutes. R. 2 at 20-23. Because they sufficiently allege offenses of the relevant statutes, the motion to dismiss them should be denied for the reasons already provided.

## V. Defendants' Motions to Dismiss Count Five for Failure to State an Offense Should Be Denied.

Count Five alleges that the defendants conspired, in violation of 18 U.S.C. §§ 2 and 371, to violate the Foreign Corrupt Practices Act (the "FCPA"), 15 U.S.C. §§ 78dd-2(a), 78dd-3(a). R. 2 at 24-27. The defendants argue that the Court should dismiss Count Five because it does not allege that they or their co-conspirators "committed bribery" while within the United States. They also argue that, because Firtash and Knopp are not "domestic concerns" within the meaning of the FCPA, or alternatively did not personally take an act within the United States in furtherance of the conspiracy, they cannot be prosecuted for a conspiracy to violate Sections 78dd-2 and 78dd-3 of the FCPA. DF Br. at 19-20.[33] For the reasons provided below, both of these arguments are meritless.

### A. When Alleging a Conspiracy to Violate the FCPA, the Government is Not Required to Allege that a Conspirator "Committed Bribery" within the United States.

#### 1. Applicable Law.

"Congress enacted the FCPA in 1977, in response to recently discovered but widespread bribery of foreign officials by United States business interests. Congress

---

[33] As with their other claims, the defendants erroneously assert, DF Br. at 19, that Count Five should be dismissed for want of jurisdiction. *See* note 19, *supra*.

resolved to interdict such bribery, not just because it is morally and economically suspect, but also because it was causing foreign policy problems for the United States." *United States v. Kay*, 359 F.3d 738, 746 (5th Cir. 2004). When it was initially enacted, the FCPA prohibited, *inter alia*, domestic concerns (*i.e.*, U.S. persons or entities[34]), or "any officer, director, employee, or agent of such domestic concern," from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the giving of anything of value to a foreign official in order to obtain or retain business. *See* 15 U.S.C. § 78dd-2(a). In construing the FCPA, the Fifth Circuit noted that Congress intended the statute to apply to "virtually every person or entity involved, including foreign nationals who participated in the payment of the bribe when the U.S. courts had jurisdiction over them," with the exception of the foreign officials who received the bribe payments. *United States v. Castle*, 925 F.2d 831, 835 (5th Cir. 1991).

Congress amended the FCPA in 1998 to expand its reach. Specifically, these amendments were made "to ensure the United States was in compliance with its treaty obligations. . . . In joining the OECD Convention, the United States agreed to 'take such measures as may be necessary to establish that it is a criminal offence under [United States] law for *any person* intentionally to'" bribe a foreign official to obtain or retain

---

[34] The statute defines a "domestic concern" as "any individual who is a citizen, national, or resident of the United States," as well as a business that "has its principal place of business in the United States," or which is organized under state law. 15 U.S.C. § 78dd-2(h)(1)(A) & (B).

71

business.  *United States v. Esquenazi*, 752 F.3d 912, 923 (11th Cir. 2014) (citations omitted and emphasis added).[35]  Among other changes to the statute, Congress added 15 U.S.C. § 78dd-3, which prohibited those individuals or entities that did not already fall under other provisions of the statute from taking action "while in the territory" of the United States in furtherance of corrupt payments.  According to the legislative history associated with the 1998 amendments, Section 78dd-3 "closes the gap left in the original FCPA and implements the OECD Convention's requirement that Parties criminalize bribery by 'any person.' . . . The new offense complies with this section by providing for criminal jurisdiction in this country over bribery by foreign nationals of foreign officials when the foreign national takes some act in furtherance of the bribery within the territory of the United States."  S. Rep. No. 105-277 at 4 (1998); H.R. Report No. 105-802 at 23 (1998).[36]

The expansive language of the statute itself makes it clear that the FCPA does not require the government to allege (or prove) that an actual bribe payment was made

---

[35]    The Organisation for Economic Cooperation and Development ("OECD") was founded in 1961 to stimulate economic progress and world trade.  The OECD's Anti-Bribery Convention ("OECD Convention") requires OECD parties to criminalize the bribery of foreign public officials in international business transactions. As of July 23, 2017, there are 43 parties to the Convention.

[36]    Notably, the OECD Convention provides that "[e]ach Party shall take any measures necessary to establish that complicity in, including incitement, aiding and abetting, or authorisation of an act of bribery of a foreign public official shall be a criminal offence," OECD Convention art. 1.2, and that "[e]ach Party which has jurisdiction to prosecute its nationals for offences committed abroad shall take such measures as may be necessary to establish its jurisdiction to do so in respect of the bribery of a foreign public official, according to the same principles," *id.* art. 4.2.

by someone within the United States. Specifically, the FCPA as a general matter prohibits an "offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to" a foreign official or a third party knowing that all or a portion of such money or thing of value will be offered, promised, or given to a foreign official. 15 U.S.C. §§ 78dd-2(a), 78dd-3(a). Thus, a bribe need not be consummated in order for the FCPA to be violated. Section 78dd-2 seeks to prevent the use of the instrumentalities of commerce in furtherance of this crime, by prohibiting "domestic concerns" (a term which includes United States nationals) from using "the mails or any means or instrumentality of interstate commerce" in furtherance of the offer, payment, promise to pay, or authorization of the payment, regardless of whether the offer or bribe payment was made abroad. 15 U.S.C. § 78dd-2(a). Section 78dd-3, for its part, seeks to prevent acts taken in the United States in furtherance of this crime, by prohibiting a foreign national[37] "while in the territory of the United States . . . do[ing] any other act in furtherance of" the offer, payment, promise to pay, or authorization of the payment. 15 U.S.C. § 78dd-3(a). Although Section 78dd-3 requires an act to be taken within the United States, like Section 78dd-2, it does not require that a bribe payment itself be made within this country.

---

[37] Section 78dd-3(a) applies to "any person other than an issuer that is subject to section 78dd–1 of this title or a domestic concern (as defined in section 78dd–2 of this title)"—in other words, it covers the conduct of foreign nationals and their agents. 15 U.S.C. § 78dd-3(a) & (f)(1).

2. **Analysis.**

Count Five charges the defendants with conspiring to violate Sections 78dd-2 and 78dd-3 of the FCPA in violation of Title 18, United States Code, Section 371. An indictment charging conspiracy need only plead the elements of 18 U.S.C. § 371, and not those of the underlying crime that is the object of the conspiracy. *See Wong Tai v. United States*, 273 U.S. 77, 81 (1927) ("It is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, or to state such object with the detail which would be required in an indictment for committing the substantive offense.") (citations omitted); *United States v. Roman*, 728 F.2d 846, 855 (7th Cir. 1984) ("'[A]n indictment for a conspiracy to commit a criminal offense need not be as specific as a substantive count' in order to meet constitutional muster") (citations omitted). Therefore, the indictment need only allege violations of the elements of a conspiracy to commit an offense against the United States.

Count Five easily meets this requirement. It alleges an agreement to violate both Sections 78dd-2 and 78dd-3, and identifies numerous overt acts within the United States by members of the conspiracy, including repeated use of the United States financial system by members of the conspiracy and repeated interstate and foreign travel in furtherance of the conspiracy. R. 2 at 11-18, 27. Thus, Count Five goes well beyond the

74

liberal pleading standards required by the Supreme Court and the Seventh Circuit.  *Cox*, 536 F.3d at 726.

