**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 CR 515** |
| | ) | |
| **DMITRY FIRTASH, aka "Dmytro Firtash,"** | ) | **Judge Rebecca R. Pallmeyer** |
| **and "DF," and ANDRAS KNOPP,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM ORDER AND OPINION**</u>

Defendants Dmitry Firtash and Andras Knopp were indicted in 2013 on charges that they made use of United States financial institutions to bribe Indian public officials. Allegedly, these bribes were intended to secure approvals for a mining project in India (hereinafter "the Project"), many products of which would then be sold to a company headquartered in Chicago. Neither Defendant has appeared in court to answer these charges. Firtash, a Ukrainian citizen, currently resides in Austria, where extradition proceedings are pending. Knopp, a Hungarian citizen, currently resides in Russia, with which the United States has no extradition agreement. Defendants move to dismiss the Indictment on several bases: (1) that the court lacks venue, (2) that the Indictment fails to state an offense, and (3) that prosecution would violate their rights under the Fifth Amendment Due Process Clause. For the reasons stated herein, Defendants' motions are denied.

<u>**BACKGROUND**</u>

**I.     The Allegations**

At the heart of this case is the proposed sale of titanium sponge to an American company headquartered in Chicago. Titanium is an abundant element present in a variety of minerals,

including ilmenite,[1] which can be found along the Indian coastline.[2]  Mining in India requires certain licenses, however, which must be approved by the Indian central and local governments. (Indictment [2] at 3.)  In this case, the United States has charged six Defendants, including Firtash and Knopp, with conspiring to obtain these licenses by bribing two Indian public officials: Y.S. Rajasekhara Reddy, Chief Minister of the State of Andhra Pradesh;[3] and K.V.P. Ramachandra Rao, a state official and close advisor to Reddy.  (Indictment [2] at 2, 6.)  According to the government, Defendants and their associates aimed to obtain a profit by processing this ilmenite into a product known as "titanium sponge" and then selling it to a United States company ("Company A").  (*Id.* at 2–3.)  A memorandum of agreement was allegedly signed to provide Company A with five to twelve million pounds of titanium sponge annually.  (*Id.* at 3.)

In connection with the Project, Defendants Firtash and Knopp allegedly worked with at least four co-conspirators: Suren Gevorgyan, Gajendra Lal, Periyasamy Sunderalingam, and K.V.P. Ramachandra Rao.  (*Id.* at 1, 5.)  All four are named as co-defendants and remain at large.  (*Id.* at 1.)  Firtash is alleged to have been the leader of this group.  (*Id.* at 5, 6–7.)  In this capacity, he is alleged to have met with Indian public officials to discuss the Project, authorized the payment of bribes to Indian public officials, and directed subordinates, including Knopp, to carry out the logistics of paying those bribes.  (*Id.* at 6–7.)  Knopp, too, is alleged to have "occupied a supervisory role."  (*Id.*)  He allegedly met with Indian public officials and directed the activities of

---

[1]  *See Titanium*, Encyclopedia Britannica, https://www.britannica.com/science/titanium (Nov. 22, 2018).  *See also Titanium Metal (Ti) / Sponge / Titanium Powder*, Reade, https://www.reade.com/products/titanium-metal-ti-sponge-titanium-powder (Jun. 21, 2019) (defining "titanium sponge" as "a porous, brittle form of titanium, a highly ductile metal which has a high strength-to-weight ratio").

[2]  *See* M Somasekhar, *Andhra Pradesh renews moves to exploit beach sands*, The Hindu Businessline, https://www.thehindubusinessline.com/news/national/andhra-pradesh-renews-moves-to-exploit-beach-sands/article21043563.ece1 (Mar. 12, 2018).

[3]  Y.S. Rajasekhara Reddy was killed in a helicopter crash in 2009.  *India politician killed in crash*, BBC News, http://news.bbc.co.uk/2/hi/8235115.stm (Sept. 3, 2009).

co-conspirators.  (*Id.*)  Additionally, Knopp is alleged to have met personally with representatives of Company A to discuss the sale of titanium products.  (*Id.*)[4]

Much of the relevant conduct is alleged to have taken place abroad, although several allegations against Firtash, Knopp, and their purported co-conspirators involve the United States. For example, several co-conspirators allegedly attended meetings with representatives of Company A, which is incorporated in Delaware and has its principal executive offices in Chicago, Illinois.  (*Id.* at 2.).  Two of these meetings, purportedly attended by Gevorgyan, allegedly took place in Seattle, Washington.  (*Id.* at 17.)  Another named co-conspirator, Lal, allegedly traveled interstate at least five times in June, July, and August 2009.  (*Id.* at 17–18.)  The alleged purpose of one of these trips, from Greensboro, North Carolina to Flushing, New York on July 14, 2009, was to solicit the participation of another company ("Company D") in the Project.  Additionally, an unidentified co-conspirator allegedly used a cellphone located in Chicago, Illinois to discuss that conspirator's activities related to the project and "direct future activity."  (*Id.* at 19.)  Finally, United States financial institutions were allegedly utilized to transfer several million dollars of bribe payments before they reached Indian public officials.  (*Id.* at 6.)

## II.    The Indictment

On June 30, 2013, the government filed a five-count indictment against the six alleged conspirators, including Firtash and Knopp.  (Indictment [2] at 1.)

Count One charges a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d).  (*Id.* at 1–19.)  It alleges that the six alleged conspirators, acting as a criminal enterprise, conspired to engage in racketeering activity.  (*Id.* at 5–11.)  Specifically, the Indictment charges that in planning to bribe Indian public officials, the enterprise conspired to engage in acts that would violate two federal statutes: the Money

---

[4]    Although the Indictment does not indicate where this meeting took place, evidence presented to the court under seal suggests that it occurred outside the United States.  *See* (Sealed Affidavit [20] at 2.)

Laundering Control Act (the "MLCA"), 18 U.S.C. § 1956, which criminalizes the laundering of monetary instruments, and the Travel Act, 18 U.S.C. § 1952, which criminalizes travel from one state to another to promote or facilitate unlawful activity. (*Id.* at 10–11.)

Count Two charges a conspiracy to violate the MLCA that relates to the same conduct, and Counts Three and Four charge conspiracy and aiding and abetting Travel Act violations.[5] (*Id.* at 20–23.)

Count Five charges Firtash, Knopp, Gevorgyan, Lal, and Sunderalingam with conspiracy and with aiding and abetting a violation of the Foreign Corrupt Practices Act (the "FCPA"), 15 U.S.C. §§ 78dd-2(a) and 78dd-3(a), which criminalizes the payment of money by a "domestic concern" to a "foreign official" for the purpose of influencing an official act. (*Id.* at 24–27.) It alleges that Lal, a permanent resident of the United States, was a "domestic concern" within the meaning of the FCPA,[6] and that the targets of bribery, Rao and Reddy, were both "foreign officials" under the Act. (*Id.* at 5, 24.) In summary, the factual allegation is that Firtash, Knopp, and others conspired to influence the decision-making of foreign public officials through the payment of bribes, and that this would be done using instruments of interstate commerce and while in the territory of the United States. (*Id.* at 25–27.)

Notably, the Indictment does not allege that Firtash or Knopp were ever physically present in the United States, either in connection with or unrelated to the Project. The government has since alleged that it has evidence showing Knopp took an act to further the conspiracy while he was physically present in the United States, although it has not specified what this act was. (*See* Gov't's Resp. [40] at 79 n.40; Gov't's 2nd Supp. Resp. [70] at 2.)

---

[5] The two counts relate to alleged travel occurring on two different days. Count Three charges a violation related to travel from Chicago to North Carolina on July 5, 2009, whereas Count Four charges a violation related to travel on the same route on August 16, 2009.

[6] As defined in the FCPA, the term "domestic concern" encompasses individuals who are citizens, nationals, or residents of the United States. 15 U.S.C. § 78dd-2(h)(1)(A). There is no allegation that Firtash, Knopp, or Gevorgyan were also domestic concerns.

## III.    Post-Indictment Proceedings

Neither Firtash, Knopp, nor any other Defendant has appeared before this court since the filing of the Indictment.

On March 12, 2014, Firtash was arrested in Vienna by Austrian law enforcement on request of the United States.  (Gov't's Resp. [40] at 5.)  He was released on bond several days later, but barred from leaving Austria.  (*Id.*)  The United States thereafter submitted a request to the Republic of Austria to extradite Firtash, which was denied by the Vienna Regional Court for Criminal Matters on April 30, 2015.  (*Id.* at 6.)  The Austrian government appealed this decision to the Vienna Higher Regional Court, which reversed the decision of the lower court on February 21, 2017, ordering Firtash be extradited to the United States.  (*Id.* at 6.)[7]

Firtash submitted a writ to the Austrian Supreme Court requesting a "retrial."[8]  (Webb Letter 1 [56] at 1.)  On December 12, 2017, the Austrian Supreme Court stayed Firtash's extradition pending its decision on Firtash's writ.  That decision was itself delayed pending a ruling by the Court of Justice of the European Union (the "CJEU") on whether the EU Charter on Human Rights applies to Firtash's appeal.  (*Id.* at 2.)  On October 24, 2018, the CJEU issued its ruling. Case C-234/17, XC and Others, http://curia.europa.eu/juris/document/document.jsf? text=&docid=206981.[9]  The Austrian Supreme Court has not yet ruled on Firtash's writ.