The defendants argue that, in addition to alleging an agreement to violate Sections 78dd-2 and 78dd-3, the government must go a step further, and also allege (and prove at trial) that a conspirator "committed bribery" within the United States.  DF Br. at 19-20.  But, as the foregoing discussion indicates, the commission of bribery within the United States is not even a required element of a substantive offense under either Section 78dd-2 or Section 78dd-3.  The expansive language of those provisions only requires the use of an instrumentality of interstate commerce (Section 78dd-2), or an act in furtherance within the United States (Section 78dd-3) of the bribery offense; no bribe needs to be passed to a foreign official within the United States.  Moreover, because Count Five charges a conspiracy to violate these provisions, the government need not allege the completion of the crime, even if this were an element of the substantive crimes, which it is not.  *United States v. Feola*, 420 U.S. 671, 694 (1975).  Indeed, the defendants fail to cite any case supporting their assertion that the government must allege, in a case charging a conspiracy to violate the FCPA, that a defendant personally made a bribe payment within the United States.[38]

---

[38]  This argument is not only meritless, but waived due to failure to develop it.  *United States v. Collins*, 361 F.3d 343, 349 (7th Cir. 2004) (applying general rule that legal issues not raised or adequately developed are waived); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.").

B.    **Defendants Firtash and Knopp Do Not Have to Be "Domestic Concerns" or to Personally Take An Act within the United States in Order to Be Prosecuted for Conspiring to Violate Sections 78dd-2 and 78dd-3 of the FCPA.**

1.    **Applicable Law.**

The general rule in conspiracy cases is that one who is incapable of committing a particular offense may still be guilty of conspiring to commit, causing, or aiding and abetting that offense.  In the conspiracy context, the Supreme Court has clearly stated that "[a] person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense." *Salinas v. United States*, 522 U.S. 52, 64 (1997).  *See also Ocasio v. United States*, 136 S. Ct. 1423, 1431 (2016) (affirming this "longstanding principle"); *United States v. Jones*, 938 F.2d 737, 742 (7th Cir. 1991) ("A person, even though incapable of committing the underlying substantive offense, can be convicted of conspiracy under 18 U.S.C. § 371.").  This fundamental rule is not altered when some portion of the crime occurs outside the United States.  Consistent with the law regarding venue, it is also well-settled that conspirators who never enter the United States may be prosecuted when an overt act is committed within the United States by some member of the conspiracy.  *See United States v. Lawson*, 507 F.2d 433, 445 (7th Cir. 1974) (citing cases), *overruled in part on other grounds by United States v. Hollinger*, 553 F.2d 535 (7th Cir. 1977).  *See also Ford*, 273 U.S. at 620 (in a conspiracy "directed to violation of the United States law within the United States, by men within and without it . . . all are guilty . . . of conspiring to violate the United States law whether they are in or out of the

76

country"); *United States v. Baker*, 609 F.2d 134, 138 (5th Cir. 1980) (stating that "the objective territorial principle has been asserted successfully" even if the defendant never performed any act within the United States when "he was part of a conspiracy in which some co-conspirator's activities took place within the United States territory").[39]

The same principles apply to accomplice liability. "One purpose of 18 U.S.C. § 2 is to enlarge the scope of criminal liability under existing substantive criminal laws so that a person who operates from behind the scenes may be convicted even though he is not expressly prohibited by the substantive statute from engaging in the acts made criminal by Congress." *United States v. Ruffin*, 613 F.2d 408, 413 (2d Cir. 1979). *See also United States v. Washington*, 287 F.2d 819, 821 (7th Cir. 1961) (noting that the legislative history associated with 1951 amendments to 18 U.S.C. § 2 reflect that Congress "intended to clarify and make certain the intent to punish aiders and abettors regardless of the fact that they may be incapable of committing the specific violation which they are charged to have aided and abetted"). As the Seventh Circuit has made clear, "[e]ver since [the passage of what is now 18 U.S.C. § 2(a) in 1909], every time Congress has passed a new criminal statute the aider and abettor provision has automatically kicked in and made the aiders and abettors of violations of the new statute punishable as principals." *United States v. Pino-Perez*, 870 F.2d 1230, 1233 (7th Cir. 1989) (citing *Standefer v. United States*,

---

39   *See also United States v. Schmucker-Bula*, 609 F.2d 399, 402 (7th Cir. 1980); *United States v. MacAllister*, 160 F.3d 1304, 1307-08 (11th Cir. 1998) ("The general rule is that a conspiracy to violate the criminal laws of the United States, in which one conspirator commits an overt act in furtherance of that conspiracy within the United States, is subject to prosecution in the district courts.").

447 U.S. 10, 20 (1980)). As with conspirators, a causer or aider and abettor who never himself acts in the United States may be prosecuted. *See, e.g.*, *Lawson*, 507 F.2d at 445 (concluding, with respect to a defendant charged as an aider and abettor pursuant to 18 U.S.C. § 2 that "[w]here, as here, the substantive offense is committed within the United States, the district court also has jurisdiction over the defendant, as a principal, with regard to the substantive offense, even though the defendant's participation took place outside the United States").

Nor is there a need for Congress to provide explicitly for conspiratorial or accessorial liability in the text of a particular criminal offense. Sections 2 and 371 apply to every statute, including the FCPA. *See, e.g.*, *Pino-Perez*, 870 F.2d at 1233 ("Congress doesn't have to think about aider and abettor liability when it passes a new criminal statute, because section 2(a) attaches automatically."); *United States v. Lake*, 472 F.3d 1247, 1266 (10th Cir. 2007) ("Traditionally there is no need for the statute setting forth the substantive offense to make any reference to liability for conspiracy. That job is performed by 18 U.S.C. § 371.").

### 2. Analysis.

Under the general principles of conspiracy and accomplice liability discussed above, both Firtash and Knopp can be prosecuted for conspiring to violate the FCPA. The government's proof at trial is expected to show that co-conspirator Gajendra Lal was a "domestic concern" within the meaning of Section 78dd-2 of the FCPA, and that Firtash and Knopp joined in a conspiracy with Lal and others to violate Section 78dd-2, a

conspiracy that included use of the instrumentalities of interstate commerce. Therefore, even though Firtash and Knopp could not be held liable for committing the substantive FCPA offense prohibited by Section 78dd-2 themselves (because neither has the status of a "domestic concern"), so long as they conspired with, caused, or aided and abetted individuals or entities who are covered by the statute, they may be held liable. *Ocasio*, 136 S. Ct. at 1431. Similarly, the government's proof at trial is expected to show that the conspirators agreed to violate Section 78dd-3, a conspiracy that involved foreign nationals—including Knopp—taking acts in furtherance of the conspiracy within the United States. Accordingly, both Firtash and Knopp may be properly charged with a conspiracy to violate Sections 78dd-2 and 78dd-3 of the FCPA. *Id.*[40]

Despite these well-established principles, the defendants ask the Court to dismiss Count Five based on the Supreme Court's decision in *Gebardi v. United States*, 287 U.S. 112 (1932). *Gebardi* involved a prosecution under the Mann Act, a statute criminalizing the "'transportation . . . [of] any woman or girl for the purpose of prostitution . . . or for any other immoral purpose.'" 287 U.S. at 118 (quoting former 18 U.S.C. § 398). The Supreme Court explained that Congress passed the Mann Act "to deal with cases which frequently, if not normally, involve consent and agreement on the part of the woman to the forbidden transportation." *Id.* at 121. The statute, therefore, "necessarily

---

[40] As noted earlier, the government's evidence at trial will show that Knopp took acts in furtherance of the conspiracy within the territory of the United States. Therefore, Knopp is in an especially poor position to make a pretrial challenge to the application of Section 78dd-3.

contemplate[d] her acquiescence," but Congress chose not to make the woman's acquiescence "a crime under the Mann Act itself." *Id.* at 121. This failure "to condemn the woman's participation in those transportations which are effected with her mere consent," the Court held, "[was] evidence of an affirmative legislative policy to leave her acquiescence unpunished." *Id.* at 123. "[A] necessary implication of that policy," was that "when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an inseparable incident of all cases in which the woman is a voluntary agent at all, but does not punish, was not automatically to be made punishable under the latter." *Id.* Thus, *Gebardi* stands for the narrow proposition that in instances where Congress so clearly was considering both sides of a transaction but chose only to punish one side of it, Congress clearly intended that the other side not be punished, and the conspiracy statute should not be used to undermine that objective.