---

[7]    Following the decision of the Vienna Higher Regional Court, Firtash was re-arrested in Austria at the request of the Spanish government, which itself sought Firtash's extradition based on separate charges filed in Spain.  An Austrian trial court denied this request, and an Austrian appellate court affirmed.  According to Firtash's counsel, this decision is "final and binding" with regard to the charges in Spain.  (Webb Letter 1 [56] at 2.)

[8]    The court is unsure what sort of "trial" this refers to.

[9]    The meaning of this ruling is not entirely clear, and neither party has enlightened the court.

During the course of all of these proceedings, on May 9, 2017, Firtash filed a motion in this court to dismiss the Indictment. (Firtash MTD [24].) On May 15, 2017, Knopp joined Firtash's motion.[10] (Knopp MTD [30].)

## DISCUSSION

### I. Venue

Defendants first argue that the court lacks venue over the charges in the Indictment.

The federal government may only try a criminal defendant in a state and district where the charged offense was committed. U.S. CONST. art. III, § 2, cl. 3; *id.* at amend. XI; FED. R. CRIM. P. 18. Except in cases where Congress has "specifically defined where a crime should be deemed to have occurred," courts determine whether venue is proper by considering "the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Clark*, 728 F.3d 622, 623–24 (7th Cir. 2013) (quoting *United States v. Tingle*, 183 F.3d 719, 726 (7th Cir. 1999)). This "substantial contacts" approach is not a rigid test, but rather a "general guide" that courts follow to ensure that "a particular jurisdiction can serve as the venue for a federal criminal trial in a manner consistent with the guarantees of the constitutional venue provisions." *United States v. Muhammad*, 502 F.3d 646, 655 (7th Cir. 2007). The flexibility of this guidance reflects a concern that "an overly mechanistic approach to the location of the defendant's acts may limit unrealistically the permissible venues in terms of the policy concerns that underlie the constitutional venue guarantee." *Id.* at 654.

Applying the substantial contacts approach to cases of criminal conspiracy, the Seventh Circuit has recognized several different adequate bases for venue. The "traditional rule" for such cases is that venue is proper in "any district in which an overt act of the conspiracy occurred," even if there is no evidence that the defendant ever entered that district or that the conspiracy

---

[10] Knopp currently resides in Russia, with which the United States has no extradition agreement. Although he is not currently facing extradition proceedings, he argues that he "suffers the adverse consequence of not being able to travel because of the likely existence of an Interpol red notice regarding him." (Knopp MTD [30] at 11.)

was formed there.  *United States v. Ochoa*, 229 F.3d 631, 636–37 (7th Cir. 2000) (citing *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281–82 (1999)).[11]  Additionally, venue is proper in the district where an overt act was "intended to have an effect."  *United States v. Muhammad*, 502 F.3d 646, 655 (7th Cir. 2007) (emphasis omitted) (quoting *United States v. Frederick*, 835 F.2nd 1211, 1215 (7th Cir. 1987)); *cf. id.* at 654 (quoting *United States v. Reed*, 773 F.2d 477, 482 (2d Cir. 1985)) ("[P]laces that suffer the effects of a crime are entitled to consideration for venue purposes.").

Where a defendant challenges venue, the government bears the burden of proving venue is proper for each count charged.  *United States v. Tingle*, 183 F.3d 719, 726–27 (7th Cir. 1999). In doing so, it may rely only on the allegations in the Indictment, accepting all the alleged facts as true.  *United States v. Clark*, 728 F.3d 622, 623 (7th Cir. 2013);  *see also United States v. Bohle*, 445 F.2d 54, 59 (7th Cir. 1971) ("An Indictment alleges proper venue when it alleges facts which, if proven, would sustain venue."), *overruled on other grounds by United States v. Lawson*, 653 F.2d 299 (7th Cir. 1981).

The government has met that generous test.  Because the Seventh Circuit recognizes venue in cases of criminal conspiracy where the illegal activity was "intended to have an effect" in the district, *United States v. Muhammad*, 502 F.3d 646, 655 (7th Cir. 2007) (emphasis omitted) (quoting *United States v. Frederick*, 835 F.2nd 1211, 1215 (7th Cir. 1987)), the Indictment here need only allege that the charged conspiracy was intended to have an effect in the Northern District of Illinois.  It does so, describing a conspiracy to, by illegal means, obtain and sell five to twelve million pounds of titanium sponge to Company A, a company with its principal place of business in Chicago, Illinois.  (Indictment [2] at 3).  The completion of this transaction was the

---

[11]    In conspiracy cases brought under the federal money laundering statute, 18 U.S.C. § 1956, this venue rule is expressly affirmed by statute. 18 U.S.C. § 1956(i)(2) ("A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), *or in any other district where an act in furtherance of the attempt or conspiracy took place.*" (emphasis added)).

object of each of the crimes charged: the alleged RICO conspiracy, the alleged conspiracy to violate the MLCA, the alleged conspiracy and aiding and abetting Travel Act violations, and the alleged conspiracy to violate the FCPA, are all alleged to have been aimed at the end of ultimately completing the transaction with Company A.  This is sufficient for the government to meet its burden.  In light of this conclusion, the court need not address the government's alternative argument that a co-conspirator's use of a cellphone in Chicago provides an independent basis for venue.

Defendants urge that the court consider an additional "foreseeability" requirement, arguing that the Indictment does not allege that it was foreseeable to Defendants "that a coconspirator was ever in the Northern District of Illinois or that a cell phone was used there."  (Firtash MTD [24] at 7.)  They cite a concurring opinion from *Andrews v. United States*, in which Judge Cudahy wrote that "[i]t would seem . . . to violate basic concepts of criminal responsibility and due process to deem a crime committed at places unknown to the defendant, places the very existence of which he may not have had any reason to suspect." 817 F.2d 1277, 1282 (7th Cir. 1987).

This argument fails for multiple reasons.  First, Judge Cudahy's concurrence was expressly not the holding of the Seventh Circuit, as he acknowledged himself that he "would go further" in setting venue requirements than the other two judges of the panel.  *Andrews*, 817 F.2d 1281.  Moreover, the application of such a test would not necessarily preclude a finding of venue in this case.  Surely, Firtash and Knopp's alleged participation in the conspiracy—which included receiving status reports from subordinates—suffices to suggest that they were aware that the object of the conspiracy was to sell titanium products to Company A, and that Company A had its principal executive offices in Chicago, Illinois.  (Indictment [2] at 8.)  These facts, if true, would give both Firtash and Knopp "reason to suspect" that they may be called to this district to account. *Andrews*, 817 F.2d at 1282.

Accordingly, Defendants' venue objection is overruled.

## II.     Failure to State an Offense – Count One

Defendants next ask the court to dismiss Count One of the Indictment—which charges Defendants with participation in a RICO conspiracy, in violation of 18 U.S.C. § 1962—on the ground that it impermissibly targets extraterritorial conduct.  Defendants argue that § 1962 only applies to the racketeering activity of a foreign enterprise acting abroad if the enterprise causes a significant effect on U.S. commerce, and contend that the Indictment should be dismissed because it "does not set forth sufficient facts to establish" such an effect.  (Firtash MTD [24] at 10.)  Defendants further argue that the RICO predicate statutes upon which Count One is based are not, themselves, applicable extraterritorially in this case, and therefore cannot sustain an extraterritorial application of RICO.

In assessing this argument, the court notes the limited purpose indictments are intended to serve: "inform[ing] the defendant of the nature of the accusation against him."  *Russell v. United States*, 369 U.S. 749, 767 (1962).  Unlike civil complaints, which must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), "[i]ndictments need not exhaustively recount the facts surrounding a crime's commission," *United States v. Agostino*, 132 F.3d 1183, 1189 (7th Cir. 1997).  Indeed, the Seventh Circuit maintains that an indictment is generally sufficient so long as it accomplishes three functions: "it must set out each of the elements of the crime to be charged; it must provide adequate notice of the nature of the charge so that the accused may prepare a defense; and it must allow the defendant to raise the judgment as a bar to future prosecutions for the same offense."  *United States v. Barrios-Ramos*, 732 F. App'x 457, 459 (7th Cir. 2018).

"Because a court's 'use[ ] [of] its supervisory power to dismiss an indictment . . . directly encroaches upon the fundamental role of the grand jury,' dismissal is granted only in unusual circumstances."  *United States v. Ballestas*, 795 F.3d 137, 148 (D.C. Cir. 2015) (quoting *Whitehouse v. U.S. Dist. Court,* 53 F.3d 1349, 1360 (1st Cir.1995)).  On a motion to dismiss,

courts review indictments "on a practical basis and in their entirety, rather than in a hypertechnical manner," *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (quoting *United States v. Harvey*, 484 F.3d 453, 456 (7th Cir. 2007)), and assume all facts asserted therein to be true. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).

When a defendant moves to dismiss an indictment as impermissibly extraterritorial, this practice of deferring to the province of the grand jury must be reconciled with the longstanding principle that "in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). The D.C. Circuit's opinion in *United States v. Ballestas* illustrates this. Ballestas, a Colombian citizen, was indicted under the Maritime Drug Law Enforcement Act (the "MDLEA"), 46 U.S.C. §§ 7503(a), 70506(b), which criminalizes "conspiring to distribute drugs 'on board . . . a vessel subject to the jurisdiction of the United States' . . . ." *Ballestas*, 795 F.3d at 142 (quoting 46 U.S.C. §§ 7503(a), 70506(b)). The indictment alleged that the relevant vessel was "subject to the jurisdiction of the United States"—meeting a statutory requirement for extraterritorial application of the MDLEA—but did not allege facts substantiating this claim. *See* Indictment at 2, No. 1:11-cr-00050-RWR (D.D.C. Feb. 23, 2011). Indeed, the indictment alleged few specific facts at all, consisting of little more than the defendants' names and the statutory language of the MDLEA. *Id.* at 1–3.