The *Gebardi* opinion itself, however, explicitly limited its reach. In the course of its opinion, the Supreme Court reaffirmed the longstanding principle that conspirator and accomplice liability can apply to those individuals participating in offenses even though they could not themselves be convicted as principals. *See id.* at 120 ("Incapacity of one to commit the substantive offense does not necessarily imply that he may with impunity conspire with others who are able to commit it."); *see also id.* at 120 n.5 (noting that "it has been held repeatedly that one not a bankrupt may be held guilty . . . of conspiring that a bankrupt shall conceal property from his trustee" and collecting cases).

80

The Court recognized the narrowness of the exception to conspiratorial liability that it was creating with respect to the Mann Act by reaffirming its prior holding in *United States v. Holte*, 236 U.S. 140 (1915), where the Court "declined to hold that a woman could not under some circumstances not precisely defined, be guilty of a violation of the Mann Act and of a conspiracy to violate it as well." *Gebardi*, 287 U.S. at 117. Thus, the Court held that a woman being transported who did more than merely acquiesce to the crime by "consent[ing] to her own transportation" would be outside the scope of the "legislative policy to leave her acquiescence unpunished" and was therefore subject to prosecution. *Id.* at 119, 123; *see also id.* at 118-19 ("[S]uch aid and assistance must . . . be more active than mere agreement on her part to the transportation and its immoral purpose.").

The limited reach of *Gebardi* was highlighted again by the Supreme Court only last term in *Ocasio v. United States*, 136 S. Ct. 1423 (2016). Ocasio, a former Baltimore police officer, was convicted of conspiracy to violate the Hobbs Act for his participation in a kickback scheme with the owners of an auto repair shop. *Id.* at 1427. As the recipient of the kickbacks, Ocasio argued that he could not be convicted of conspiring to obtain money from the repair shop owners under color of official right because the Hobbs Act required obtaining property from "another," and the owners of the auto repair shop were members of the charged conspiracy. *Id.* Ocasio therefore argued that, because the shop owners were not capable of being punished for the substantive offense (since they weren't getting property from "another," they were paying the kickbacks to him), it was improper to charge him in a conspiracy with individuals who Congress placed outside the

reach of the statute. The Supreme Court rejected Ocasio's argument "because it is contrary to age-old principles of conspiracy law." *Id.* "[T]he Government has no obligation," the Court wrote, "to demonstrate that each conspirator agreed personally to commit—or was even capable of committing—the substantive offense . . . . It is sufficient to prove that the conspirators agreed that the underlying crime *be committed* by a member of the conspiracy who was capable of committing it." *Id.* (emphasis in original). The Court explained that the principle elucidated in *Gebardi* only limits conspiratorial liability "when that person's consent or acquiescence is inherent in the underlying substantive offense"—in which case, conspiracy liability is not wholly barred, but "something more than bare consent or acquiescence may be needed to prove that the person was a conspirator."[41]

a.     *Gebardi* Does Not Apply to this Case Because the Defendants Are Neither Victims of, Nor Necessary Parties to, an FCPA Violation.

It is apparent that the narrow rule of *Gebardi* does not apply to the defendants in this case. The allegations in the indictment make it clear that defendants Firtash and Knopp did much more than merely "acquiesce" in the bribery scheme and, therefore, they

---

41     In this respect, the Supreme Court merely reiterated the limited reading the Courts of Appeals had given to *Gebardi* for years. *See, e.g.*, *United States v. Spitler*, 800 F.2d 1267, 1276 (4th Cir. 1986) ("When an individual protected by such legislation exhibits conduct more active than mere acquiescence, however, he or she may depart the realm of a victim and may unquestionably be subject to conviction for aiding and abetting and conspiracy. We derive such conclusion again from *Gebardi*, wherein the Court . . . observed that where the woman's conduct is 'more active than mere agreement on her part to the transportation,' and where she is 'the active or moving spirit in conceiving or carrying out the transportation' she is not a victim, but an accomplice.") (internal citations omitted).

are not entitled to claim the limited immunity to conspiratorial liability granted by the Supreme Court to transported women (and other similarly situated individuals) in *Gebardi*. Indeed, Firtash is identified as "the leader of the enterprise" who "oversaw, directed and guided certain of the enterprise's illegal activities"; he met with Indian government officials, authorized the payment of bribes, and directed the creation of false documents. R. 2 at 6-7. Knopp occupied a "supervisory role in the enterprise" and met with Indian government officials and representatives of Company A in other to further the objectives of the conspiracy. *Id.* at 7-8. In light of these allegations, which must be accepted as true at this juncture, *Ladish Malting*, 135 F.3d at 490-91; *Yaska*, 884 F.2d at 1000-01, the defendants plainly are not entitled to invoke the *Gebardi* exception.

Even absent allegations that make it clear that the defendants' conduct amounted to more than mere acquiescence in the criminal scheme, the defendants' reliance on *Gebardi* would be misplaced. As matter of law, the *Gebardi* doctrine does not apply to FCPA co-conspirators in the defendants' positions—that is, a leader and supervisor of a criminal enterprise engaged in bribery of foreign officials. The Supreme Court has made clear that the *Gebardi* exception applies only when the defendant's "consent or acquiescence is inherent" in the object offense, *Ocasio*, 136 S. Ct. at 1432, or, at least where the defendant's participation in the crime is "frequently, if not normally" a feature of the criminal conduct, yet the statute chooses not to make the defendant's behavior "a crime under the [statute] itself," *Gebardi*, 287 U.S. at 121. *See also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 246 (1940) (distinguishing *Gebardi* as a case

83

"where the participation of those . . . against whom the judgment of conviction was reversed was necessary for the existence of the crime charged"). Put more simply, if someone is expected to acquiesce or participate in most instances of the offense, yet Congress chose not to criminalize that participation, a court can reasonably infer that Congress did not mean for that individual to face liability for his role, at least under typical circumstances. Such an inference, if strong enough based on all relevant factors, can overcome the normal rule that secondary liability applies generally throughout the criminal code, but the inference only makes sense, as in *Gebardi*, when the offense "frequently, if not normally, involve[s] consent and agreement on the part of" the other person involved in the crime. 287 U.S. at 121.