Ballestas moved to dismiss the indictment arguing, inter alia, "that the MDLEA's conspiracy provision did not extend extraterritorially to reach individuals (like Ballestas) who never came 'on board' [a vessel subject to the jurisdiction of the United States]." *Id.* (quoting 46 U.S.C. § 70503(a)); *see also* Defendant's Reply to Government's Response to Motion to Dismiss the Indictment, No. 1:11-cr-00050-RWR (D.D.C. Oct. 26, 2012). Without an evidentiary hearing, the district court denied Ballestas' motion, concluding "that the conspiracy provision of the MDLEA applied extraterritorially to Ballestas' actions in Colombia." *Ballestas*, 795 F.3d at 142–43, 148. In reaching this conclusion, the court relied on a proffer by the government that the relevant vessel

was a "vessel without nationality," which, by statute, would make it a "vessel subject to the jurisdiction of the United States." *Id.* at 148. Ballestas entered a conditional plea of guilty, and argued on appeal that because the government did not prove beyond a reasonable doubt that the relevant vessel was "subject to the jurisdiction of the United States," the indictment should have been dismissed as impermissibly extraterritorial. *Id.* at 141, 148; *see also* Opening Brief of Appellant at 24–27, *United States v. Ballestas*, 795 F.3d 138 (D.C. Cir. 2015) (No. 13-3107), 2014 WL 2635088. The D.C. Circuit rejected this argument out of hand, writing that it "fundamentally misperceives the nature of a motion to dismiss an indictment." *Ballestas*, 795 F.3d at 148. Noting that an indictment "need only contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged,'" *id.* at 149 (quoting Fed. R. Crim. P. 7(c)), and that "[w]hen considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations," *id.* at 149, the D.C. Circuit held that the district court "did not err when it assumed the truth of the government's proffered facts in denying Ballestas's motion, including with regard to whether the pertinent vessel was subject to the jurisdiction of the United States," *id.*

As *Ballestas* illustrates, a pre-trial motion to dismiss an indictment is not a means through which to dispute the government's allegations or demand the presentation of all relevant facts. Although the government may only charge extraterritorial conduct that falls within the purview of a statute, an indictment is not necessarily rendered insufficient for lack of factual allegations conclusively demonstrating the requisite connection. And where there is a credible disagreement over what conduct the government is criminally charging, or whether that conduct falls within the extraterritorial scope of a statute, it is not impermissible for the court to reach beyond the indictment to factual allegations in the government's pleadings. With these principles in mind, the court turns to the substance of Defendants' arguments on extraterritoriality.

A.    *RJR Nabisco*

The Supreme Court addressed the extraterritoriality of RICO's substantive provisions, §§ 1962(a)–(c), in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016).  In that case, the European Community brought a civil RICO action against RJR Nabisco, a New York-based cigarette manufacturer, alleging that RJR engaged in racketeering activity—including money laundering, material support to foreign terrorist organizations, mail fraud, wire fraud, and violations of the Travel Act—in its dealings with drug traffickers and money launders in South American and Russia.  *Id.* at 2098–99, 2105.  The district court, finding that the only racketeering alleged in the complaint occurred outside the United States, and holding that RICO has no extraterritorial application, dismissed the civil RICO claims.  *Id.* at 2099.  The Second Circuit reversed and reinstated the claims, concluding that Congress manifested an intent for certain RICO predicates to apply extraterritorially, and finding that allegations contained in the complaint fell within their purview.  *Id.*  On certiorari to the Supreme Court, RJR Nabisco argued that RICO had no extraterritorial application, reaching neither foreign enterprises nor foreign injuries.  *See* Brief for Petitioners at 24–56, *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016), (No. 15-138).

The Court began its analysis by following a "two-step framework for analyzing extraterritoriality issues," asking first whether the "presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear affirmative indication that it applies extraterritorially."  *Id.* at 2101.  Based on Congress's incorporation of extraterritorial predicates, the Court found that the presumption was rebutted, "but only with respect to certain applications of the statute."  *Id.*  Specifically, it held that a RICO violation "may be based on a pattern of racketeering that includes predicate offenses committed abroad, provided that each of those offenses violates a predicate statute that is itself extraterritorial."  *Id.* at 2103.

The Court further stressed that, under its holding, not every foreign enterprise would qualify for prosecution under RICO; RICO's substantive provisions by their own terms require

proof of an enterprise that is "engaged in, or the activities of which affect, interstate or foreign commerce." *Id.* at 2105 (quoting 18 U.S.C. §§ 1962(a)–(c). The Court thus cautioned that a foreign RICO enterprise "must engage in, or affect in some significant way, commerce directly involving the United States." *Id.* at 2105. It continued, "Enterprises whose activities lack that anchor to U.S. commerce cannot sustain a RICO violation." *Id.*

Significantly, the Court expressly confined this analysis to RICO's substantive provisions. The Court voiced the possibility that § 1962(d), the RICO section at issue in this case, "should be treated differently from the provision (§ 1962(a), (b), or (c)) that a defendant allegedly conspired to violate," but the Court did not flesh out this possibility. *Id.* at 2103. Instead, it "assumed without deciding that § 1962(d)'s extraterritoriality tracks that of the provision underlying the alleged conspiracy." *Id.*

### B.      Effect on United States Commerce

Defendants now ask this court to extend *RJR Nabisco*'s holding beyond RICO's substantive provisions to its conspiracy provision, § 1962(d). Defendants first contend that the *RJR Nabisco* Court's comment on the effect of its holding on foreign enterprises—that for such an enterprise to fall within RICO's purview, it "must engage in, or affect in some significant way, commerce directly involving the United States"—applies without modification to RICO conspiracy cases. Defendants therefore argue that the Indictment is insufficient in that it "does not set forth sufficient facts to establish an enterprise significantly affecting United States commerce." (Firtash MTD at 9–10.) But this appears to be an overstatement of the Court's holding in *RJR Nabisco*; as discussed above, the Court there explicitly reserved judgment on the extraterritorial application of § 1962(d). Indeed, the segment of the opinion to which Defendants refer is a discussion of RICO's substantive provisions, §§ 1962(a)–(c), which expressly "require[ ] proof of an enterprise that is 'engaged in, or the activities of which affect, interstate or foreign commerce.'" *Id.* at 2105 (quoting 18 U.S.C. 1962(a)–(c)). No such language appears in § 1962(d), which criminalizes conspiracy to violate one of the substantive provisions, and thus only requires proof "[t]hat the

activities of [the enterprise] *would affect* interstate commerce." PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT 549 (2017) (emphasis added).

In essence, Defendants are arguing that § 1962(d) should cease to be read as a conspiracy statute when applied extraterritorially, and instead should be interpreted to criminalize only activity that has already had its intended effect on U.S commerce. That result is not compelled by *RJR Nabisco*, however, and is inconsistent with decades of Supreme Court precedent holding that an agreement to commit an unlawful act "is 'a distinct evil,' which 'may exist and be punished whether or not the substantive crime ensues.'" *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). Consistent with this principle, the Court's holding in *RJR Nabisco*, and the express language of § 1962(d), this court finds that the RICO conspiracy statute does not require proof that Defendants "engage[d] in, or affect[ed] in some significant way, commerce directly involving the United States"—only that Defendants *conspired to do so*.

Additionally, Defendants' contention that the facts alleged in the Indictment are not sufficient to establish the necessary connection to United States commerce misstates the standard to which indictments are held upon a motion to dismiss. "A motion to dismiss is not intended to be a 'summary trial of the evidence.' Such a motion is directed only to the validity of the indictment or the information, and it tests only whether an offense has been sufficiently charged." *United States v. Yasak*, 884 F.2d 996, 1001 (7th Cir. 1989) (quoting *United States v. Winer*, 323 F.Supp. 604, 605 (E.D.Pa.1971)). As laid out above, indictments are generally sufficient so long as they set out the elements, apprise defendants of the nature of the charge, and allow defendants to raise the charge as a bar against further prosecutions for the same offense.

The indictment here does so: it "sets out" the effect-on-commerce element of the RICO charge and provides "adequate notice of the nature of the charge" sufficient to enable Defendants to prepare a defense. It exhaustively lays out the nature of the grand jury's finding that Defendants

were members of a "criminal organization" that "was engaged in, and the activities of which affected, interstate commerce." (Indictment [2] at 5.) It alleges that this criminal organization used "facilities of interstate and foreign commerce to coordinate, plan, facilitate, and promote the bribery of Indian public officials," and that its members "travel[ed] in interstate and foreign commerce to further the goals of the criminal enterprise." (*Id.* at 6.) And it details that this enterprise allegedly conspired to illegally obtain and then sell five to twelve million pounds of titanium sponge to a company headquartered in the United States. (*Id.* at 3.) To the extent Defendants dispute the government's ability to prove their case, that is a matter for trial, not a basis for dismissal.