For this reason, the Seventh Circuit and several of its sister courts have recognized that the *Gebardi* exception is limited to cases featuring bilateral transactions necessarily involving participation by another, but for which Congress has chosen to punish only one side of the transaction. *See United States v. Pino-Perez*, 870 F.2d 1230, 1232 (7th Cir. 1989) ("When a 'crime is so defined that participation by another is necessary to its commission,' that other participant is not an aider and abettor." (quoting *United States v. Southard*, 700 F.2d 1, 20 (1st Cir. 1983)); *see also United States v. Shear*, 962 F.2d 488, 493-94 (5th Cir. 1992) (employee could not be convicted of aiding and abetting employer in violating safety regulations because every employer "*necessarily* has employees" for whom Congress must have contemplated principal liability) (emphasis in original). Even in such cases, however, there is only a "weak presumption" that

84

conspirator and accomplice liability do not apply. *United States v. Falletta*, 523 F.2d 1198, 1200 (5th Cir. 1975) ("At the same time, we do not hold that the aiding and abetting statute can never be brought into play when the legislature has prescribed criminal penalties for one party in a transaction that necessarily involves two. The rule of construction announced in *Gebardi* amounts at best to a weak presumption about legislative intent.") (citation omitted).[42]

Consistent with this line of cases, the only Court of Appeals to consider the *Gebardi* doctrine in the context of the FCPA has restricted *Gebardi* to situations in which the defendant is a "necessary party" to a transaction where Congress did not criminalize that party's conduct. In *United States v. Castle*, 925 F.2d 831, 833 (5th Cir. 1991), the Fifth Circuit relied on the necessary party analysis to exclude the foreign official bribe recipient from conspiratorial liability. The court likened the FCPA to the Mann Act, observing that "Congress intended in both the FCPA and the Mann Act to deter and punish certain activities which necessarily involved the agreement of at least two people, but Congress chose in both statutes to punish only one party to the agreement." *Id.* at

---

42    In *Pino-Perez*, the Seventh Circuit recognized that some courts have interpreted *Gebardi* to insulate from accessorial liability both "the victims of the crime" as well as "members of a group that the criminal statute seeks to protect." *Pino-Perez*, 870 F.2d at 1232 (analyzing *Gebardi* in context of drug "kingpin" statute). *Pino-Perez*, however, noted that the "necessary participation" reading of *Gebardi* "applies even though the statute was not intended to protect the other participants." *Id.* at 1231 (citing *Southard*, 700 F.2d 20). Nevertheless, the other two exceptions mentioned by the Seventh Circuit do not apply to the defendants, as they clearly are not victims of an FCPA offense, and it would strain credulity to believe that Congress passed the FCPA to "protect" foreign nationals who lead and supervise a scheme to bribe foreign officials.

833 (footnote omitted). In the FCPA, the *Castle* court found, Congress had affirmatively chosen to leave unpunished foreign officials who accept bribes—"a well-defined group of persons who were necessary parties to the acts constituting a violation of the substantive law." *Id.* at 836.

Under these principles, the *Gebardi* exception to conspirator and accomplice liability does not apply to defendants Firtash and Knopp. The defendants clearly are not part of any class of persons that Congress has excluded from coverage under the FCPA. To the contrary, a review of both the statutory text and legislative history of the FCPA confirms that Congress expressly intended to subject to prosecution those authorizing bribe payments to foreign officials. Indeed, *Castle* makes this clear. In describing the legislative history of the FCPA, the Fifth Circuit stated: "In the conference report, the conferees indicated that the bill would reach as far as possible, and listed all the persons or entities who could be prosecuted. The list includes virtually every person or entity involved, including foreign nationals who participated in the payment of the bribe when the U.S. courts had jurisdiction over them." *Castle*, 925 F.2d at 835 (citing H.R. Rep. No. 95-831, at 14 (1977) (Conf. Rep.)); *see also United States v. McLean*, 738 F.2d 655, 659 n.9 (5th Cir. 1984) (legislative history of the 1977 FCPA provided that "concepts of aiding and abetting and joint participation would apply to a violation under this bill") (quoting H.R. Rep. No. 95-640 (1977)).

The legislative history associated with the 1998 amendments is even more unequivocal as to the applicability of conspiratorial and accessorial liability to foreign

nationals who assist domestic actors. In enacting 15 U.S.C. § 78dd-3, the territorial jurisdiction provision of the FCPA, Congress pronounced that, "[a]lthough this section limits jurisdiction over foreign nationals and companies to instances in which the foreign national or company takes some action while physically present within the territory of the United States, *Congress does not thereby intend to place a similar limit on the exercise of U.S. criminal jurisdiction over foreign nationals and companies under any other statute or regulation.*" S. Rep. No. 105-277, at 5 (1998); H.R. Rep. No. 105-802, at 23 (1998) (emphasis added). Thus, more than merely leaving undisturbed the general principle that 18 U.S.C. §§ 2 and 371 shall apply to those statutes enacted in their wake, Congress provided an unambiguous statement that it intended them to apply in cases such as this one. *See also United States v. Bodmer*, 342 F. Supp. 2d 176, 188-89 (S.D.N.Y. 2004) (holding that Congress, through the 1998 amendments, "clarified that the FCPA's criminal penalties apply to any natural person who is subject to the jurisdiction of the United States courts")."

Indeed, to adopt the defendants' view that they cannot be prosecuted would create an unwarranted anomaly in the law that would insulate foreign leaders of an organized crime group from liability while at the same time punishing their foreign underlings. As explained above, the FCPA precludes "domestic concerns" and their officers, directors, employees, and agents from using interstate commerce in furtherance of the corrupt payment. There is no dispute that, if the defendants qualified as "employees" or "agents" of a domestic concern, they would be subject to conspiratorial and accessorial liability,

87

even if they never took any action in furtherance of the scheme in the United States. Thus, the unstated (but necessary) premise underlying the defendants' motion to dismiss Count Five is that they are not sufficiently low enough within the criminal enterprise to be culpable under the FCPA. Firtash is alleged to be the leader, and Knopp a supervisor, of the enterprise engaging in the corrupt bribery scheme. Although much lower-level foreign national schemers can be prosecuted despite never setting foot in the United States, the defendants, so their reasoning goes, escape liability.

There is no support in the legislative history (or anywhere else) for such an illogical proposition. Instead, Congress sought to curb all such bribery linked to U.S. interests. *See*, *e.g.*, *Kay*, 359 F.3d at 746. Congress never expressed an affirmative desire to punish low-level foreign nationals while immunizing high-level foreign national members of a bribery scheme. To interpret the FCPA in the manner that defendants suggest "would create a gaping loophole in the law that would hinder, rather than promote," the enforcement of the statute, punishing low-level foreign nationals facilitating the bribe scheme on behalf of a domestic concern, but not the foreign national ringleaders that were directing the commission of the very same offense. *United States v. Henson*, 848 F.2d 1374, 1384 (6th Cir. 1988). This Court should reject such an "absurd interpretation." *See United States v. Coleman*, 590 F.2d 228, 231 (7th Cir. 1978) (rejecting a narrow construction of a criminal statute on the grounds that doing so "would accomplish an absurd interpretation of the statute, one that should not be imputed to Congress by a court having the proper degree of respect for that body").

88

Moreover, to accept the defendants' argument that they cannot be prosecuted for conspiracy and aiding and abetting an FCPA violation under the circumstances present here would risk placing the United States in violation of its treaty obligations. As noted above, the 1998 amendments to the FCPA were "enacted to ensure the United States was in compliance with its treaty obligations" under the OECD Convention. *Esquenazi*, 752 F.3d at 923; *see also* S. Rep. No. 105-277, at 2 ("This Act amends the FCPA to conform it to the requirements of and to implement the OECD Convention."). The OECD Convention requires the United States to "take such measures as may be necessary to establish that it is a criminal offence under its law for *any* person" to engage in bribery of foreign officials to further business interests, including "establish[ing] that complicity in, including incitement, aiding and abetting, or authorisation of an act of bribery of a foreign public official shall be a criminal offence." OECD Convention, arts. 1.1, 1.2 (emphasis added). The OECD Convention also requires the United States to treat offenders under the FCPA the same way it treats violators of other offenses. *Id.* art. 4.2. Applying federal principles of conspirator and accomplice liability to the FCPA so as to encompass non-agent foreign nationals who never enter the United States, but who conspire, cause or aid and abet U.S.-based actors, is consistent with the requirements of the OECD Convention. *See Kay*, 359 F.3d at 755 n.68 ("Indeed, given the United States's ratification and implementation of the [OECD] Convention without any reservation, understandings or alterations specifically pertaining to its scope, we would find it difficult to interpret the statute as narrowly as the defendants suggest: Such a construction would

89

likely create a conflict with our international treaty obligations, with which we presume Congress meant to comply fully.").