### C.    Predicate Statutes

Citing *RJR Nabisco*'s central holding—that RICO's substantive provisions may only be applied extraterritorially where the predicate statutes reach a defendant's extraterritorial conduct—Defendants further argue that the RICO charge must be dismissed because neither of the predicates cited in the indictment apply extraterritorially in this case. Specifically, Defendants argue that the relevant conduct is strictly extraterritorial and not indictable under either the MLCA or the Travel Act.

The Seventh Circuit has held, however, that indictments charging RICO conspiracy need not even list predicate acts, stressing that the "outer boundary" of what is sufficient would be, for instance, a "mere allegation of 'various acts of bribery.'" *United States v. Glecier*, 923 F.2d 496, 501 (7th Cir. 1991). Based on *Glecier*, the government contends that Defendants' point is moot at this stage: if the indictment would be sufficient absent any predicate acts, they argue, the inclusion of legally deficient predicate acts cannot warrant pre-trial dismissal. (Gov't Response at 52–53.) Defendants respond that the general test for sufficiency does not apply where, as here, an Indictment raises extraterritoriality concerns. (Def. Reply at 19.) Putting this issue aside, however, the court declines to dismiss the RICO charge on this ground, because the MLCA has

extraterritorial application to the conduct alleged here, and the Travel Act violation charged in the indictment is not extraterritorial.

### 1. The Money Laundering Control Act

The Money Laundering Control Act, 18 U.S.C. § 1956, criminalizes the transportation, a conspiracy to transport, or any attempt to transport money to or from the United States "with the intent to promote the carrying on of specified unlawful activity." *Id.* at §§ 1956(a)(2)(A), 1956(h). "[U]nlawful activity" in this context expressly includes "bribery of a [foreign] public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official" so long as the transaction occurs "in whole or in part in the United States." *Id.* at § 1956(c)(7)(B)(iv). By statute, the MLCA may be applied extraterritorially where, "in the case of a non-United States citizen, the conduct occurs in part in the United States" and "the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000." *Id.* at § 1956(f); *see also RJR Nabisco*, 136 S. Ct. at 2099 (accepting the Second Circuit's conclusion that the MLCA applies extraterritorially). Because neither Firtash nor Knopp is a United States citizen, both parties acknowledge that extraterritorial application of the MLCA requires that the relevant conduct occur "in whole or in part in the United States." (Gov't's Resp. [40] at 54–55 (quoting 18 U.S.C. § 1956(c)(7)(B)(iv))); (Def. Reply at 19.)

"Congress enacted the [MLCA] 'to criminalize the use of United States financial institutions as clearinghouses for criminal money laundering and conversion into United States currency.'" *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 93 (D.D.C. 2017) [hereinafter "*All Assets II*"] (quoting *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1 (D.D.C. 2008) [hereinafter "*All Assets I*"] and citing S. Rep. 99-433, at 2 (1986)), *reconsideration granted on other grounds sub nom. United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 315 F. Supp. 3d 90 (D.D.C. 2018) [hereinafter "*All Assets III*"]. Courts in

other districts[12] interpret the extraterritorial trigger in Section 1956(f) to effectuate this purpose, and generally hold that "a transfer from a foreign account to an account in a U.S. financial institution and a transfer from a U.S. account to a foreign financial institution occur in part in the United States under 18 U.S.C. § 1956(f)." *All Assets II*, 251 F. Supp. 3d at 93 (collecting cases). Defendants acknowledge and do not challenge this application of Section 1956(f). (Firtash MTD [24] at 12.)

The Indictment charges that Defendants "conspired . . . to transport, transmit, and transfer a monetary instrument and funds" (1) from a foreign country to New York, and (2) from New York and California "to and through a place outside the United States," all "with the intent to promote" a financial transaction involving bribery of an Indian public official. (Indictment [2] at 20.) The government has proffered that these allegations will be proven through evidence that "millions of dollars in bribe money was funneled through United States financial institutions, at times acting in their capacity as correspondent banks, in order to make bribe payments to Indian public officials." (Gov't's Resp. [40] at 53.) Additionally, the government proffers that evidence at trial will show that money was transferred into the United States to reimburse a co-conspirator operating within U.S. territory, and that "other transfers were destined for the benefit of third parties located within the United States who were designated as third-party beneficiaries of the bribes paid." (*Id.*) These allegations suffice to charge criminal conduct that falls within the extraterritorial reach of the MLCA.

In challenging this conclusion, Defendants cite a February 16, 2017 letter from the prosecutors (the "USAO") to the Republic of Austria Federal Ministry of Justice, in which the government presented it its basis for asserting jurisdiction in the United States. As Defendants read that letter, the government asserts extraterritorial jurisdiction based solely on the transfer of funds from a foreign country to another foreign country through a correspondent bank in the

---

[12] The court is not aware of any case from this district or the Seventh Circuit construing Section 1956(f).

United States. (Firtash MTD [24] at 11–12.) Defendants argue that such transactions do not amount to conduct occurring within the United States under Section 1956(f), and therefore that the MLCA does not reach Defendants' conduct. (*Id.*)

But this argument does not support dismissal of the Indictment at this stage, where the court reviews the Indictment on a practical basis and in its entirety, accepting all allegations as true. Because the Indictment does not specify that the government's proof is limited to correspondent bank transactions—and, indeed, the government has proffered that its proof is not so limited—Defendants are effectively challenging the government's ability to prove its case. Such merit-based arguments, even when intermeshed with jurisdictional questions, should be determined at trial. *Cf. United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998) (quoting *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1048 (11th Cir. 1987) ("[W]hen a question of federal subject matter jurisdiction is intermeshed with questions going to the merits, the issue should be determined at trial . . . . This is clearly the case when the jurisdictional requirement is also a substantive element of the offense charged."). The court therefore declines to dismiss the RICO charge on this basis.

### B. The Travel Act

The Travel Act, 18 U.S.C. § 1952, criminalizes "travel[ ] in interstate or foreign commerce . . . with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity," when the traveler "thereafter performs or attempts to perform" that activity. 18 U.S.C. § 1952(a)(1), (A). The federal aiding and abetting statute, moreover, provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 19 U.S.C. § 2. The Travel Act does not have extraterritorial reach. *See RJR Nabisco*, 136 S. Ct. at 2105. However, in *RJR Nabisco*, the Supreme Court held that "[i]f the conduct relevant to [a non-extraterritorial] statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *Id.* at 2101.

18

The Indictment sets out the elements of a domestic Travel Act violation, charging that on two occasions—once on July 5, 2009, and again on August 16, 2009—Defendants "traveled and caused another person to travel in interstate commerce from Chicago, Illinois, to Greensboro, North Carolina, with intent to promote, manage, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, namely, violation of [the MLCA]; and thereafter, the defendants did perform, cause to be performed and did aid and abet the performance of acts to promote manage, establish, and carry on and facilitate the promotion, management, establishment, and carrying on of said unlawful activity." (Indictment [2] at 22.)

Defendants contend that these allegations are insufficient because "[n]one of the travel listed in the Indictment is relevant to the Travel Act's focus," which, they argue, should be "the alleged conduct of non-U.S. companies and foreign nationals bribing Indian officials in India for a project to be undertaken in India." (Firtash MTD [24] at 15.) Specifically, Defendants claim that because Defendant Lal lived in North Carolina, his travel there in 2009 was "incidental to any other purpose he may have had." (*Id.* at 17.) They further assert that any travel done to meet with Company A was "not intended to advance and did not advance an illegal purpose." (*Id.* at 18.) These claims cannot be inferred from the text of the Indictment, and indeed directly contradict the Indictment's allegation that the relevant travel was in fact carried out with intent to promote unlawful activity.

The crux of Defendants' argument appears to be that if the Indictment does not defeat the possibility that the government's evidence will ultimately be insufficient for a conviction, then dismissal is appropriate. This is not the standard to which Indictments are held. The allegations in the Indictment, presumed to be true, sufficiently set out the elements of domestic Travel Act violations. Defendants' motion to dismiss the RICO charge as impermissibly extraterritorial is denied.

### III. Failure to State an Offense – Counts Two, Three, and Four

Defendants further argue that Count Two, which alleges a conspiracy to violate the MLCA, and Counts Three and Four, which allege violations of the Travel Act, should be dismissed. This section of Defendants' brief simply restates the arguments made to dismiss the RICO charge, and can be disposed of on the same grounds. For the reasons discussed above, the Indictment is sufficient as to all three counts.

### IV. Failure to State an Offense – Count Five

Defendants next argue that the court should dismiss Count Five. Count Five alleges that Defendants conspired, in violation of the federal aider and abettor statute, 18 U.S.C. § 2, and the federal conspiracy statute, *id.* at § 371, to violate the Foreign Corrupt Practices Act (the "FCPA"), 15 U.S.C. §§ 78dd-2(a) and 78dd-3(a). Pertinently, § 78dd-2(a) applies only to domestic concerns[13] and the agents thereof,[14] whereas § 78dd-3 applies only to foreign persons or businesses who take specified illegal acts while physically present in the United States. However, secondary liability charged via 18 U.S.C. §§ 2 or 371 generally applies regardless of whether the defendant himself is capable of committing the substantive offense. *See Salinas v. United States*, 522 U.S. 52 (1997).