In addition, the defendants are not "necessary parties" to an FCPA violation. Rather, they are but one of several conspiring bribe-payors, none of whose involvement is necessary to the crime. Nor can it be said that an FCPA case "frequently" or "normally," *Gebardi*, 287 U.S. at 121, involves a racketeering and bribery conspiracy overseen by foreign nationals who are not agents of a domestic concern and who did not take actions in furtherance of the conspiracy while within the United States. *See*, *e.g.*, *United States v. Lake*, 472 F.3d 1247, 1265 (10th Cir. 2007) ("[I]n both [*Gebardi* and *Castle*] the role of the defendant co-conspirator was so central to the commission of the substantive offense that the failure of the statute defining the substantive offense to prohibit that role explicitly was a compelling indication of legislative intent not to punish such a co-conspirator. The defendants here . . . could not argue . . . that their alleged roles . . . are of that nature.").

> ### b. *Hoskins'* Application of the Narrow Exception in *Gebardi* to the FCPA is Inconsistent with the Supreme Court's More Recent Decision in *Ocasio* and Seventh Circuit Precedent.

The defendants urge this Court to adopt their reading of *Gebardi* by pointing to *United States v. Hoskins*, 123 F. Supp. 3d 316, 321 (D. Conn. 2016), in which the district court read the *Gebardi* exception to apply to the FCPA on the ground that *Gebardi* must apply whenever "Congress chooses to exclude a class of individuals from liability under a

90

statute." *Hoskins*, 123 F. Supp. 3d at 321.[43] *Hoskins*'s expansive reading of the *Gebardi* exception is wrong for the reasons discussed above; the exception to conspiratorial liability laid out in *Gebardi* does not apply simply because a class of individuals is excluded from liability under a statute. Moreover, there are two additional reasons why this Court should decline to follow *Hoskins*.

First, *Hoskins* was decided before the Supreme Court's recent decision in *Ocasio*, which, as discussed above, has reaffirmed the narrow confines of *Gebardi*. *Ocasio* makes clear that the mere fact that a statute is written so as to directly cover a limited category of persons does not alone support application of the *Gebardi* exception, even where those categories are "carefully delineate[d]."[44] *Ocasio*, 136 S. Ct. at 1432. *See also Ruffin*, 613 F.3d at 413 (finding defendant liable under causing theory even though "he obviously could not have been found guilty of violating 42 U.S.C. § 2703, since he was never an 'officer, director, agent or employee of, or connected in any capacity with, any agency receiving financial assistance,' the only category of persons to whom the criminal sanction of § 2703 directly applies").

Second, the *Hoskins* ruling was heavily premised on the reasoning of a Second Circuit decision (binding on the District of Connecticut) that has been expressly rejected

---

43      The government has appealed this decision to the United States Court of Appeals for the Second Circuit. *See United States v. Pierucci (Hoskins)*, No. 16-1010 (2d Cir.). The Second Circuit held oral argument on March 2, 2017, and the parties are awaiting a decision.

44      *Hoskins*, 123 F. Supp. 3d at 323.

by the Seventh Circuit. Specifically, the *Hoskins* court relied in part on the Second Circuit's decision in *United States v. Amen*, 831 F.2d 373 (2d Cir. 1987). *See Hoskins*, 123 F. Supp. 3d at 322. *Amen* reversed a conviction for aiding and abetting a violation of the Continuing Criminal Enterprise statute, 21 U.S.C. § 848, holding that the "drug kingpin" sentencing enhancement could not be applied under an aiding-and-abetting theory to those who merely assisted the kingpin. In the course of its opinion, the Second Circuit cited *Gebardi* for the proposition that, "[w]hen Congress assigns guilt to only one type of participant in a transaction, it intends to leave the others unpunished for the offense." *Amen*, 831 F.2d at 381. The district court in *Hoskins* relied on this language from *Amen* as the basis to reject the government's argument that the *Gebardi* exception was limited to circumstances where "a class of person is a necessary party to the crime and was specifically excluded from prosecution for the substantive violation by Congress . . . or . . . . where the substantive statute was enacted to protect the class of person to which the individual belongs." *Hoskins*, 123 F. Supp. 3d at 322. In *United States v. Pino-Perez*, 870 F.2d 1230, 1233-35 (7th Cir. 1989) (*en banc*), the Seventh Circuit explicitly cited and rejected *Amen*'s analysis and conclusion that Congress did not intend for accessorial liability for those that aid and abet the kingpin: "To this we cannot say 'amen.'" Instead, the Seventh Circuit indicated its preference for the "presumption" that, absent an affirmative legislative policy, "[d]oubt about Congress's intentions was resolved in favor of aider and abettor liability." *Id.* at 1234 (citing *Falletta*, 523 F.2d at 1200 and *Gebardi*, 287 U.S. at 123). The motions to dismiss Count Five should therefore be denied.

92

## VI. Defendants' Motions to Dismiss on Due Process Grounds Should Be Denied.

The defendants take the extraordinary position that the Due Process Clause bars their prosecution for all the offenses in the indictment. DF Br. at 23-25. For the reasons provided below, this argument is meritless.

### A. The Due Process Clause Does Not Apply to the Defendants.

The defendants argue that the Due Process Clause of the Fifth Amendment, which provides that no person shall "be deprived of life, liberty, or property, without due process of law," U.S. Const. amend. V, bars their prosecution in the United States. As a threshold matter, the defendants cannot claim the protection of the Fifth Amendment without presenting themselves in court here. The Supreme Court has long held "that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). In particular, the Fifth Amendment does not apply to aliens who have no presence in any territory over which the United States is sovereign. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990) ("[W]e have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States."); *Zadvydas*, 533 U.S. at 693 (citing *Verdugo-Urquidez* for the proposition that the "Fifth Amendment's protections do not extend to aliens outside the territorial boundaries" of the United States); *Johnson v. Eisentrager*, 339 U.S. 763, 783 (1950) (finding "no authority whatever" supporting the contention "that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located").

93

*See also In re Kashamu*, 769 F.3d 490, 492 (7th Cir. 2014) (noting this argument "seems right" in reference to application of the Sixth Amendment).[45]   Moreover, as discussed below, their arguments lack substantive merit.

### B.    The Defendants' Due Process Arguments are Without Merit.

#### 1.    Applicable Law.

Following *In re Hijazi*'s suggestion of looking to principles of international law in order to determine whether a defendant's contacts with the United States are sufficient under principles of Due Process to support prosecution here, 589 F.3d at 412, district courts in this Circuit have looked to principles set forth in the Restatement (Third) of Foreign Relations Law of the United States ("Restatement") to determine whether prosecution in this country comports with Due Process.  *See United States v. Hijazi*, 845

---

[45]    In *United States v. Hayes*, 99 F. Supp. 3d 409, 414 (S.D.N.Y. 2015), a case cited by the defendants, the court determined that the Fifth Amendment applied to a Swiss citizen living in Switzerland who had been charged with conspiracy to commit wire fraud in the United States.  The government is unaware of any other court following the reasoning of *Hayes*.  Moreover, the *Hayes* court erroneously found a "suggestion" of a due process analysis by the Seventh Circuit in *Hijazi*.  *See id.* (citing *Hijazi*, 589 F.3d at 406–12).  The Seventh Circuit expressly refused to rule on the merits of Hijazi's motion to dismiss; its decision was limited to whether mandamus was appropriate.  *Hijazi*, 589 F.3d at 412. Besides, as noted above, the Seventh Circuit noted in *Kashamu* (which was decided after *Hijazi*) the apparent correctness of the view that Constitutional protections do not apply to foreign citizens located abroad.