Defendants dispute that the government has set out all the elements of these charges. According to Defendants, although the indictment charges only secondary liability under Sections 2 and 371, it must nevertheless also allege that Defendants each belong to the class of individuals capable of committing a substantive FCPA violation. Because the Indictment does not charge that either Firtash or Knopp is the agent of a domestic concern or a qualified foreign national,

---

[13]     Domestic concern is defined as either a "citizen, national, or resident of the United States" or a "corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or a territory, possession, or commonwealth of the United States." 15 U.S.C. § 78dd-2(h)(1).

[14]     Specifically, "any officer, director, employee, or agent of such domestic concern or any stockholder thereof acting on behalf of such domestic concern." 15 U.S.C. § 78dd-2(a).

accepting Defendants' argument would necessarily imply that the Indictment fails to set out an essential element of the offense.

Two doctrines are relevant to Defendants' argument: limits to secondary liability imposed by the common law, *see generally Gebardi v. United States*, 287 U.S. 112 (1932), and the presumption against extraterritorial application of statutes, *see generally RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016). It is well-established that "[a] conspirator need not agree to commit the substantive offense—or even be capable of committing it—in order to be convicted." *Ocasio v. United States*, 136 S.Ct. 1423, 1426 (2016). Interpreting the legislative history of the FCPA, however, the Second Circuit recently held that even when charged via the federal conspiracy or complicity statutes, "foreign nationals may only violate the [FCPA] outside the United States if they are agents, employees, officers, directors, or shareholders of an American issuer or domestic concern." *United States v. Hoskins*, 902 F.3d 69, 97 (2d Cir. 2018). *Hoskins* would thus require an additional element be alleged in any indictment for conspiracy or complicity where the substantive offense is (or would have been) an FCPA violation: that the defendant is the agent of a domestic concern or a qualified foreign national.

No such allegation is included in Count Five of the indictment for Firtash or Knopp; the government does not dispute this fact. The government observes, however, that controlling Seventh Circuit case law declines to impose the requirement recognized in *Hoskins*. The government is correct. Indeed, although the Seventh Circuit has not yet ruled on this precise question, its disagreement with the Second Circuit's approach in *Hoskins* is evident from a pair of existing cases discussing exceptions to secondary liability: *United States v. Amen*, 831 F.2d 373 (2d Cir. 1978) and *United States v. Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989).

In *Amen*, the Second Circuit considered the use of secondary liability to convict a defendant under the "Continuing criminal enterprise" statute, 12 U.S.C. § 848, also known as the federal "kingpin" statute. 831 F.2d at 381. The kingpin statute, "designed to reach the 'top brass' in the drug rings," sets out heightened criminal penalties for commission of certain felonies "in

concert with five or more other persons with respect to whom [the defendant] occupies a position of organizer, a supervisory position, or any other position of management" and "from whom [the defendant] obtains substantial income or resources." *Garrett v. United States*, 471 U.S. 773, 781 (1985) (quoting 12. U.S.C. § 848(2)). One of the defendants in *Amen*, Abbamonte, was convicted under the statute, and another defendant, Paradiso, was convicted for conspiracy and for aiding and abetting Abbamonte. *Amen*, 831 F.2d at 381. On appeal, Paradiso argued that because the kingpin statute expressly applies only to the head of an enterprise, one cannot incur liability for aiding and abetting such a person. *Id.*

The Second Circuit approached this problem by analyzing legislative history to determine whether Congress had intended for the kingpin statute to be covered by the already-existing aider and abettor and conspiracy laws. *Amen*, 831 F.2d at 381–82. The panel's analysis uncovered "no mention of aiders and abettors," and it thus determined that "the purpose of making [the kingpin statute] a new offense . . . was not to catch in [its] net those who aided and abetted the supervisors' activities." *Id.* at 382. Absent evidence that Congress's purpose in passing the substantive criminal statute was for secondary liability to apply, the Second Circuit refused to draw the conclusion that it did. *Id.* at 381 (holding that to be convicted under the kingpin statute, "one must meet all the requirements for a conviction under [the kingpin statute]"); *id.* at 381 ("[O]ne cannot incur liability for aiding and abetting [a person who violates the kingpin statute]."). The Second Circuit thus vacated Paradiso's convictions for conspiracy and for aiding and abetting Abbamonte's violation of the kingpin statute. *Id.* at 383.

Two years later, in *United States v. Pino-Perez*, the Seventh Circuit considered the same question, *en banc*, although only with regard to the federal aider and abettor statute.[15] 870 F.2d at 1231. Pino-Perez was a drug supplier for a criminal enterprise, not the leader of the enterprise.

---

[15] The *Pino-Perez* court was not asked to consider the applicability of the conspiracy statute, but this court concludes that its reasoning compels an identical conclusion, as discussed below.

*Id.* at 1232. On appeal from his conviction under the kingpin statute for aiding and abetting the operation of the enterprise, Pino-Perez made the same argument as that made in *Amen*: that aiding and abetting liability did not apply to the kingpin statute. *Id.* at 1233. But the Seventh Circuit panel departed from the Second Circuit, rejecting the *Amen* court's focus on legislative history, and explaining, "Congress doesn't have to think about aider and abettor liability when it passes a new criminal statute, because section 2(a) attaches automatically." *Id.* at 1233. It continued, "It would introduce great uncertainty into federal criminal law if the liability of a conceded aider and abettor depended on the results of an inquiry into Congress's intent concerning such liability in creating the offense that the defendant aided and abetted. Yet that is the inquiry required by *Amen*." *Id.* at 1234.

The Seventh Circuit held, therefore, that exclusions to the aider and abettor statute may only be derived from statutory text, and are limited to three circumstances. First, where "a 'crime is so defined that participation by another is necessary to its commission,' that other participant is not an aider and abettor." *Id.* at 1231 (quoting *United States v. Southard*, 700 F.2d 1, 20 (1st Cir. 1983). Second, where a participant is also "the victim of the crime," that participant may not be an aider and abettor. *Id.* at 1232. And third, where a participant is the "member[ ] of a group that the criminal statute seeks to protect," that participant may not be an aider and abettor. *Id.* (citing *Gebardi v. United States*, 287 U.S. 112, 123 (1932)). These three categories, the Seventh Circuit wrote, "exhaust the cases" in which "an inference can confidently be drawn that Congress in enacting a criminal statute meant to protect a class of accomplices from being charged as aiders and abettors." *Pino-Perez*, 870 F.2d at 1234.

The Seventh Circuit also noted an apparent tension between the Second Circuit's approach and Supreme Court precedent. In *Gebardi v. United States*, 287 U.S. 112 (1932), the Supreme Court held that the Mann Act, 18. U.S.C. § 397, which criminalized "the transportation [of] any woman or girl for the purpose of prostitution . . . or for any other immoral purpose," could not be used to punish a woman being transported. *Gebardi*, 287 U.S. at 112. In reaching this

conclusion, the *Gebardi* Court set two notable standards from which the Second Circuit appears to depart in *Amen*. For example, whereas the *Amen* court based its holding on the *absence* of evidence demonstrating an intent to create secondary liability, *Gebardi* directs that "to create an exemption from the ordinary rules of accessorial liability" there must be a showing of "an *affirmative* legislative policy." *Pino-Perez*, 870 F.2d at 1234 (first quoting *United States v. Falletta*, 523 F.2d 1198, 1200 (5th Cir. 1975), then quoting *Gebardi*, 287 U.S. at 123 (emphasis added)). Moreover, whereas *Amen* focuses heavily on legislative history, *Gebardi* (like *Pino-Perez*) infers legislative intent only from the text of the statute. *See Gebardi*, 287 U.S. at 123 ("[W]e perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished."). These variances informed the Seventh Circuit's departure from *Amen* and, as discussed below, those issues continue with *Hoskins*.

*United States v. Hoskins* follows closely in the footsteps of *Amen* and, with it, the reasoning rejected by the Seventh Circuit in *Pino-Perez*. There, the Second Circuit considered whether Hoskins, a foreign national, could be convicted under conspiracy or complicity theory for violating the FCPA, even if he belonged to none of the categories of persons expressly targeted by the FCPA.[16] *Hoskins*, 902 F.3d at 76. The Indictment charged that Hoskins was part of a scheme to secure a $118 million contract for his employer—the subsidiary of a global company with another subsidiary headquartered in the United States—by bribing Indonesian officials. *Id.* at 72. Although Hoskins never traveled to the United States while the bribery scheme was ongoing, the government alleged that several parts of the scheme occurred within the United States, and that Hoskins repeatedly emailed and called co-conspirators while they were in the United States. *Id.*

---

[16] For reasons not made clear in the opinion, the Second Circuit "assume[d] that Hoskins was neither an employee nor an agent of a domestic concern and therefore does not fall within the terms of the statute." *Hoskins*, 902 F.3d at 76.

Hoskins moved to dismiss the FCPA charge on the ground that the statute did not apply to him. *Id.* at 73. The district court granted Hoskins' motion, and the government appealed. *Id.* at 74.