94

F. Supp. 2d 874, 883-84 (C.D. Ill. 2011);[46] *United States v. Kashamu*, 15 F. Supp. 3d 854,

866-67 (N.D. Ill. 2014).[47] Section 402 of the Restatement provides, in pertinent part:

> Subject to § 403, a state has jurisdiction to prescribe law with respect to (1) (a) conduct that, wholly or in substantial part, takes place within its territory; (b) the status of persons, or interests in things, present within its territory; (c) conduct outside its territory that has or is intended to have substantial effect within its territory; . . . (3) certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests.

---

[46] Upon the Seventh Circuit's issuance of a writ of mandamus in *In re Hijazi*, the district court applied the Restatement's principles to acts performed by an alien on foreign soil. *Hijazi*, 845 F. Supp. 2d at 883. Specifically, the district court considered whether Hijazi's actions in Kuwait "were intended to have a substantial effect within the United States, or [whether] they were directed against the security of the state, or other state interests." *Id.* The district court found that allegations of Hijazi's participation in a scheme to defraud the United States, his causing of wires to be used in furtherance of the conspiracy, and his knowledge that the U.S. government was the ultimate payor on the relevant contract were sufficient to meet the requirements of Section 402 of the Restatement. *Id.* at 884. The district court also found that Hijazi's prosecution was reasonable under Section 403, as the United States "has a strong interest in protecting itself from fraud." *Id.* (citing *United States v. Bowman*, 260 U.S. 94 (1922); *United States v. Columba-Colella*, 604 F.2d 356, 358 (5th Cir. 1979).

[47] In *Kashamu*, this Court, while noting the general rule that "[a] district court has personal jurisdiction over any defendant brought before it on a federal indictment charging a violation of federal law," *id.* at 866 (citation and internal quotation marks omitted), also took note of the Restatement's principles. *Id.* at 867. The Court determined, however, that it need not consider the Restatement in detail because Kashamu's due process challenge rested only on his argument of mistaken identity, which was a question of fact to be determined at trial. *Id.* Notably, the Court then concluded that allegations similar to those here were sufficient to establish jurisdiction over Kashamu: he participated, from Benin, in a conspiracy with U.S. persons to import heroin into the United States. *Id.* at 868.

Restatement § 402. Section 403, in turn, limits the exercise of prosecutive authority when the exercise of such authority would be unreasonable. *Id.* § 403. Although it states that "all relevant factors" should be considered, Section 403 provides a list of non-exclusive factors to consider when determining reasonableness, such as the link of the activity to the prosecuting state, the character of the activity involved, and the extent to which the prosecution "is consistent with the traditions of the international system." *Id.* Other circuits have approached the issue somewhat differently, with the key question being whether the application of a federal criminal statute is "arbitrary or fundamentally unfair."[48] As discussed below, the prosecution of Firtash and Knopp does not violate Due Process under any of these standards.

---

[48]    The Second and Ninth circuits have held that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) (quoting *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990) and rejecting the defendants' due process claim). The First, Third, and Fifth Circuits have expressly rejected the "nexus" requirement, holding that due process is satisfied as long as application of a statute is not "arbitrary or fundamentally unfair." *See, e.g., United States v. Suerte*, 291 F.3d 366, 375-76 (5th Cir. 2002); *United States v. Perez-Oviedo*, 281 F.3d 400, 402-03 (3d Cir. 2002); *United States v. Cardales*, 168 F.3d 548, 552-53 (1st Cir. 1999); *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056-57 (3d Cir. 1993). Even in the Ninth Circuit, however, the "nexus" requirement does not apply in all cases. *See, e.g., United States v. Caicedo*, 47 F.3d 370, 373 (9th Cir. 1995) (holding that a nexus is not required for prosecutions under the Maritime Drug Law Enforcement Act involving "stateless vessels").

2.  **Analysis**

a.  **This Prosecution Does Not Offend Due Process Because the Conduct Took Place in Substantial Part in the United States.**

Under the Restatement, subject to the reasonableness requirement, "a state has jurisdiction to prescribe law with respect to . . . conduct that, wholly or in substantial part, takes place within its territory." Restatement § 402(1)(a). Although the defendants cite the Restatement in support of their Due Process argument, they delete reference to this portion of the Restatement in their briefs, and do not address the fact that a substantial part of the enterprise's criminal activity occurred in the United States. The omission is telling. As discussed earlier, the enterprise conducted extensive operations within the United States. In order to carry out this illegal bribery activity, individuals working with Firtash, and under Firtash's direction and control, utilized United States financial institutions to transfer bribe money to Indian officials, used the communications infrastructure of the United States to direct the ongoing illegal activity, and traveled and held meetings within the United States to advance the illegal activity. The conspirators also caused personnel from Company A to take acts in the United States in aid of the objectives of the conspiracy as well. Because a substantial part of the conduct took place here, this prosecution is proper. *Leija-Sanchez*, 602 F.3d at 801 (relying on substantial conduct occurring in United States to find prosecution of international murder proper in this district).

97

### b. This Prosecution Does Not Offend Due Process Because the Conduct Had or Was Intended to Have Substantial Effect within the United States.

This prosecution also passes muster under Section 402(1)(c), because the conduct had, or was intended to have, a substantial effect within the United States. Restatement § 402(1)(c). The indictment alleges that one of the principal aims of the criminal enterprise was to introduce between five to twelve million pounds of illegally obtained titanium sponge annually into the United States market. To do so, the conspirators funneled millions of dollars of bribes through the United States' financial system; used the communications infrastructure in order to plan, carry out and coordinate the illegal bribery activity; traveled in interstate and foreign commerce in order to further the project; attended meetings with various companies and individuals here in the United States in order to line up purchasers of goods obtained through bribery, and sought out financers of the project in this country.[49] The defendants also caused third parties located within the United States to take acts in aid of the enterprise as well, including Company A. This puts the defendants squarely within the jurisdiction of this Court. *Leija-Sanchez*, 602 F.3d at 801 (where indictment alleged that goals of the illegal activity were to advance the defendants' interests in this country by curtailing business competition, prosecution in this district was proper); *Schmucker-Bula*, 609 F.2d at 402 ("Because the defendant's crime was conspiracy . . . we need not dwell at length on the jurisdictional issue. A

---

[49]    The foregoing makes it clear that the defendants are simply wrong when they contend that no part of the criminal conduct took place in the United States. DF Br. at 28-29.

sovereign has jurisdiction to punish crimes that occur within its territory. This principle has been applied to confer jurisdiction over conspiracies when at least one of the conspirators commits an overt act in the territorial jurisdiction of the United States district court.") (citations omitted).

The defendants take the frivolous position that all of this does not add up to conduct that had or was intended to have a substantial effect within the United States. DF Br. at 28-33. They point out again that Company A did not actually purchase products derived from the project. *Id.* at 28. However, the question is whether the illegal conduct "has or is *intended* to have substantial effect" in the United States, not whether it was successful. *Schmucker-Bula*, 609 F.2d at 401 ("[I]t is an elementary principle of conspiracy law that the criminal venture need not succeed for there to be criminal liability."). Moreover, as with their argument concerning the RICO enterprise and whether the government will be able to prove the enterprise had an effect on commerce, the defendants simply minimize all the other conduct alleged in the indictment. *See* pp. 48-52, *supra*.