By its own terms, the *Hoskins* opinion "focuse[d] on two cases": *Gebardi* and *Amen*. *Hoskins*, 902 F.3d at 78. Consistent with *Gebardi*, the Second Circuit's analysis began with a brief discussion of the text and structure of the statute. Then, echoing its holding in *Amen*, the Second Circuit observed that "an affirmative legislative policy can be discerned by looking to the statute's text, structure, *and legislative history*." *Hoskins*, 902 F.3d at 81 (emphasis added). Thereafter, the lion's share of the court's analysis centered on legislative history. *Compare id.* at 84–85 (two pages discussing the text and structure of the FCPA) *with id.* at 85–95 (ten pages discussing the FCPA's legislative history). And it was only after conducting this segment of its analysis that the court found a basis to exempt the defendant from conspiracy and complicity liability. *Compare id.* at 85 (noting, immediately after its discussion of text and structure, that "[t]he question thus becomes whether there is 'something more,' a policy basis for Congress to exclude Hoskins's category of defendants from criminal liability") *with id. at* 93 ("The strands of legislative history demonstrate, in several ways, the affirmative policy described above . . . ."). In focusing on legislative history, the Second Circuit thus relied on analysis that the Seventh Circuit has summarily determined is unreliable in this type of inquiry. *See Pino-Perez*, U.S. at 1233. And omitting that segment of the Second Circuit's analysis, as this court believes the Seventh Circuit would, eliminates any basis from which the court might infer an affirmative legislative policy.

Moreover, *Pino-Perez* lists only three circumstances in which "an inference can confidently be drawn that Congress in enacting a criminal statute meant to protect a class of accomplices from being charged as aiders and abettors." *Pino-Perez*, 870 F.2d at 1234. None describe the facts here. Neither Firtash nor Knopp can fairly be described as victims of the alleged crimes, nor are they members of a group the FCPA was designed to protect. And while they were certainly alleged to be involved in the alleged crimes, their participation as co-conspirators was not definitionally "essential" to the statute's violation.

Defendants correctly note that *Pino-Perez* did not deal with issues of extraterritoriality, and that the presumption against extraterritoriality arguably undermines assumptions on which *Pino-Perez* was based. The *Pino-Perez* court noted that "once that determination [that someone is an aider and abettor] is made, liability is automatic by virtue of section 2(a)," but that may not always be true where the defendant's actions are extraterritorial and the underlying statute has no extraterritorial application. *Pino-Perez*, 870 F.2d at 1234. *RJR Nabisco* did not address extraterritorial limits for conspiracy claims, but appears to acknowledge that legislative history can constrain a statute's extraterritorial application. Absent binding precedent on this issue, however, this court is unwilling to disregard clear guidance from the Seventh Circuit on this subject. For these reasons, Defendants' motion to dismiss Count Five is denied.

## V.    Due Process

Finally, Defendants Knopp and Firtash assert that their prosecution in the United States violates the Fifth Amendment's Due Process Clause. (Firtash MTD [24] at 1–2; Knopp MTD [30] at 11.) They argue that their contacts with the United States are so tenuous that prosecution here violates their constitutional rights. The parties debate whether the Defendants, who are aliens not present in the United States, and who are not detained by the United States, are entitled to due process protections at all. The court need not decide this issue here, however, as it concludes that prosecution of Firtash and Knopp in the United States does not violate the Fifth Amendment's Due Process Clause.

The Defendants and the Government agree that Defendants' presumed due process rights should be assessed using principles of international law, as laid out in the Restatement (Third) of Foreign Relations Law (1987) ("Restatement").[17] *See In re Hijazi*, 589 F.3d 401, 412

---

[17]    Instead of turning to international law principles, some circuits instead employ a "sufficient nexus" test of due process: "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Yousef*, 327 F.3d 56, 112 (2d Cir. 2003) (quoting *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990)). *See also United States v. Reumayr*, 530 F. Supp. 2d

(7th Cir. 2009) (looking to the Restatement (Third) of Foreign Relations Law to determine whether a criminal defendant's "contacts are adequate to support the U.S. proceeding" against a defendant abroad); *United States v. Hijazi*, 245 F.Supp. 2d 874, 883 (C.D. Ill. 2011) (interpreting the Seventh Circuit's *Hijazi* opinion as an instruction to analyze due process "under the rubric of international law"). *See also United States v. Kashamu*, 15 F. Supp. 3d 854, 866 (N.D. Ill. 2014) (interpreting *Hijazi* as directing lower courts to analyze due process arguments under the Restatement (Third) of Foreign Relations Law). The court agrees with the parties and the courts in this district and proceeds under that line of analysis.

## A. Restatement § 402 – Grounds for Jurisdiction

Section 402 of the Restatement recounts the principles of international law that limit a state's ability to reach conduct outside of its own borders. Section 402 of the Restatement provides that:

> Subject to § 403 [discussed below], a state has jurisdiction to prescribe law with respect to
> (1)     (a) conduct that, wholly or in substantial part, takes place within its territory;
>          (b) the status of persons, or interests in things, present within its territory;
>          (c) conduct outside its territory that has or is intended to have substantial effect within its territory;
> . . . [and]
> (3) certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests.

Any single ground under § 402 is sufficient to support jurisdiction in accordance with the Due Process Clause. *United States v. Kashamu*, 15 F. Supp. 3d 854, 867 (N.D. Ill. 2014). But Defendants Knopp and Firtash claim that the Indictment violates their due process rights under each relevant sub-section—they argue that their activity did not take place in the United States, it

---

1210, 1223 (D.N.M. 2008) (explaining that "the Ninth and Second Circuits have adopted the strongest statement of due process rights").

   Other circuits have approached the question through a lens of international law. *See, for example*, *United States v. Cardales*, 168 F.2d 548, 553 (1st Cir. 1999) (rejecting the sufficient nexus test, and instead looking to "principles of international law" to determine if due process had been satisfied in a prosecution under the Maritime Drug Law Enforcement Act). This court finds that the Seventh Circuit has indicated its support for the latter approach through its opinion in *In re Hijazi*, 589 F.3d.

did not have a substantial effect on the United States, and it was not intended to have a substantial effect on the United States. They additionally assert that the conduct did not affect the security interests of the United States. The court finds none of the arguments compelling.

The first provision of § 402—permitting jurisdiction over any conduct that, in substantial part, takes place within the United States—proves sufficient here. *See* Restatement § 402(1)(a); *United States v. Leija-Sanchez*, 602 F.3d 797, 800, 801 (7th Cir. 2010), *as amended on denial of reh'g and reh'g en banc* (May 21, 2010) (reversing the dismissal of an indictment, where a defendant "arrang[ed] and pa[id] for the murder" of a business competitor in Mexico from the United States, in order to benefit the defendant's U.S. criminal syndicate, because the defendant's conduct "took place 'in substantial part'" in the U.S. and his conduct had a substantial effect in the U.S.). The indictment here charges Defendants Knopp and Firtash with conspiracy and aiding and abetting across five counts. One co-conspirator, Mr. Lal, resided in the United States during the course of the conspiracy. (Indictment [2] at 5.) Mr. Lal allegedly flew to and from the United States to meet with Defendant Firtash "in advance of Firtash's meeting with Chief Minister YSR Reddy," (Sealed Affidavit [16] Ex. D, at ¶ 39), and Mr. Lal sent emails to Defendant Knopp, from the U.S., with an email address hosted on servers in the United States, regarding the bribery plan. (*Id.* at ¶¶ 32, 39, 40, 41.) Mr. Lal sent at least one additional email from the United States instructing an assistant to pay out bribe money (*id.* at ¶ 42), and he allegedly traveled from North Carolina to New York to "attend a meeting with representatives of Company D for the purpose of soliciting the participation of Company D in the project." (Indictment [2] at 18.) Another co-conspirator, Mr. Gevorgyan, traveled within the United States to meet with representatives of Company A multiple times. (*Id.* at 17.) And, "one or more of the conspirators used and caused the use of cellular telephones . . . operated on the interstate network of AT&T" in furtherance of the alleged unlawful activity. (*Id.* at 19.) These acts were part of an alleged conspiracy that aimed, in part, to "supply 5,000,000 to 12,000,000 pounds of titanium sponge to" a Chicago-headquartered company. (*Id.* at 3.)

Further, the Indictment lists millions of dollars of alleged bribe money that went to, from, or through the United States. (*Id.* at 11–16; *id.* at Schedule A.[18]  *See also id.* at 20 (charging, in Count Two, that defendants "conspired with each other . . . to transport, transmit, and transfer a monetary instrument and funds to New York, . . . from a place outside the United States, and from New York and California . . . to and through a place outside the United States").)  The transfers were allegedly facilitated by businesses controlled by Defendant Firtash, carried out under the direction of Mr. Firtash, and with the involvement of Defendant Knopp.  (Indictment [2] at 6–7; Sealed Affidavit [16] Ex. D, at ¶ 50.)

These acts are sufficient to subject the Defendants to prosecution in the United States in accordance with the requirements of due process.  While there is little case law discussing § 402(1)(a), cases discussing jurisdiction and extraterritoriality generally support this conclusion. In *Leija-Sanchez*, the Seventh Circuit reversed the dismissal of an indictment of a defendant who, from the United States, "arrang[ed] and pa[id] for the murder" of a business competitor in Mexico. 602 F.3d, at 798, 800.  "[S]ome of the acts (planning and payment) occurred in the United States, one (the killing) occurred abroad; and the objective (reduced competition for Leija-Sanchez' syndicate) was realized in the United States."  *Id.* at 800.  Reversing the dismissal, the circuit court explained that "[w]hen an international cartel has effects both within and without our borders, American law applies to at least the domestic effects, even when many (if not all) of the acts producing those adverse effects occur abroad."  *Id.* at 801.