They also point out that Firtash did not set foot in the United States. DF Br. at 28. But this is no more than a rehash of their other failed arguments, suggesting that Firtash had to personally commit acts within the United States in order to be held accountable. *Salinas*, 522 U.S. at 64 ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."); *Ford*, 273 U.S. at 619-20 (conspirators outside United

99

States properly charged in liquor importation scheme).  The evidence at trial will show that Firtash knew that members of the enterprise were taking acts to advance the objectives of the enterprise in the United States.  Aside from a passing reference to the Supreme Court's decision in a civil case, *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007), DF Br. at 28, the defendants point to no law—in the Seventh Circuit or elsewhere—that would justify dismissal, on "substantial effect" grounds, of an indictment alleging a multinational conspiracy with overt acts taking place in the United States.

> c. **This Prosecution Does Not Offend Due Process Because the Conduct Was Directed Against Significant United States Interests.**

Section 402(3) of the Restatement provides prosecution may also be reasonable where a case concerns conduct outside a state's territory by non-nationals, when that conduct is "directed against the security of the state or against a limited class of other state interests."  Restatement § 402(3).  The defendants argue that the charges here do "not implicate any legitimate or other United States interest."  DF Br. at 28.

On the contrary, this prosecution vindicates United States interests of the highest order.  When it enacted the RICO statute, Congress made findings that "organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens."  Pub. L. 91-452, § 1.  This is precisely the type of activity targeted by this prosecution: an effort by a criminal

100

enterprise to infiltrate the United States commercial sector by introducing corruptly obtained titanium products into the domestic market. The successful prosecution of Firtash and Knopp—who have been identified by United States law enforcement as two upper-echelon associates of Russian organized crime—will disrupt this organized crime group and prevent it from taking further criminal acts within the United States. This prosecution therefore seeks to protect this country, its commerce and its citizens from the corrupting influence and withering effects of international organized crime.

Eradicating transnational criminal enterprises is also an international legal obligation of the United States. The Palermo Convention specifically contemplates prosecution of transnational criminal organizations, and specifies that jurisdiction over these offenses is proper, even if an organized crime group operates in more than one country. Palermo Convention, art. 3, 5, 15. The global importance of this mission is highlighted by the fact that approximately 187 parties—including nearly every country in the world—are signatories to the Palermo Convention.

The Palermo Convention is not the only international agreement the United States has entered into that demonstrates the United States has a significant interest in, and legal commitment to, combat the corruption of foreign officials. In 1977, Congress enacted the FCPA in response to what it saw as the pervasive problem of foreign bribery and as an attempt to address that corruption's negative impact on the global economy.[50]

---

[50] *See*, *e.g.*, S. Rep. No. 95-114, at 4 (1977) ("Corporate bribery is bad business. In our free market system it is basic that the sale of products should take place on the basis of price,

In 1988, while making other amendments to the FCPA, Congress requested that the Executive Branch pursue an agreement among members of the Organisation for Economic Co-operation and Development ("OECD") to address international corruption. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5003(d), 102 Stat. 1107 (1988). The President did so, and in December 1997, the United States signed the OECD Convention. 37 I.L.M. 1 (Dec. 18, 1997). *See also* S. Treaty Doc. No. 105-43 (ratified Dec. 8, 1998). The OECD Convention, among other things, requires parties to the agreement to make it a crime to bribe foreign officials.[51] Congress broadened the scope the FCPA in 1998 to comply with the requirements of the OECD Convention.[52] Congress has affirmed that the corruption of public officials remains a threat to global

---

quality, and service. Corporate bribery is fundamentally destructive of this basic tenet. Corporate bribery of foreign officials takes place primarily to assist corporations in gaining business. Thus foreign corporate bribery affects the very stability of overseas business. Foreign corporate bribes also affect our domestic competitive climate when domestic firms engage in such practices as a substitute for healthy competition for foreign business.").

[51] The OECD Convention and its commentaries also call on all parties (1) to ensure that aiding and abetting and authorization of an act of bribery are criminal offenses, (2) to assert territorial jurisdiction "broadly so that an extensive physical connection to the bribery act is not required," and (3) to assert nationality jurisdiction consistent with the general principles and conditions of each party's legal system. *Id.* at art. 1.2, cmts. 25, 26.

[52] These amendments expanded the FCPA's scope to: (1) include payments made to secure "any improper advantage"; (2) reach certain foreign persons who commit an act in furtherance of a foreign bribe while in the United States; (3) cover public international organizations in the definition of "foreign official"; (4) add an alternative basis for jurisdiction based on nationality; and (5) apply criminal penalties to foreign nationals employed by or acting as agents of U.S. companies. *See* International Anti-Bribery and Fair Competition Act of 1998, Pub. L. 105-366, 112 Stat. 3302 (1998).

security.  *See, e.g.*, Int'l Anti-Corruption and Good Governance Act of 2000, Pub. L. No. 106-309, § 202, 114 Stat. 1090 (codified as amended at 22 U.S.C. §§ 2151-2152 (2000)) ("[w]idespread corruption endangers the stability and security of societies, undermines democracy, and jeopardizes the social, political, and economic development of a society. . . . [and that] [c]orruption facilitates criminal activities, such as money laundering, hinders economic development, inflates the costs of doing business, and undermines the legitimacy of the government and public trust").[53]

The United Nations has also addressed the scourge of international corruption. The U.N. General Assembly adopted the United Nations Convention Against Corruption ("UNCAC") in October 2003, and it has since been ratified by approximately 181 parties, including the United States.  *See* S. Treaty Doc. No. 109-6, 2349 U.N.T.S. 41 (Oct. 31, 2003).  The UNCAC notes "the seriousness of problems and threats posed by corruption

---

[53]  Successive presidents have expressed similar concerns.  For example, National Security Strategy papers released in 2010 and 2015, respectively, recognized that "pervasive corruption is a violation of basic human rights and a severe impediment to development and global security" and that "[t]oo often, failures in governance and endemic corruption hold back the potential of rising regions."  The White House, National Security Strategy 38 (2010), *available at* https://obamawhitehouse.archives.gov/sites/default/files/rss_viewer/national_security_st rategy.pdf; The White House, National Security Strategy 1 (2015), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/2015_national_security_str ategy.pdf.  Similarly, President George W. Bush observed in 2006 that "the culture of corruption has undercut development and good governance and . . . . impedes our efforts to promote freedom and democracy, end poverty, and combat international crime and terrorism."  President's Statement on Kleptocracy, 2 Pub. Papers 1504 (Aug. 10, 2006), *available at* http://georgewbush-whitehouse.archives.gov/news/releases/2006/08/20060810.html.

to the stability and security of societies, undermining the institutions and values of democracy, ethical values and justice and jeopardizing sustainable development and the rule of law[.]" *Id.*

The defendants appear to argue that the only transnational crime that can give rise to significant United States interests justifying prosecution are cases involving terrorism and drug trafficking. DF Br. at 30-31. But they cite to no authority for the proposition that U.S. interests must be so limited, and the decisions of Congress and the Executive Branch to pass and enforce a series of laws and enter into a network of international agreements to combat transnational organized crime and foreign corruption must be given great deference by the judiciary when answering the question of where the interests of the United States lie. *Medellin v. Texas*, 552 U.S. 491, 523 (2008) (where Executive Branch seeks to vindicate interests in ensuring compliance with treaty commitments, protecting relations with foreign governments and demonstrating commitment to international law, these interests are "plainly compelling"); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (where Executive action that implicates foreign affairs occurs with the express authorization of Congress, the executive action "would be supported by the strongest of presumptions and the widest latitude of judicial interpretation"). Indeed, nearly every country on the planet has committed to prosecuting transnational organized crime and corruption, making these offenses more akin to universally condemned practices like terrorism and drug trafficking than to peculiar interests of particular nations. The case law reaffirms

104

this view.  *See Leija-Sanchez*, 602 F.3d at 801-02 (international murder in aid of racketeering organization); *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 9 (1st Cir. 1997) (extraterritorial antitrust conspiracy directed toward the United States); *United States v. Campbell*, 798 F. Supp. 2d 293, 296 (D.D.C. 2011) (bribery in connection with contracts funded by U.S. government agency).