In contrast, the district court in *United States v. Sidorenko*, 102 F. Supp. 3d 1124 (N.D. Cal. 2015) found that prosecution in the U.S. violated defendants' due process rights.  The United States there charged three defendants with a host of charges arising out of a scheme in which two non-U.S. citizens living in Dubai bribed an employee of a Canada-based U.N. agency.  The

---

[18]    Though the companies listed in Indictment Schedule A are almost entirely organized and based outside of the United States, the transfers were allegedly completed using United States financial institutions.  (*See, for example*, Sealed Affidavit [16] Ex. D, at ¶¶ 41, 55–59.)

bribe was intended to benefit a "Ukrainian conglomerate of companies," *id.* at 1126, and the only connection to the United States was that the United States made monetary contributions to the U.N. agency. The court explained that "[a]ll of this conduct occurred outside of the United States between three defendants who are not United States citizens, who never worked in the United States, and whose use of wires did not reach or pass through the United States." *Id.* at 1127. In the case before the court, as in *Leija-Sanchez*, and unlike *Sidorenko*, substantial conspiratorial activity took place in the United States, even if the bribes themselves were aimed at foreign officials, and the bribery money allegedly flowed through United States financial institutions.

The court recognizes that, unlike the defendant in *Leija-Sanchez*, Defendants Knopp and Firtash may not have personally been in the United States during the conspiracy.[19] Their co-conspirators took substantial actions in the United States in furtherance of the conspiracy, however. *United States v. Columba-Colella*, 604 F.2d 356 (5th Cir. 1979) suggests that this allegation of conspiracy is sufficient for the court to exercise jurisdiction over all co-conspirators. There, the defendant was a British-Mexican citizen, living in Mexico, who agreed to help another individual sell a car in Mexico. The sole connection between the defendant and the United States was the fact that the car's seller had informed the defendant "that the car had been stolen in El Paso, Texas." *Id.* at 358. Finding that the court lacked jurisdiction over the defendant, the court explained:

> There is no basis for jurisdiction over the defendant . . . He is not a United States citizen. He has not threatened the security of this country or interfered with its governmental function. Although the objective territorial theory applies,[20] the fact that no conspiracy has been alleged means that the theory does not support jurisdiction in the case.

---

[19]    As noted earlier, however, the Government claims that its "evidence at trial will show that Knopp took acts in furtherance of the conspiracy within the territory of the United States." (Gov't's Resp. [40] at 79 n.40.)

[20]    "The objective territorial theory . . . requires that before a state may attach criminal consequences to an extraterritorial act, the act must be intended to have an effect within the state." *United States v. Columba-Colella*, 604 F.2d 356, 358 (5th Cir. 1979). This theory is discussed in more depth below.

> Had a conspiracy been demonstrated, the defendant could be said to have been engaged in a criminal enterprise, an essential element of which, the theft, occurred in the United States. Had [Defendant] Columba-Colella's intent anticipated and embraced the car theft in Texas, that act could be imputed to him.

*Id.* at 359. Unlike *Columba-Colella*, the indictment here *does* charge the Defendants with a conspiracy that took place, in substantial part, in the United States.[21] *See also Salinas v. United States*, 522 U.S. 52, 64 (1997) ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."). (*See* Indictment [2] at 6 (alleging that Firtash "was the leader of the enterprise"); *id.* at 7 (alleging that Knopp "occupied a supervisory role in the enterprise").)

The Defendants make several counterarguments. First, they list types of activity that did *not* occur in the United States: no meetings with Indian officials took place in the United States, none of the project's mining operations took place in the United States, and the government makes no allegations that "the titanium sponge meant for sale to Company A was improperly priced based on the alleged bribery scheme." (Dfs.' Joint Reply [47] at 38.) That many events did not happen in the United States does not alter the fact that a substantial part of the conspiratorial activity *did* take place in the United States. Defendants also argue that Mr. Lal's enterprise-related activity in the United States was "incidental[ ] because he resided there," and that it should therefore not be considered "substantial criminal activity in the United States."[22] (*Id.* at 39.) Defendants have offered no authority to support the notion that Defendant Lal's residence in the United States militates against prosecuting acts in which he was involved. Thus, the court

---

[21]   In fact, Defendants recognize their potential liability for their co-conspirators' actions. (Dfs.' Joint Reply [47] at 38 (arguing that "the allegations in the Indictment reveal that the actions of others in the United States, for which Defendants would be responsible only under the layers of conspiracy charges crafted into the Indictment, were minimal, incidental, and non-criminal").)

[22]   This phrasing by the Defendants is misleading. Pursuant to Restatement § 402(1)(a), a nation has the power to prescribe laws regarding "conduct that, wholly or in substantial part, takes place within its territory."

finds that substantial conduct of the conspiracy occurred in the United States. This subjects the Defendants to this court's jurisdiction, in accordance with their presumed due process rights.

Though the court need not reach this ground, this prosecution also satisfies the Fifth Amendment's due process requirements under Restatement § 402(1)(c)—providing for laws that proscribe conduct outside of a nation's territory when that conduct "has or is intended to have substantial effect within its territory." This is also called the objective territorial theory of international law. *Hijazi*, 845 F. Supp. 2d at 883. The government alleges that "[i]n or around February 2007, Company A entered into a memorandum of agreement with Ostchem Holding AG, by and through Bothli Trade AG," a company over which Firtash exercised control. (Indictment [2] at 3.) "The agreement specified that the parties would work towards entering a supply agreement whereby Bothli Trade AG would supply 5,000,000 to 12,000,000 pounds of titanium sponge to Company A on an annual basis. The titanium sponge to be supplied to Company A was to be derived from the project" in India. (*Id.*) Members of the conspiracy also allegedly met with officers of Company A in the U.S. multiple times; travelled to, from, and within the United States; gave orders and directions from within the United States; and transferred money to, from, and through the United States. These efforts to introduce a product, derived from the illegal bribery of foreign officials, into the United States market constitutes, at minimum, an intent to have a substantial effect within U.S. territory. *See* § 403(1)(c).

The Defendants claim that, because the agreement with Company A never resulted in an actual purchase, it is insufficient to constitute conduct that had or was intended to have a substantial effect in the United States. Again, the court disagrees. Section 402(1)(c) only requires that behavior be *intended* to have a substantial effect within the United States. Defendants also argue that if their "minor incidental 'connections' to the United States could serve as the basis of jurisdiction, almost any business transaction could, rendering . . . the presumption against United States jurisdiction voice by the Supreme Court in *Microsoft* [*v. AT&T Corp.*, 550 U.S. 437 (2007)] meaningless." (Firtash MTD [25] at 28.) *See Microsoft*, 550 U.S. at 454–55 (2007) ("The

presumption that United States law governs domestically but does not rule the world applies with particular force in *patent* law.") (emphasis added). The court disagrees with Defendants' characterization of their connections to the U.S. as minor and incidental. Further, *Microsoft*, a patent dispute, focuses specifically on interpreting the extraterritoriality of the Patent Act and not on due process. In that case the defendant AT&T claimed, and Microsoft conceded, that a portion of code in Microsoft's operating system software had "the potential to infringe" a patent held by AT&T. *Microsoft*, 550 U.S. at 441. Microsoft's software was being loaded onto new computers abroad by a foreign manufacturer from a Microsoft "master disk or electronic transmission dispatched by Microsoft from the United States." *Id.* at 442. The Supreme Court acknowledged the "traditional understanding that our patent law operates only domestically and does not extend to foreign activities." *Id.* at 455 (citation and internal quotation marks and modifications omitted). The only potential exception to that rule is Section 271(f) of the Patent Act, which provides that patent infringement occurs when "one supplies . . . from the United States for combination abroad, a patented invention's components." *Id.* at 441 (internal quotation marks omitted). The Court found that the Microsoft code, when sent from the United States, did not constitute a " 'component' amenable to 'combination,' " and that therefore Section 271(f) was not violated. *Id.* at 449. Thus, the *Microsoft* court focused specifically on the extraterritorial application of U.S. patent law, without any mention of due process concerns. Here, the court found above that the pertinent criminal statutes apply extraterritorially, and nothing in *Microsoft* convinces the court that the Defendants' contacts are so minimal that their prosecution in the United States would violate the Due Process Clause.[23]

---

[23] Defendants also feebly argue that Company A "could not have suffered" as a result of the alleged enterprise. This misconstrues the requirement under § 402—the pertinent provision asks whether the defendant's conduct "has or is intended to have a substantial effect in [the] territory," not whether there has been a substantial effect on any particular party. Restatement § 402(1)(c).