Finally, the defendants do not cite to a single case in which a court—under any circuit's due process standard—has found that it lacked jurisdiction over foreign conspirators in a multinational conspiracy where overt acts were taken within the United States, and the government is aware of none.  Indeed, the cases the defendants do cite, in which courts determined that jurisdiction was not proper, are both legally and factually distinguishable from the case before this Court.   DF Br. at 31-32.  For example, the defendants cite *United States v. Perlaza*, 439 F.3d 1149, 1153-57 (9th Cir. 2006), in which the Ninth Circuit reversed the cocaine trafficking convictions of the crewmembers of two ships apprehended by U.S. law enforcement off the coast of South America.  The case did not involve any action within the United States by any conspirator or accomplice or any indication that the cocaine was even headed to the United States.  *Id.* at 1153-57, 1168-69.  The defendants also cite *United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1126-27 (N.D. Cal. 2015), a case involving an employee of an international organization who lived in Canada; the indictment charged no domestic conduct or intended effect, no domestic conspirators, and no wires to, from, or through the United States.  The defendants also cite *United States v. Columba-Colella*, 604 F.2d 356 (5th Cir. 1979).  This case involved

105

the sale of a car stolen in the United States to a British citizen in Mexico; the Fifth Circuit specifically noted that a prosecution for conspiracy would have led to a different outcome. *Id.* at 359 ("Had a conspiracy been demonstrated . . . [the government] would then have had the jurisdiction it asserts in this case.").  Lastly, *Abelesz v. OTP Bank*, 692 F.3d 638, 645-46, 656-59 (7th Cir. 2012), was not even a criminal case; rather, it was a civil case construing the civil rules governing jurisdiction over claims against Hungarian banks that related to the banks' participation, more than 70 years ago,  in the expropriation of Hungarian Jews' property during the Holocaust.  The case does not begin to resemble the facts of this one, where the criminal enterprise engaged in illegal activity within the United States.  These cases only serve to highlight the weakness of the defendants' argument in this case.  Because each provision of Restatement Section 402 weighs in the government's favor, the defendants' motions to dismiss should be denied.

### d.  This Prosecution Does Not Offend Due Process Because it is Reasonable.

In a last-gasp attempt to escape prosecution, the defendants claim that the charges against them are unreasonable.  DF Br. at 33.  First they argue that the charges are "entirely unrelated to the United States."  *Id.* at 33-34.  It is apparent by now this argument is frivolous.  *See*, *e.g.*, pp. 48-52, *supra*.

The cases the defendants cite to support their claim of unreasonableness are also inapplicable.  Several of them are civil cases that do not implicate the interests of the Executive Branch in enforcing federal criminal law.  For example, in *United States v.*

*Lloyds TSB Bank PLC*, 639 F. Supp. 2d 314, 323-24 (S.D.N.Y. 2009), the court declined to hear a case involving international transfers by a Swiss bank to other European countries, where the subject bank was not named as part of any criminal conspiracy. *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 129 (2d Cir. 1998), is also a civil case where the court declined to exercise jurisdiction over securities fraud claims that had few contacts with the United States.

Another case the defendants cite bears no relationship to the crimes charged here. In *United States v. Javino*, 960 F.2d 1137, 1142-43 (2d Cir. 1992), the Second Circuit held that Congress did not silently intend to criminalize the manufacture of weapons abroad unless they were first registered in this country before they were manufactured overseas.[54] Here, in contrast, the indictment alleges a criminal conspiracy that took place, in substantial part, here in the United States. Prosecution of the conspiracy alleged here is well within traditional notions of reasonableness under international law.

The defendants also argue that their prosecution here is unreasonable under Section 403(2)(g) of the Restatement, which relates to "the extent to which another state may have an interest in regulating the activity." *Id.* § 403(2)(f). They claim that here, due to the indictment's allegation of the violation of Indian anticorruption laws, "India, not the United States, has that interest." DF Br. at 34.

---

54      The Restatement played a limited role in *Javino*. The court found no evidence of congressional intent "that nowhere in the world may a person, without violating § 5822, make a 'firearm' without, *inter alia*, providing his photograph and fingerprints to the United States Secretary of the Treasury, obtaining the approval of the Secretary, and paying a tax to the United States." *Id.*

This argument is easily disposed of.  As has been noted above, this is a case that does not concern India alone: this enterprise carried out its illegal activities here, within the territory of the United States, over the span of several years, and it is this country in which the enterprise hoped to sell millions of pounds of illegally obtained goods.  That said, both India and the United States have signed international treaties that commit both parties to criminalize efforts to bribe foreign officials; both countries are parties to the Palermo Convention and the UNCAC, which specifically provide that the signatories will take measures to prosecute the bribery of foreign officials.  It is not unreasonable for the United States to comply with its international legal obligations, particularly where India has agreed to participate in the very same international framework.  And, if there is any issue that must be resolved with India, that is a matter "for the political branches to resolve with their counterparts in [India], rather than matters for the judicial branch." *Leija-Sanchez*, 602 F.3d at 801.  Consistent with the international framework which Congress and the Executive Branch have chosen to join, this investigation and prosecution has been marked by extensive cooperation with other countries that are also committed to the fight against transnational organized crime and corruption.  The efforts of two members of organized crime to derail this prosecution and avoid accountability for their actions on the most tenuous of grounds should be rejected.

## CONCLUSION

For the reasons provided above, the Motions should be denied.

WHEREFORE, the government respectfully requests that the Court enter an order (i) denying the Motions without prejudice to the defendants' right to present them after the Austrian extradition proceedings have concluded, and striking oral argument on the Motions; and (ii) in the alternative, denying the Motions.

Dated:       Chicago, Illinois
              July 24, 2017

Respectfully submitted.

JOEL R. LEVIN
Acting United States Attorney


By:    /s/ Amarjeet S. Bhachu
        AMARJEET S. BHACHU
        Assistant United States Attorney
        219 South Dearborn Street
        Fifth Floor
        Chicago, Illinois 60604
        (312) 469-6212

        MICHAEL T. DONOVAN
        Special Assistant United States Attorney
        219 South Dearborn Street
        Fifth Floor
        Chicago, Illinois 60604

        SANDRA MOSER
        Acting Chief, Fraud Section
        United States Department of Justice

By:    JONATHAN P. ROBELL
        Trial Attorney
        United States Department of Justice
        Criminal Division, Fraud Section
        1400 New York Avenue, NW
        Washington, DC 20530

## CERTIFICATE OF SERVICE

Amarjeet S. Bhachu, an Assistant United States Attorney assigned to the instant matter, hereby certifies that the attached GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT FIRTASH'S AND KNOPP'S MOTIONS TO DISMISS INDICTMENT was served on July 24, 2017, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Amarjeet S. Bhachu
AMARJEET S. BHACHU
Assistant United States Attorney
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604