The Defendants also cite several cases that analyze jurisdiction and due process under the sufficient nexus test instead of under international law principles. For example, in *United States v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006), the Ninth Circuit concluded that the United States had no jurisdiction over a criminal prosecution arising out of the seizure of 1,964 kilograms of cocaine from two vessels—one Columbian, and one stateless—in "the Eastern waters of the Pacific off the coasts of Ecuador, Columbia, and Peru." *Id.* at 1152. The United States ultimately detained several individuals from the vessels and recovered 1,964 kilograms of cocaine. *Id.* at 1156. The defendants argued that they lacked any nexus with the United States sufficient to support jurisdiction, and the Ninth Circuit agreed. *Id.* at 1169 (directing the district court to dismiss the indictment, when the government had not "establish[ed] [any] detrimental effect within, or nexus to, the United States.") That court pointed out that " 'prohibiting foreigners on foreign ships 500 miles offshore from possessing drugs that . . . might be bound for Canada, South America, or Zanzibar' . . . has been repeatedly called into question." *Id.* at 1162 (quoting *United States v. Robinson*, 843 F.2d 1, 3 (1st Cir. 1998)). Unlike *Perlaza*, the Defendants' enterprise here has already conducted activity in the United States and attempted to sell their product to a U.S. company. Defendants also cite *Columba-Colella*, the Mexican car sale case discussed above, where the court found jurisdiction lacking. 604 F.2d 356 (5th Cir. 1979). The Fifth Circuit later clarified that *Columbo-Colella* was a case "in which *all* of defendant's criminal acts took place in Mexico." *United States v. Davis*, 608 F.2d 555, 557 (5th Cir. 1979). That is simply not the case here, given the allegations of conspiracy and criminal enterprise, and none of these "sufficient nexus" cases defeat the conclusion that the court has jurisdiction.

Defendants attempt to liken their case to those where the court has found jurisdiction lacking. In *Abelesz v. OTP Bank*, 692 F.3d 638 (7th Cir. 2012), for example, survivors of the Holocaust and their next of kin filed a civil suit against two Hungarian banks for their role in the expropriation of Hungarian Jews' property. The circuit court, conducting the civil jurisdictional analysis required by due process, the Seventh Circuit concluded that "Plaintiffs' claims do not

arise out of any business contacts these defendants have with the United States, so specific personal jurisdiction does not apply here." *Id.* at 651. The court further found that it lacked general jurisdiction because the defendant banks' "contacts with the United States simply do not come close to meeting the 'essentially at home' standard needed to exercise general jurisdiction over a foreign defendant." *Id.* at 653. *See id.* at 654 (noting that "the constitution requirement for general jurisdiction [ ] is 'considerably more stringent' than that required for specific jurisdiction") (quoting *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003)). Those contacts included that both banks had account holders with U.S. mailing addresses; both had "correspondent banking and contractual relationships with U.S. banks and other companies"; both had personnel that had "traveled to the United States on business trips"; and one of the banks advertised in "U.S. publications and in media that targets part of the U.S. audience." *Id.* at 656. However, the court there did not consider these contacts to be "so continuous and systematic as to render [defendants] essentially at home in the forum." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Here, however, the court finds that the Defendants' conduct has had a substantial effect in the U.S., rendering jurisdiction over the case constitutional.

Finally, the Defendants attempt to distinguish this prosecution from others in which courts have exercised jurisdiction. They point out that the *In re Hijazi* defendant's fraudulent agreements with a U.S. Army subcontractor "were intended to have a substantial effect on the United States, namely the theft of millions of dollars from its treasury," 845 F. Supp. 2d at 884, while their alleged crimes took no money from the U.S. government. True enough, but the statute does not require the "substantial effect" be felt by a government. The Defendants also attempt to distinguish their alleged conduct from that of terrorism and drug trafficking defendants, using more cases from circuits that utilize the substantial nexus test. The court fully understands that Defendants Knopp and Firtash have not "conspire[ed] to kill U.S. officers," *United States v. Al Kassar*, 660 F.3d 108, 115 (2d Cir. 2011), nor conspired to "detain U.S. nationals," *United States v. Mostafa*, 965 F.

Supp. 2d 451, 456 (S.D.N.Y. 2013), nor attempted to smuggle drugs into the United States. *Davis*, 905 F.2d at 245. However, these cases do not address the "substantial effect" standard of § 402(1)(c). Instead, they speak to Defendants' argument under Restatement § 402(3) that their activity has not severely impacted the security interests of the United States. The court does not reach that argument here.

Ultimately, the court finds that the Defendants' conspiracy was intended to have a substantial effect in the United States. This further supports the court's assertion of jurisdiction over Defendants without violating the Due Process Clause.

### B.    Restatement § 403 – Reasonableness

Even if a court has jurisdiction pursuant to a principle of international law laid out in Restatement § 402, a state is prohibited from exercising that jurisdiction when it would be unreasonable. Restatement § 403(1). Reasonableness "is determined by evaluating all relevant factors," including, but not limited to:

> (a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
> . . .
> (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
> (d) the existence of justified expectations that might be protected or hurt by the regulation;
> . . .
> (f) the extent to which the regulation is consistent with the traditions of the international system; [and]
> (g) the extent to which another state may have an interest in regulating the activity;

Restatement § 403(2). Defendants claim that their prosecution is unreasonable under these factors, and that the court's exercise of jurisdiction over them therefore violates their right to due process. This argument, too, fails. As discussed above, Defendants' alleged activity was intended to have a substantial effect within the United States. The facts establishing jurisdiction under §§ 402(1)(a) and (c) similarly establish a link between Defendants and the United States sufficient to render jurisdiction reasonable.

36

Defendants make their most lengthy reasonability argument under § 403(2)(g), arguing that "India, not the United States" has an interest in regulating the alleged conduct. (Firtash MTD [24] at 34.) India very well may have a significant interest in the alleged criminal activity in this case. But that interest does not require the conclusion that the United States must stand aside and decline to prosecute conduct that reaches into and is intended to affect the United States. The cases on which Defendants depend do not convince the court otherwise.

In *United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 314 (S.D.N.Y. 2009), the U.S. government brought a civil action against Lloyds Bank, seeking a civil penalty for Lloyds' alleged violation of the Money Laundering Control Act ("MCLA"). Lloyds was "organized and existing under the laws of the United Kingdom of Great Britain and Northern Ireland" and maintained a branch in Geneva, Switzerland. *Id.* at 315. The bank had allegedly "made it possible, and in many instances easy, for" an alleged money launderer named Lycourgos Kyprianou "to launder the proceeds of his criminal and fraudulent conduct through Lloyds' accounts." *Id.* at 315. Kyprianou also "maintained or controlled accounts at the Bank's Geneva branch." *Id.* The district court held that it lacked extraterritorial jurisdiction over the bank under the MCLA because the government's civil complaint failed to allege facts necessary to tie the defendant bank to the underlying conspiracy, which was the only hook for subject matter jurisdiction. *Id.* at 319, 323–24 ("[T]his Court lacks subject matter jurisdiction over Lloyds TSB, which is not named as a participant in the underlying fraud conspiracy in the United States, and whose conduct consisted exclusively of transfers between its branch in Geneva, Switzerland and other European banks."). Unlike *Lloyds*, the government here has alleged facts that tie Firtash and Knopp to the activity of a criminal enterprise with substantial activity in the United States.

Briefly ruling in the alternative, the *Lloyds* court also noted Restatement "§ 403(3)(g)" (presumably an erroneous reference to § 403(2)(g)). *See Lloyds*, 639 F. Supp. 2d at 325 (noting "that one of the Restatement factors is 'the extent to which another state may have an interest in regulating the activity'"). Citing that provision, the court determined that, in any case,

"Switzerland's interest in regulating the conduct of banks within its borders, particularly where the bank is a leading financial services provider in the country, is great," and, therefore, that an exercise of jurisdiction by the court would be unreasonable. *Id.* (noting, in footnote 6, the foreign relations implications of such a prosecution) (citing *LaSala v. TSB Bank, PLC*, 514 F. Supp. 2d 447, 465 (S.D.N.Y. 2007) (conducting a "last place" analysis to determine a choice of law issue in a civil case)). This court disagrees that the indictment of Firtash and Knopp would be similarly unreasonable, given that the alleged criminal enterprise's activity took place, in substantial part, in the United States and was intended to have a substantial effect in the United States.[24]

Finally, Defendants cite *United States v. Javino*, 960 F.2d 1137 (2d Cir. 1992) in support of their reasonability argument. There, an indictment charged the defendant with provisions of the National Firearms Act (NFA) criminalizing the "receipt and possession of a destructive device 'made' in violation of the Act." *Id.* at 1142 (citing 26 U.S.C. §§ 5822, 5861(c)). Defendant Javino was charged with possession of a bomb; following his conviction, he contended that the government failed to prove the bomb was made in the United States. *Javino*, 960 F.2d at 1141. The court therefore analyzed the extraterritorial application of the NFA provisions in question, including a Restatement § 403 analysis. Without going into further detail, the Second Circuit explained that "in light of the substantial interests that other countries have in regulating the manufacture of firearms within their own borders, and the attenuated impact that a foreign-made firearm is likely to have within this country—unless the firearm is imported into the United States— application of § 5822 to all foreign manufacturers would likely be ruled unreasonable." *Javino*, 960 F.2d at 1143. The facts of that case—analyzing the extraterritorial application of an NFA statute—bear little relation to the reasonability analysis here—where the court has already found

---

[24] Defendants also cite *Europe & Overseas Commodity Traders, SA v. Banque Paribas London*, 147 F.3d 118, 131 (2d Cir. 1988) without citing or explaining its abrogation by *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).

that the underlying statutes apply extraterritorially, and where conspiratorial activity within the United States squarely places the defendants within the jurisdiction of this court.

Ultimately, the prosecution of Defendants Knopp and Firtash in the United States is not unreasonable under any combination of § 403(2) factors and does not violate any of their rights to due process granted by the United States Constitution.

## **CONCLUSION**

For the reasons stated herein, Defendants' motions to dismiss [24, 30] are denied.

ENTER:

Dated: June 21, 2019

_____
REBECCA R. PALLMEYER
United States District Judge